IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,        )        Cr. No. 4:02-992-JFA
                                 )
                                 )
VERSUS                           )        Columbia, SC
                                 )        January 30, 2012
BRANDON LEON BASHAM,             )
                                 )
     Defendant.                  )
                                 )
 ---------------------------)


          TRANSCRIPT OF SATELLITE/TELEPHONE CONFERENCE
          BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
                 UNITED STATES DISTRICT JUDGE


Appearances:

For the Government:        ROBERT F. DALEY, JR., ESQ.
                           JIMMIE EWING, ESQ.
                           JEFFREY M. JOHNSON, ESQ.
                           Assistant U.S. Attorneys
                           1441 Main Street, Suite 500
                           Columbia, SC  29201

For the Defendant:         MICHAEL L. BURKE, ESQ. (By satellite)
                           SARAH ELIZABETH STONE, ESQ. (By phone)
                           Arizona Federal Public Defenders
                           850 West Adams, Suite 201
                           Phoenix, AZ  85007

                           JULIA G. MIMMS, ESQ. (By phone)
                           1001 Elizabeth Ave., Suite 1A
                           Charlotte, NC  28204


Court Reporter:        Gary N. Smith, CM
                       901 Richland Street
                       Columbia, SC  29201
                       (803) 256-7743

          Stenotype/Computer-aided Transcription

THE COURT:  Good morning, this is Judge Joe Anderson -- I'm sorry, be seated.  This is Judge Joe Anderson, I'm here in Columbia.  Present in the courtroom are the two United States Attorneys handling this case for the government, along with some FBI agents.

I have my law clerks here and courtroom deputy and court reporter, and I understand we have by way of satellite Mr. Brandon Leon Basham, the defendant in this case, along with one of his attorneys.

Mr. Burke, is that you there on the satellite?

MR. BURKE:  Yes, it is, Your Honor.

THE COURT:  Do we have anyone else participating by way of satellite?

THE CLERK:  They are on the phone.

THE COURT:  All right.  Ms. Julia Mimms and Sarah Stone are on the telephone hookup; is that correct?

MS. STONE:  That's correct, Your Honor.

MS. MIMMS:  Correct, Your Honor.

THE COURT:  For the record, this the case of the United States of America versus Brandon Leon Basham, and it is case number 4:02-992.  That's the original criminal case number but it's the same number retained for this action, which has been filed pursuant to 28 USC Section 2255.

Mr. Basham, can you hear me this morning?

THE DEFENDANT:  Yes, I can hear you.

THE COURT:  The purpose of us getting together on the satellite this morning, as you know, back in June of last year you filed on your own behalf, not through your attorneys, a motion with this court asking to withdraw your appeals in this case.  And that would have the net result of you being executed without any further legal proceedings.

I deliberately did not act upon that motion as soon as I received it because my experience with your co-defendant was that he filed a similar request on four occasions, and each time he filed it, a few weeks later he would withdraw it.  So, I did not want to act hastily on your motion.

Then sometime several months thereafter we had a satellite conference call to talk about the briefing schedule and so forth on your pending 2255 petition, and you spoke up and asked me about your pending request to drop your appeals.

Since you seemed to be sincere at that time, I scheduled an examination -- a competency examination and selected Dr. George Parker in Indianapolis to visit with you, to examine you, to give me an opinion as to whether you were competent.

The defense lawyers then asked for permission to have Dr. Donna Schwartz-Watts, a local medical professional, fly out there to visit with you, and she did that back in early January.

The reason we are here today is, your lawyers

suggested in a phone conference call last week that you may have possibly changed your mind or may be thinking about changing your mind, or something to that effect.

And so before we go further with proceedings and plans for a hearing out there in Indiana, I just need to find out from you what your intentions are, and that's the purpose of getting you here on the satellite this morning.

THE DEFENDANT:  Yes, sir.  First I would like to say, I apologize for any inconvenience for the courts or anybody.  I did not realize that it was going to be -- I don't think that my attorney knew it was going to be this difficult or this much of a problem to get a call or to be able to talk to you.

My thing is this, I mean, as you can probably understand, this not only affects me, it affects my family, it affects people around me, the decision that I'm making.  You know, I talked to the doctor, at y'all's request, and I have been steadfast all the way through all of this.

And to be quite honest, I'm being pulled in every direction.  My family don't want me to do it -- or some parts of my family understand and other parts don't.  My dad don't want me to do it, you know, his religion and things.  The lawyers talk to me, kind of they think I have a good case.

Me, myself, I'm just tired of being miserable.  I feel like I'm on the verge of a nervous breakdown as I was when I was in South Carolina, as you well remember at the time.  I

do not take this stress very well.  I have been doing a whole lot better, I believe, because of my learning to adjust and having to deal with it over the years, and my maturing.

But honestly, to be honest with you, I'm to that point I can feel it building inside of me, and I don't know how to get it out.  I don't know what to do, to be honest.  I -- after -- since being here, after -- this is just a few years ago they had started -- you know, as you well know, I was on a lot of medication.  And when I got here they left me on for a while, for a couple of years, actually.

Just recently they have taken me off of them, and I have done nothing but sit in my cell because I can't -- and this is -- well, I talked to that doctor, Ms. Schwartz-Watts, and she helped me to understand some things that I wasn't seeing too clearly.

And I think that's -- I'm not very good at explaining myself.  I guess what -- I mean, I don't -- I don't get what -- like right now, kind of like right now, I'm tongue-tied, I can't -- I get -- everything is running through my head like a 100 mile-an-hour freight train.  Do you understand?

I mean, I can't -- in spite -- well, I can't get it out.  All right.  So I -- what I guess -- he helped me write something here, I will read it for you.

"I am very stressed out.  I feel like I am on the verge of a nervous breakdown.  I was on medication for a few

years here but then they took me off of everything because it is non -- non-formulary.  So, they said I didn't need them any more.  Without my meds I am miserable.  I cannot concentrate and talk to my lawyers or even to my family.  I cannot control my emotions.  I explode and make things worse, or I get very depressed.

"I asked to waive my appeals because without -- without the medication I feel like I didn't have any other choice.  I don't know what to do any more.  In the past few weeks my medications have been doubled.  I am able to sleep better and feel a little better, but not like a normal --"

I guess when I say normal, is to be able to function and things.  The only way I have been able to cope is to lay in my cell and sleep for days at a time.

I mean, I don't -- or -- or -- or sometimes I can't even sleep.  I have slept for days at a time.  I don't really -- I can't have a routine.  And I guess what I'm asking for is -- I'm not going back on what I want.

I mean, the only thing I'm asking for is -- and I guess maybe it's to -- maybe it's my conscience doing this also, the doctors and people that come see me, even that Parker fellow, the guy that you sent up here, right, he even agreed to -- yes, I'm competent and things, he said he had to think on it.  He had issues with my -- what I'm doing, and he said that -- you know, morals and things.

But, I mean, I guess by talking to these people and my family, they would just like to be able to see me and be able to talk to me like I used to be when I was more able to communicate better and be part of the family -- even though I'm in prison, I guess I gave -- I have given up. Does that make sense?

I have given up because of my circumstances. I just say I can't -- I can't be out there, so just let me die. Does that make sense? And that's what I have done.

I guess so today what I come to you to ask you is, if you could help me to be able to get on my medications that I was on to help me make me feel like -- you know, so maybe I can make a conscious decision to see if maybe -- if they are right or whether they are wrong. Did that make sense to you? I mean --

THE COURT: I'm --

THE DEFENDANT: The doctors say they feel if I was on my meds I wouldn't be so depressed and so -- am I making any sense here?

MR. BURKE: Yes, you are making --

THE DEFENDANT: I'm rambling on here.

MR. BURKE: No, that' fine. I don't think the judge will be able to answer your question about --

THE DEFENDANT: Well --

THE COURT: Mr. Basham, let me just say, if I

understand what you just told me then, in response to my question whether you want to pursue or go forward with your request to drop your appeal, you said you don't want to make that decision right now until you can get back on the medications that you think you need; is that right?

THE DEFENDANT:  Right.  And what the doctors say that I need to make me to be able to think more clearly and be able to at least -- and even if -- even if I do get on it, and like I told the doctors and my family, even if I do get on medication, I still may not change -- I mean, I still may go through with what I'm doing here.

I have already went this far and I'm not going to trouble the courts and everybody and just turn around and say no.  But I would like to be able to, for the last few days of my life here, to be able to communicate with my family and not be depressed and -- and not be able to get my feelings out to them for the last little bit of time that I have left with them.  Does that make sense?

THE COURT:  All right.  Well, I'm not sure I have authority to order the prison to let you have more contact with your family, that's a security issue that is really beyond my authority, I believe.

Also, with regard to the medicine, I don't know that I can order the prison to give you medicine.  I can perhaps hear from the prison doctors and nurses who do the medicine

prescribing to find out what their recommendations are.

THE DEFENDANT:  Well, I think, I think it kind of come down to the same thing that like Ms. Schwartz-Watts pointed out and Dr. Morgan, remember when I was in Columbia Care Center and I wasn't getting proper -- properly my meds and things like I was, when I had -- when I was at the jail and things.  And then you did the order for Dr. Morgan, you know -- you remember Dr. Morgan, right?

THE COURT:  Yes, sir.

THE DEFENDANT:  From the case?  Okay.  You had him to come in and treat me, you know, side line -- I guess that's what we are trying to get, so that I can get leveled out and on, you know, track to be able to at least deal with this and not explode and blow up.  And also to be able to talk to people more rationally and be able to get the things I'm trying to say out.

Like, help me out here.

MR. BURKE:  Well, I don't want to speak for Mr. Basham.  I think, Your Honor, one of the things -- and correct me if I'm wrong -- that you said to me earlier was that you don't care if your 2255 proceeding goes forward?

THE DEFENDANT:  Right.

MR. BURKE:  You just want to be medicated?

THE DEFENDANT:  Right.

MR. BURKE:  So that you can communicate with your

lawyers and your family?

THE DEFENDANT:  Right.

THE COURT:  Well, Dr. Parker did not indicate in his report that any medicine was needed, I don't think.  Now, I'm not saying I agree with that, but I don't think he raised that concern.  Dr. Schwartz-Watts did, right?

MR. BURKE:  Your Honor, this is Mr. Burke.  Actually I believe Dr. Parker did say in his report that medication would be appropriate, ADHD included, and Mr. Basham is not being medicated for ADHD.  He's also not being medicated for seizures, that Dr. Parker apparently was not even aware of.

THE COURT:  Well, I think we just need to put the briefing schedule back in place for the 2255.  I might do an order asking the Bureau of Prisons to look at the medications and see if there is a need for a change, but I'm very reluctant as a non-medical professional to order that anybody be medicated.  And I don't know where that leaves us with his request.

Mr. Basham, the statement that you read, did you say you were reading from a statement that your attorney had prepared for you?

THE DEFENDANT:  Yeah.  Well, yes, sir, we had -- this thing that I had told him -- because like I said, when I'm trying to say something it's like a freight train running through my head, hard for me to get all the words out in order

like they are supposed to be, and he just typed this up for me just in case I got kind of tongue-tied, to help me out a little bit.  But that's pretty much how I feel, right -- I mean -- I mean -- I mean, I don't want -- I guess what I'm saying is --

THE COURT:  It suits me fine -- let me just say, let me interrupt you here.  When we spoke last week, your attorney said that you were afraid that you were going to offend me if you change your mind.  You won't offend me at all if you change your mind.  It doesn't make any difference to me what you do.

THE DEFENDANT:  Right.

THE COURT:  I'm prepared to rule on your issues, and I don't know how I might rule on them.  Who knows how I might rule, I haven't studied the law yet.  But as far as what we are talking about here today, it doesn't matter to me at all if you change your mind.

If you tell me you want to change your mind right now, that's the end of that and we won't have to worry about anything else on that end.  But you seem to be saying you are sort of up in the air about what to do; is that right?

THE DEFENDANT:  Yes.  And I'm only human, I guess is the way to put it, but I don't want -- I don't want to go back on what I have been working on for over a year.  I do want to be executed, I agree with that.

But here is something that they brought up to me that I'm worried about.  And I will just be frank with you, when I

started all of this, okay, I was looking at it as I would get all this done, I'd go down there and tell -- just to get everything taken care of, I would come in front of you, you would give me an execution date. You would set the date yourself, and that would be it. And they would execute me within 90 days as of your order. Is this not the case?

THE COURT: It's my understanding that if your appeals all play out and you lose, or if you withdraw your appeals, I do have to enter some type of order and I think the execution cannot occur any sooner than 60 days, I believe, instead of no later than 60 days. I might be wrong about that, but I don't know.

MS. STONE: Your Honor, this is Sarah Stone. If I may, the BOP execution protocol indicates that it's the Bureau of Prisons that actually sets the date, and I believe Your Honor just issues an order giving them the green light to do so.

THE COURT: All right.

MS. STONE: The court does not set the date themselves.

THE COURT: But isn't there some 60-day thing, that they have to wait on clemency petitions or something?

MS. STONE: That's correct. And I believe it is 60 days. That I don't know off the top of my head. There is a certain time period. But Mr. Basham's issue is who actually

sets the date, and my understanding both from reading the protocol and e-mailing with some of the McVeigh lawyers, is that it's the Bureau of Prisons that sets the actual date.

THE COURT:  All right.  Well, Mr. Basham, I could do an order requiring the Bureau of Prisons to give me a written report on what medicines you are receiving and why you didn't receive -- why they stopped you on some medicines.  And after receiving that report we could conduct another -- we could get back together.

Another way to do it would be to leave in place the hearing that we scheduled for late February and let me come on out there and let me order the prison medicine people, medical people, whoever is doing the prescribing of the medicine, to come to the hearing and explain what you are taking and why you are taking it and why you are not taking other medicine.

At some point, unless you want to drop this request, I have got to go forward and make some sort of record about your medication, I suppose.

Let me ask, does the government have any position one way or another on this issue?  Do you have any questions to ask Mr. Basham or any suggestions to me?

MR. DALEY:  Well, Your Honor, two things come to mind.  One, he clearly has not withdrawn, at this point, the best I can tell from his statements, either his motion that he made actually in June of 2010, nor the more recent motion that

he made a couple of weeks before the 2255 was ever filed, which was in May of 2011.

So, the best I can tell, I don't know that he's withdrawn it.  In fact, he just a moment ago said, "I do want to be executed," apparently wanting to go forward.  It appears that he wants to, though, create some leverage to allow him to have some control over how he's medicated, what medicines he gets.  And clearly that is not something that is a proper -- this is not the proper forum for that to happen.

The government has already sort of anticipated that we might end up, I guess, in this situation.  And we would be happy to have the court order that all the medical records about how medicine was distributed, when it was distributed, you know, whatever medical records there are, given to the court and for the court to review it.  We could, I guess, call those people and have them testify in Indianapolis --

THE COURT:  If they give me a written report, that's technically hearsay I guess and not subject to cross-examination.  We would have to have a hearing at some point and bring the people in who gave me the written report to talk about it, and allow defense counsel -- I'm sure they would want to cross-examine, or probably would want to cross-examine on why they aren't medicating him more.

I'm of the inclination right now just to keep the hearing set for when it is and call upon the government to get

the medical people there to the hearing; or I can order it, either one.

MR. BURKE:  Your Honor, this is --

THE COURT:  Yes, sir.

MR. BURKE:  Your Honor, this is Michael Burke.  I just wanted to address one other point that I think the government is overlooking, is that Mr. Basham has told the court that he isn't able to make a decision about whether to go forward with his case or not go forward with his case, which itself shows that he's not making a voluntary decision in this case.

So, I mean, what Mr. Basham has told you today is that because he is not being medicated, he's not able to rationally make those decisions, he's not able to rationally communicate with his attorneys --

THE DEFENDANT:  Or my family.

MR. BURKE:  Or his family.  And so I think the proper decision would be to -- as the court had suggested, is be informed by the department of -- the Bureau of Prisons as to Mr. -- what medications Mr. Basham is receiving.  And as Mr. Basham has indicated, to allow his 2255 proceeding to go forward while that is happening.

THE COURT:  Well, they may agree -- they may agree to start giving him more medicine, I don't know.  And if they do, that would -- that issue, we've cleared that issue.  But if

they don't, if they say, "No, in our medical judgment he doesn't need any more medicine and shouldn't get any more medicine," then we are back in limbo again.

So, Mr. Burke, do you not object to me asking the Bureau of Prisons to give me a written report on what he's taking and what he's not taking and why, and certainly give you a copy, with the understanding I'm not going to act on anything until we at least get back together for a hearing?

MR. BURKE:  We would not object to that, Your Honor.

THE DEFENDANT:  That's fine.

MR. DALEY:  That would be fine, Your Honor.  I mean, the only point that I would make is, he's either competent or he isn't competent, and this certainly has some --

THE COURT:  Well, his statement that he wants to go forward is conditioned on him getting some medicine --

MR. DALEY:  Which shows a great level of rationality, Your Honor.  I will have to say, that can be turned either way.  I mean, clearly he -- listening to him, again, just like in June, he does exhibit a certain level of competency just in how he speaks.

He may be nervous and he may very well have some concerns about whether he's thinking as clearly as say a lawyer might.  But I have to tell you, Your Honor, I mean -- we are happy, though, Your Honor if you want us to have the prison put together the medical record and some sort of report about --

THE COURT:  I think maybe I should just do a written request to the prison and let them submit it to me with a copy to both sides.

MR. DALEY:  That would be fine.

THE COURT:  Once we get that, then we can decide how to proceed from that point forward.

MR. DALEY:  Your Honor, my only concern is, I don't know that we want to rush and have this hearing on the 23rd, then.  I think we may be --

THE COURT:  I'm not sure we should.  No, I don't know that we should.  But in fact we can just agree right now to put that off if we need to, and just cancel that for now.

MR. DALEY:  That will be fine.  I do think we should move forward, though, on that second track, to get this case --

THE COURT:  I want the briefing to continue.  I have already given defense counsel an extension of time because of this issue, but no more extensions of time are going to be granted to any party in this case.

I have got this Fourth Circuit rule -- I noted on the phone last week, y'all told me the Fourth Circuit was the only circuit that has such a rule; the problem is, I sit in the Fourth Circuit and that's the only rule that concerns me.  I don't care about some other circuit.

So, no more extensions of time, and we will just run these things on parallel tracks.  And I will write the prison

and ask them to give me a report of what medicine he's taking and not taking and why.

THE COURT:  Mr. Basham, let me ask you this then, if the prison tells me you are not going to get any more medicine, other than what you are getting now --

THE DEFENDANT:  Yes, sir.

THE COURT:  -- what do you want to do then?  I'm just asking, what would happen then?

THE DEFENDANT:  Well, I guess I would request that you have another specialist come and see me.  Here is the thing, for their psychology here, for what they do here, they come around every Thursday -- you will see it in the thing, they come around every 30 days to your door, and they knock on the door.  It's a little lady.  She says, "Hello, how are you doing today, Mr. Basham?  Is there anything I can do for you?"

She says the exact same thing to everybody, and she's not even a doctor.  The only time you get to see a psychiatrist or anybody is over the TV.  And I have not seen one since I got here in 2000 -- and what?  '4?  Or whenever it was.  I don't even remember.  Whenever I first got here, that's the last time I seen anybody.

And they didn't mess with my medications until about two years later.  They said the meds was non-formulary, and what that means is, that the government don't want to pay for it, and I understand it's expensive.  So they start giving me

generic stuff like Elavil and frigging Thorazine and shit from the 60s.

I don't mean to get upset, sir.  So me, instead of arguing with them -- I'm in a little cell -- you know how I am when I was in court, so I just try to lay down and ignore everything.  And that's what I have done for the past two years, I have laid down and ignored everything.

And I have -- I have hurt my family and I have hurt myself, because I have give up on everything and everybody. I'm not trying to use this as leverage, I'm not trying to use this as any type of anything.

I guess the next step I would ask and request is that -- well, first of all, you know that the government is not going to say they have done anything wrong.  They are not going to say -- what they say is exactly what they -- well, they may not.  Which they tried to get me some of my meds, but they refused it because -- I don't remember what it was.

But anyway, I guess the next step will be, I would ask that you have a -- like you did with Dr. Morgan, have the doctor come in and see me and treat me like he did, on a -- what do you call it -- one person -- an individual basis or whatever.

And -- and -- and, you know -- and I wouldn't even ask this if it wasn't for, to be honest with you, that I have to deal with my family and the courts during this time, and I'm

so stressed out.

And I'm sorry to bother you with this, but in order for me to get up out of my bed and out of my cell and have to come out and go to court, and to be transferred out to court, okay, that's all I'm thinking about.  You know how I was with the marshals, and the first thing somebody says something to me and I'm -- and I'm -- I'm very agitated and upset anyway from all this stuff --

THE COURT:  Mr. Basham, Mr. Basham, hold on.  The court reporter is having a hard time taking down what you say because you are talking so fast.  I don't think we need to talk about it any more.

I'm going to cancel the February hearing we scheduled.  I'm going to either issue an order or write a letter to the Bureau of Prisons where you are to give me a report on what medicines you are receiving and whether they think you need any more medicine.

And once we receive that, your lawyer will get a copy of it and the government will get a copy of it and we will go from there and decide how to proceed.  I think that's all we can do today.

All right?

THE DEFENDANT:  I apologize, Judge Anderson, I didn't mean to get upset, I just don't want --

THE COURT:  Well, I understand, but you are getting

very repetitive and you are talking so fast, and I don't think we are really getting any new information that we don't already have.  So, with that, unless somebody else has something else to bring up, we will go ahead and adjourn court right now.

MR. DALEY:  Nothing from the government, Your Honor.

THE COURT:  All right.  Thank you very much.  We will sign off.  Thank y'all for being available.

(Thereupon, the proceedings were adjourned.)

* * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

s/ Gary N. Smith                    February 7, 2012
_____     _____

Gary N. Smith, CM
Official Court Reporter
United States District Court
District of South Carolina