700

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
    -vs-                                    October 16, 2012

BRANDON LEON BASHAM,

            Defendant

------------------------------

            BEFORE HON. JOSEPH F. ANDERSON, JR.
          UNITED STATES DISTRICT COURT JUDGE
                    MOTION HEARING

APPEARANCES:


FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JIMMIE EWING
                          JEFFREY M. JOHNSON
                          WILLIAM K. WITHERSPOON
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR DEFENDANT:       JULIA G. MIMMS, ESQ.
                     JULIA G. MIMMS LAW OFFICE
                     1001 Elizabeth Avenue, Suite 1A
                     Charleston, NC  28204

                     ARIZONA FEDERAL PUBLIC DEFENDER
                     BY:  MICHAEL L. BURKE
                          SARAH E. STONE
                     Assistant Federal Public Defenders
                     850 W. Adams, #201
                     Phoenix, AZ  85007

701

COURT REPORTER:        DANIEL E. MAYO, RDR
                       Certified Realtime Reporter
                       901 Richland Street
                       Columbia, SC   29201


            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT: I'm informed Mr. Basham wishes to participate again. This is Tuesday of the second week of the hearing. Mr. Basham is on the satellite and I'm informed that counsel would like a quick ex parte conference.

MR. BURKE: Yes, your Honor, just to explain the situation.

THE COURT: If the government lawyers could step out for just a moment, please.

(There was a pause in the proceedings)

* * * * * * * * * *

(The government attorneys return to the courtroom)

MS. STONE: Mr. Basham would like to apologize to the court for the language the other day.

THE COURT: All right. Does he want to speak?

DEFENDANT: Yes, please.

THE COURT: Go ahead.

DEFENDANT: I just wanted to -- I just want to say I'm sorry for blowing up the other day. I'm just -- this is -- and I just, I kind of said things without thinking and, you know, me being here like this having to do it this way is very hard on the officers and, in turn, that makes it very hard on me and I'm just very stressed out. Like he said, I didn't even sleep last night I was so stressed out. I wasn't

going to come today but I wanted to be here and at least say I apologize. That's all I want to say.

THE COURT: Very good. Thank you, sir. Let's move forward. Mr. Swerling, you are still under oath. Resume the cross-examination, please.

MR. DALEY: Your Honor, one thing the government would like for you to do is have a short colloquy with Mr. Basham to determine he understands the case we're having right now is not simply on whether he gets to dismiss or withdraw his 2255, his appeal of his conviction, but also that we are litigating here today, and have been, the substance of the various claims in his 2255 petition. I don't know that we have actually been able to get that on the record yet, your Honor.

THE COURT: Mr. Basham, I want to make sure you understand the purpose of the proceeding that we're now engaged in. Last year you filed a request to drop your appeals and be executed and we attempted to have a hearing on that out in Indiana where you are, and that effort was abandoned when it appeared to me that you were not strongly -- you did not strongly hold those beliefs such we should go forward with that effort.

So what we are here on today is the petition filed by your attorneys asking me to set aside your conviction and your death sentence because of alleged errors that occurred during

the trial.  And I am here hearing testimony about those alleged errors, will make a decision on the petition after all the testimony is concluded.  Do you understand all that?

DEFENDANT:  A little bit.  A little bit.  Kind of.

THE COURT:  Well, the main thing is we're not here today deciding whether your should be able to drop your appeals, that issue has come and gone.

DEFENDANT:  Like when they -- these packets and stuff with this stuff that you are doing and stuff, but I don't want to -- I don't really -- I don't even have the patience to read it.  A lot of it don't make sense like, you know, Jackson versus this one and that one.  And I know, you know, what -- I mean, I'm just -- events of incompetence I guess I came down to hear what was going on.

THE COURT:  All right.  The petition raises a lot of very complicated legal issues and it's not at all surprising that you don't understand all those legal issues.  But there may be some issues that you are able to help your lawyers with so you need to pay attention and speak with your lawyers when you think it is necessary or when they think it's necessary. Now let's move forward.

DEFENDANT:  Yes, sir.  All right.

BY MR. DALEY:

Q.  Good morning, Mr. Swerling.

A.  Good morning, Mr. Daley.  I was wondering if I could

readdress or revisit something that happened at the end of the day yesterday, the last issue.

Q.  Yes, you are welcome.

A.  Your Honor, you had asked me, and I was -- obviously, I was getting very tired by the end of the day, but you had asked me about whether or not there had been something put on the record about Clifford Jay.

THE COURT:  Right.

THE WITNESS:  And at that time I was not recalling that but, actually, there was something put on the record.  As I understand in looking at it that what happened was it came up by Mr. Gasser, that he was questioning the fact that the cross-examination had gone unchallenged.  And he was concerned that the jury would take that as evidence in the case, I think it was sort of the tone of what he was trying to say.  And then a discussion went to whether or not there was a good faith basis to ask the question.  And I believe we established that there had been a good faith basis to ask the question because of prior contact with Mr. Jay.

So I just wanted your Honor to understand, I do remember now that particular colloquy, and but essentially what I was saying yesterday was that, and I would reaffirm today, that we decided not to go ahead and attempt to impeach Mr. Jay.  The two officers, as evidenced by the memos in the file, were not sure, they said they did not remember those

Swerling – Cross                706

things.  But we were not going to -- we decided not to try and impeach him and put him up by that because it was soft evidence, as well as the fact that we wanted to keep him as a viable witness for the guilt phase, I mean the penalty phase, and it just would have given the opportunity to go back and even if instead of we killed them, we killed her would just be to re-emphasize that.  So I just wanted the court to know I do recall that now and I just got tired.

THE COURT:  Very good.  Thank you.

BY MR. DALEY:

Q.  Mr. Swerling, let's go to claim 18.  Although this may only tangentially impact you it involves the failure to cross-examine Sheriff Ronald Hewitt effectively, in particular Mr. Harris' cross-examination where Sheriff Hewitt testified after being asked whether his notes had anything in there about Basham saying he killed Alice Donovan, and Sheriff Hewitt's response was he demonstrated, there was nothing in there, he didn't say anything, he demonstrated.

And in particular my question, though, goes to -- first I assume that this all just happened as Mr. Harris was doing his cross-examination.  He didn't confer with you immediately after this exchange with Sheriff Hewitt, did he, or --

A.  You mean right at the time it was happening?

Q.  Right, yeah.

A.  I don't recall that we had a conversation right at that

point.

Q.  The allegation that would impact you is that they also allege under this claim that there was a failure to mitigate the damage caused by the cross-examination and, in particular, they find fault with the fact you didn't try to cross-examine FBI Agent Jeff Long regarding certain items in his 302 that appears to be a summary 302 of the search, but has some language in there that would be -- would have been helpful, they say.

Do you recall you were actually the one who cross-examined Agent Long?  He testified about a number of things.  Do you recall if there was a discussion about trying to go down that road, or do you not recall at this time?

A.  Well, I don't recall whether there was a discussion about it, I remember the issue.  And I can tell you in looking back at everything, and again trying to refresh my memory for eight years, from eight years, my concern at that time was obviously, and I believe apparently and obviously, that going into that with Agent Long would have opened up the possibility that we have opened the door to allow evidence from the hypothetical in because there were communications between Mr. Littlejohn and Mr. Special Agent long in dealing with the purse strap.

And, if you recall, Special Agent Long did not distinguish in his 302 between what was part of a hypothetical and what

Swerling – Cross                          708

was not, where Sheriff Hewitt did.  So there would be a concern there of opening the door to try and -- where the government would have been able to argue that they could come back with evidence of the hypothetical that had already been ruled out.  So I didn't think we should go down that dangerous path.

THE COURT:  Let me interrupt here.  I'm rusty on what the hypothetical statement was.  I know that that was the basis which I discharged the original attorneys, because they might be witnesses, and then ultimately at the trial I did not allow it to come in anyway.

MR. DALEY:  Correct, your Honor.

THE COURT:  So but what was the hypothetical statement?  I've honestly forgotten now.

MR. DALEY:  I'm rusty as to the substance of that, as well, your Honor.

THE COURT:  It didn't come in at trial, so -- it was a long time ago.

MR. DALEY:  It actually didn't --

MR. BURKE:  Right.  I think we're all a little bit rusty on it.  Our understanding of the hypothetical is that Mr. Littlejohn informed the law enforcement there, you know, hypothetically they should be looking for a purse strap.

Now, let me tell -- you will remember, your Honor, that that he -- Mr. Littlejohn and Mr. Monckton testified at

the hearings on their disqualification that the information that they conveyed in the hypothetical was almost entirely information they had received from U.S. Attorney Rose Mary Parham the day before.  But the hypothetical they should look for a purse strap, I believe that the victim's body had been dragged from the car and a number of yards into the brush or the woods, that the -- after that there was the -- there was a knife that was under Mr. Basham's leg, I believe this is all part of the hypothetical, that was then thrown out the window as they were leaving.  And at this point, without going back and checking exactly, that is what I seem to remember.

MR. DALEY:  Your Honor, I don't fault Mr. Burke because I'm almost certain that the purse strap was mentioned, though, in the van and Mr. Basham was given permission and allowed by Mr. Littlejohn to say that they need to be looking for a purse strap.

THE COURT:  I read Sheriff Hewitt's trial testimony over the weekend and he said that Basham told him about the strap.

MR. DALEY:  In the van.

THE COURT:  He didn't say it was part of any hypothetical at all.

MR. BURKE:  It may have been.

MR. DALEY:  It may have also been, this is where I am rusty, the hypothetical mentioned purse strap, too.

MR. BURKE:  As well, your Honor.

THE COURT:  We all need to go back and refresh our memory on what was in the hypothetical.  But suffice it to say that was the basis which I discharged the attorneys, because of the possibility they might be witnesses or --

MR. DALEY:  Correct.

THE COURT:  -- later be subject to a charge they structured the trial in a way so they wouldn't have to be witnesses.  There's all kinds of bad possibilities.  And ultimately at trial I did not allow the hypothetical statement in anyway.

MR. DALEY:  Correct.

THE COURT:  So you could say the disqualification was out of an abundance of caution, really.  But I just want to put any context of what Mr. Swerling just said about he didn't want to open the door to the hypothetical as one reason he made that strategy decision.

MR. DALEY:  And I'm pretty sure -- I know Mr. Burke is right, there was the mention of the knife and that they, I'm -- I think it was Mr. Basham said that Mr. Fulks slit her throat and put her in the trunk of the car.  So there's overlapping information but then there's also unique information in the hypothetical.

MR. BURKE:  During the first break, your Honor, we will try to locate as best as possible the exact language from

the hypothetical.

THE COURT:  All right.  That would be helpful if you could do that.  I think we could all benefit from that.

THE WITNESS:  Judge, for your information, I have Agent Long's 302 which describes what's in the hypothetical.

THE COURT:  Go ahead and put that on the record right now, if you would.

MR. DALEY:  Excuse me, Mr. Burke.  I think he's going to read Agent Long's 302.  He actually has it, it has the -- I don't think --

MR. BURKE:  I don't think it's necessary, I think we can work this out without Mr. Swerling's assistance.

THE COURT:  All right.

THE WITNESS:  Well, Judge, suffice it to say then if they don't want me to read it, that's fine.  But the strap was mentioned on two different occasions, one to Sheriff Hewitt and then also Agent Long refers to the strap as part of the hypothetical.  And so, you know, trying to think back eight years, what I was trying to think about as far as strategy, there would be a dangerous road, I think, to walk about where the information in the hypothetical came in and where other information came in, and so that would have been one of the reasons not no do it.

The other reason was that it was -- as I remember the conversation, that Special Agent Long could have been

Swerling – Cross                                712

cross-examined on it, it was hearsay, it was about how Fulks used -- Basham saying how Fulks used the strap.  So that would have been another issue, because I probably -- at that point the objection would have been sustained.  I'm sure an objection would have been made about hearsay, so --

THE COURT:  Let me jump in here.  I told my law clerk a story last week, I tried a plane crash case in 1997 where some U.S. Air pilots flew into a thunderstorm in Charlotte, the plane crashed and killed 37 people.  And at trial, about two-thirds of the way through trial, a giant dispute erupted as to whether the pilot in question had testified earlier in the trial about whether he would ever knowingly have flown into a thunderstorm before.  And the plaintiff said he clearly admitted he had flown into a thunderstorm before and the other side said no, he didn't say that.

And I said well, let's get out the transcript, we had several disputes about that, I said let's go back to the transcript and see what he says.  So what he said was, the question was have you ever flown into a thunderstorm before, and he said anyone who's ever flown planes in the south during the summer knows about flying into thunderstorms.

So it was an ambiguous answer, and it seemed to me both sides were scared to clarify it.  Both sides.  You've got that ambiguous answer and each side thought well, strategically I'm going to let it sit at that so I can later

argue he admitted flying into a thunderstorm or he didn't admit it. And neither side wanted to clarify it.

It seems like we almost have the same thing here with the strap quotation. The sheriff gave somewhat of an ambiguous reference as to what the -- how the strap was described, and both sides were scared to touch it. Am I -- Mr. Swerling, am I reading things right or not?

THE WITNESS: Well, during the testimony you had that issue about whether or not he actually said something or he just demonstrated, and it --

THE COURT: I know Mr. Gasser in his closing said he demonstrated how Mr. Fulks killed her and what more do you need, or words to that effect, right?

MR. BURKE: At Mr. Basham's trial he testified that, excuse me, he argued, Mr. Gasser argued Mr. Basham had demonstrated how Mr. Basham had killed the victim.

THE COURT: Right. But if you look at the sheriff's testimony I thought he said Mr. Basham described how she was strangled and how he, Basham, threw the strap out of the car. I thought he made it somewhat ambiguous.

MR. BURKE: And I can get the exact language for you, your Honor.

MR. DALEY: Your Honor, I can tell you that, maybe we can go ahead and pull it up, it's the trial transcript, September 27, that's volume ten, and I believe it's at page

54. I think we can probably pull that up. The questions, first, and then --

MR. BURKE: The record will speak for itself.

MR. DALEY: Yeah, just --

MS. STONE: Judge, I think you are correct that was his testimony at the Jackson versus Denno hearing. That's -- my recollection, again the transcript will speak for itself, but what you just described is exactly the testimony at the Jackson v. Denno hearing.

THE COURT: Which is what I read last weekend, that's why I was thinking that. He said Basham described how she was strangled.

MS. STONE: Correct.

THE COURT: Passive verb, and how he threw the strap out, active verb. So somewhat ambiguous answer.

MS. STONE: I think that's correct.

MR. DALEY: Maybe it's the previous page. Okay. This is page 53 of the trial transcript and this is Mr. Harris in his cross-examination saying -- he's asking Sheriff Hewitt, they came to a certain point, and Mr. Basham, Answer, he was emotional? Question, he was emotional. Answer, frustrated, I'm thinking. Anger, I didn't see any anger, I just saw Brandon Basham emotional at the cemetery. Question, now at the cemetery, and I would like you to refer to your notes, if you will. Okay, is the answer.

Question, there's nothing in your notes nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there? Answer, no, sir, he didn't tell me he used the strap. He demonstrated, though. Question, he demonstrated? Answer, yes, sir.

THE COURT: That's Mr. Harris cross-examining?

MR. DALEY: That is. And then a follow-up question, your notes nor Lieutenant Crocker's notes say that he did that, isn't that true? And then the answer on the next page, page 54, that is true. Because he didn't say, he showed.

And that's -- that's pages 53 and 54 of the trial transcript, volume ten, on September 27th, your Honor.

THE COURT: Go back to the page before.

MR. DALEY: Starts at line 17.

THE COURT: All right. Well, I think a fair inference would be that it's still somewhat ambiguous, it's still somewhat ambiguous. But I think it's more direct on Mr. Basham's involvement than the Jackson v. Denno testimony was.

MR. DALEY: It's the way the question was asked, too. And I will tell you, your Honor, and it's obviously in the record, there is a point in the closing where Mr. Gasser in the penalty phase says is the government saying Brandon Basham strangling Alice Donovan is, it's said in that way, are we saying that's what you should give him the death penalty for?

Swerling - Cross                         716

And it's followed up by no, they were -- they couldn't have done it, they had to do it together.  So there is at least what you call a rhetorical question that would refer back to the cross-examination answers of Sheriff Hewitt.

THE COURT:  All right.

MR. DALEY:  So that's where we are.  I'm sorry that we sort of got off -- I'm not sure there is anything more for Mr. Swerling to testify to, but perhaps that will help you in resolving this.

THE COURT:  I guess my point is the testimony you just said read, if the questioning attorney had asked for clarification it would have been a stronger answer.  He didn't say, he demonstrated.  He demonstrated what?  He demonstrated how he killed them or how the codefendant killed her or what -- I mean, it could have been followed up and made clearer.

MR. DALEY:  It could have.

THE COURT:  And I suspect it's because the lawyer was scared of the answer he might get.  I mean, I'm just thinking out loud.

MR. DALEY:  Well, you know, and the record will reflect, but Mr. Harris did say he was concerned about getting, I can't remember what the phrase was, but having him ring the bell again.  I can't remember what the --

THE COURT:  Mr. Burke?

Swerling - Cross                    717

MR. BURKE:  The only thing we would add to this, your Honor, two things, actually.  One is that they did -- defense counsel did have the 302 by FBI Agent Long which states expressly that according to Sheriff Hewitt Mr. Basham had said -- had said that Mr. Fulks had used the strap to kill the victim.  So they did have that for purposes of impeaching the testimony.

THE COURT:  So you say they should have driven that point home in cross-examination with the 302?

MR. BURKE:  Yes, your Honor, that's one of our arguments.  And the other argument, returning to Mr. Daley's statement about closing arguments and Mr. Gasser' statements, he is correct, but we would also say to the court the record will reflect Mr. Gasser's final statements to the jury were to the effect I don't see how you can go back there given what Mr. -- what Sheriff Hewitt said to you and what Clifford Jay said to you and not convict him.

THE COURT:  He focused on those two points.

MR. BURKE:  Yes, your Honor.

MR. DALEY:  I think there also may have been a third point in there, too.  But there were two or three points that --

THE COURT:  We will hear argument on this later.  All right, go ahead.

MR. DALEY:  And, your Honor, the government is more

Swerling – Cross                         718

than willing if we need to take a break at any point, if Mr.

Basham needs a break we want to make it clear that we want to

do everything we can to accommodate him.  So --

THE COURT:  All right.

BY MR. DALEY:

Q.  Let's go to claim 19, Mr. Swerling.

A.  I had one more point I wanted to make about the 302.

Q.  Okay.

A.  I don't know where it says that the sheriff told Mr. Long

that information Mr. Burke was just saying.

Q.  Well, I guess we're not -- it looks like a summary 302.

A.  It's a summary 302, and the problem is that what he was

saying, what he wrote, what Agent Long wrote, we're talking

about cross-examination, what he wrote was that Basham -- I'm

sorry, Basham had a conversation with Attorney Littlejohn

resulting in information being passed to this agent that

Basham would be positive on the location of the cemetery.

Basham located a purse strap.  That was one part of it.

And later down below it talks about the attorneys met with

Basham inside the van outside of law enforcement presence and

then provided the following information.  And that's where the

language from the hypothetical is, although he doesn't clearly

say it was the hypothetical.

But the bottom line is that what he was saying was that

Basham would have said that Fulks used the purse strap, and

that's in his 302.  And I did not think that we could cross-examine him on what -- bring that up, that Fulks said that, because that would be hearsay.  And that people were jealously guarding the record about hearsay in that kind of situation, and it could have potentially opened the door for further discussion about it.  And I don't remember where he says that she would have told him that.  So that would not -- I don't know that I would have been impeaching Hewitt at that point.

BY MR. DALEY:

Q.  Let's try to move on now to claim 19 and 20.  In particular, we're going to go through what you did in this case, but the two issues that seem to have -- they focused on is the failure to raise a mental retardation issue and then the fetal alcohol syndrome or fetal alcohol spectrum disorder.

Mr. Swerling, we're not going to put these into evidence, but I want to just show you some things that were put into your file and wanted to just see if you knew these were in your files when we went to look at them.  And I just want to have them put on the record just to show that there were materials that you at least had in your files and perhaps read, I'm not certain.

So let's talk about this for just a second regarding mental retardation.  The first one is a document entitled "Materials Related to Litigating Mental Retardation in Federal

Swerling - Cross                               720

Capital Prosecutions."  And it's authored by a number of
folks.  I think the document is on the screen.

A.  Yes.

Q.  Two of the three we have heard spoken about quite a bit,
David Bruck and Kevin McNally.  Do you recall reading this
document or looking it over at some point?

A.  Well, I would have read it.  Do I recall it?  No.

Q.  But you think you did read it?

A.  I would have.

Q.  The next document is a memorandum that was in your file
that is to counsel in federal capital cases from David Bruck,
"Re Materials on Mental Retardation in Federal Capital
Sentencing."  February 2000 is the date of it.  It talks about
the federal death penalty not allowing -- federal death
penalty act not allowing for the execution of the mentally
retarded.  You believe if it's in your file, which it was,
that you read it?

A.  Yes.

Q.  Okay.  The next document is a document entitled "Mental
Retardation and the Death Penalty:  A Guide for State
Legislative Issues."  It was written by James Ellis, who was
the regents professor of law at the University of New Mexico
School of Law.  Again, same answer.  If it's in your files
it's in -- it appears to be materials that were sent by
resource counsel, it was in one of those boxes.  If you got it

you would have read it?

A.   Mr. Daley, we solicited a lot of information from various sources.

Q.   Okay.

A.   And there are a couple of boxes in the file room that had documents such as this, and I would have read them.

Q.   And then the next document is actually the Atkins versus Virginia case.  Again, in your files, you would have read it, is that correct?

A.   Correct.

Q.   Next document is a law review article, "Mitigating Mental Retardation in Capital Cases, Finding the Invisible Defendant," by Dennis Keyes and some other folks.

A.   Yes.

Q.   And, again, you would have read it.  The next document actually is -- only has a table of contents, but it's actually initialed by you.  Are those your initials on the top right-hand corner?

A.   That's my writing.

Q.   12-19-03 and that's a JS?

A.   Yes.

Q.   Let me hand this up to you and see if you can -- it appears to be a brief that must have been filed in the state Supreme Court in South Carolina in which a couple of lawyers -- who are the lawyers that wrote this brief?  It's to

the very back, last page, perhaps, of this document.  It

appears that they have filed a motion to have all of these

folks that were suspected to be mentally retarded on South

Carolina's death row taken off death row because of their

mental retardation?

A.   John Blume is one of them, Robert Dudek, Robert Lominack,

David Voison, Teresa Norris, Diana Holt, Jeff Bloom.  These

were people that worked for either the Death Penalty Resource

Center or, remembering what the name was, the Center for

Capital Litigation.

Q.   And John Blume was also a lawyer who litigated -- who

tried the Fulks case, correct?

A.   Correct.

Q.   And so it's initialed, so you are pretty sure that would

indicate you obviously read it, as well?

A.   Yes, I would have read it.

Q.   And the next document is a document entitled "A Newsletter

for Defense Counsel in Federal Capital Cases."  It's prepared

by the Federal Death Penalty Resource Counsel Project.  Says

on the top right-hand corner, to read.  And that is your

handwriting up there?

A.   Yes.

Q.   And, again, in your files, you would have read this?

A.   Yes.

Q.   On page nine of it it appears that there is an article

that, "Investigating Mental Retardation?"

A.  Yes.

Q.  It was dated April 2003.  The last document that we'll go over that was in your file is an article from John Blume and Pamela Blume Leonard that is entitled, "Principles of Developing and Presenting Evidence of Mental Retardation," May 2002, from -- I'm not sure of the publication.  But, again, in your files, you would have read it?

A.  Yes.

MR. BURKE:  Your Honor, we would -- we would request that these materials -- they are not among the exhibits that are the government's exhibits, but we would ask they be made government's exhibits.  And we do not oppose their admission.

MR. DALEY:  That would be fine, your Honor.  I just --

THE COURT:  Give them an exhibit number now then.

MR. DALEY:  Okay.  We have some -- we have got some others that we're going to be admitting that we have already numbered, so it would be 237 --

MR. BURKE:  We don't have any objection to these others.

MR. DALEY:  Your Honor, if we can move the other exhibits into evidence, they are Exhibits 225 through 236.  They are actually -- I think it starts at, we have already done 225 so it starts at 226 and goes through 236.  And these

are a number of memos prepared by Mr. Swerling in reviewing various medical records and school records, and also at least one memorandum from Lesa Watson, an interview of a doctor at the Methodist Home, and there's also at least one document, one document it looks like a list of things to talk about with -- it's entitled Paige to Donna.  So that's actually Government's Exhibit 235.  We ask to move these into evidence without objection from --

THE COURT:  All right.  Without objection, admitted.

MR. DALEY:  And then so starting at 237 to 244 we would move the additional documents that that Mr. Swerling has just testified to, move those into evidence, as well.

THE CLERK:  244, you said?

MR. DALEY:  244.  Yes.

(There was a pause in the proceedings)

BY MR. DALEY:

Q.  Mr. Swerling, let's start with why didn't you make a pretrial claim of mental retardation before Judge Anderson?  I mean, obviously, if that had been successful the death penalty would have been taken off the table prior to trial.

A.  The only thing I can tell you at this point is that we did not have experts who were supporting the fact that he fit the definition of mental retardation.

Q.  Let's go ahead and put up -- well, here, I think Mr. Burke went through lay people, several lay people who said he had

Swerling – Cross                                    725

low intellectual functioning, a couple who opined he was

retarded, and a couple others that said he had very low IQ.

So it's six or eight people.  In counterbalance to that, I

mean, were not the records just overwhelming with references

to his manipulation that he used, that he was manipulative?

A.  I mean, a lot of records reflected that, yes.

Q.  Well, let's go ahead --

A.  If you have something specific --

Q.  I do, I do.  Let's go ahead and put up Government's

Exhibit 226.  And this, what is this, Mr. Swerling?

A.  Could you come down a little further?  Okay.  That's my

review of the Penny -- I don't have it spelled right, the

Penny Royal Hospital, the records that I had gotten from Penny

Royal.  And what I did generally is when records would come in

I would -- when I read them I would make notations on them,

and hopefully most of the time I did make a typewritten review

of it.  And then if I felt like there were people in the

records that we needed to follow up and go interview, then I

would either designate people to go interview them or they

would be people that I eventually would go ahead and interview

myself.

Q.  If we go to page two, and it starts there is a note of Dr.

James Rozell, about halfway down.  A little bit higher, Gayle.

And in this, obviously, your notes reflect that you put down

that there was a Dr. Rozell who talks about Brandon being

Swerling – Cross                          726

quite obnoxious, and he's referred to as manipulative and
uncontrolled, is that correct?

A.  That would have been something I extracted from the
documents.  Along with all these other things, as well.

Q.  It was your practice as these documents came in to
personally, you actually would review these medical records?

A.  Right.  For the purpose, and as I guess you will get into,
we had various chronologies and time lines we were also doing.
So what I would do, as I would review these things we would
get together and put them into the chronologies.  We would
follow up on people that need to be interviewed out of these
records or documents to get that are referred to in these
records, and who was going to interview them.  And ultimately
a lot of these people I went ahead and interviewed a number of
them, as well.  So I read documents for that purpose.

Q.  Let's go to Government's Exhibit 227.  Same thing.  You
are reviewing documents from the Hopkins County School
records?

A.  That's correct.

Q.  And then if we go down to the second full paragraph,
Gayle, first, towards the end of that first paragraph there's
a note that he is manipulative, correct, from an evaluation
done by Brenda Tompkins?

A.  Yeah.  That, okay, first paragraph.  Okay.

Q.  I'm sorry?

A.   Starts with, there is an evaluation by Brenda Tompkins, yeah.

Q.   And there's a note -- it's noted by this counselor?

A.   Correct.  I would have extracted that from the document.

Q.   Okay.

A.   Among the other things.

Q.   Let's go to the next document, Government's 228.  And the top, this is a review of the Charter Ridge records?

A.   Right.  That was another hospital.

Q.   Next, the first full paragraph below the date there.  He is described throughout as manipulative and abusive, impulsive, dishonest, easily frustrated.  So, again, throughout he's described as manipulative?

A.   Correct.  And those were -- that was an extract, I guess, in my own words, it wasn't verbatim, out of the documents.

Q.   Correct.  And then if we go down to page 487, which is two-thirds of the way down the page, Gayle, at 487, again he is noted to be manipulative.

A.   I'm sorry, page 487 of the records.

Q.   This is obviously going through the medical records.

A.   Right, okay.

Q.   Two more lines down at page 498 he is noted to be argumentative and manipulative.

A.   Correct.

Q.   And the next page at 512 and 539, at 544, again, he is

Swerling – Cross                    728

manipulative, aggressive and manipulative.  He's aggressive and manipulative.

A.   These are, again, notes that I was extracting out of the records.

Q.   And, again, these are -- this is information that obviously went into several different databases and information that would have been forwarded to Dr. Schwartz-Watts and Dr. Brawley?

A.   Well, I think actually I believe she's noted on the recipient in the e-mails.

Q.   On some of these --

A.   Dr. Schwartz-Watts.

Q.   I do see that.  Okay.  Let's go to the next exhibit, 229. This is a review of records from Ridge Behavioral Systems.

A.   Correct.

Q.   Third paragraph, you're again extracting information from the records.  At page 683 he's described as manipulative, is that correct?

A.   Yes.

Q.   Next page at the top at page 748, and then says noted to dominate group being aggressive and manipulative.  And then at page 768 he is noted to be argumentative, manipulative, with testing limits.  So, again, the documents are just strewn with references by counselors, by professionals, that he is manipulative, is that correct?

A.   Yes.

Q.   Let's go to Government's Exhibit 230.  This appears to be the review of Rivendell Psychiatric records?

A.   Yes, it's another one of the institutions.

Q.   That Mr. Basham was in at some point.

A.   Yes.

Q.   Third paragraph, page 3806, a Dr. Littleton, second line, noting that he again is manipulative.

A.   That's correct.

Q.   Again, these are not lay people, these are folks who are -- records from institutions that he's been in, correct?

A.   Right.  And we went, tried to go back as far as we could to get records from the institutions where he was at.  That's what you have in those -- in our medical records.

Q.   Lets go to Government's Exhibit 231.  This is a review of the records of the Cardinal Center.  You remember the Cardinal Center?

A.   I remember the name.

Q.   Let's go down towards the bottom at page 5145.  He's aggressive, defiant, argues, manipulative.  Is that correct?

A.   Yes.

Q.   And we have got -- at the bottom of the page we have a report from the Children's Psychiatric, I guess hospital, I don't know if she's a counselor, I think Gillingham might be a doctor, but what's it say there?  The note is no remorse, he

is a con artist, manipulative?

A.  Yes.

Q.  So again this is --

DEFENDANT:  You motherfucker.  When I was a kid he's saying -- it's over.

MR. DALEY:  If you would like for us to take a break we would be happy to, your Honor.

THE COURT:  Let's go ahead and take our morning recess at this time.

DEFENDANT:  I'm sorry.  I didn't mean to interrupt the courtroom, but you keep saying stuff, you don't think of what they do in prison for what you do.  The same people you get to lock me in a fucking room and fucking addicted to --

THE COURT:  All right.  Let's take our morning recess.

(A recess transpired)

THE COURT:  Please continue.

BY MR. DALEY:

Q.  Mr. Swerling, let's go and look at Government's Exhibit 232, please.  And this appears to be another memo of yours where you are reviewing Kentucky DJJ records, apparently.

A.  Yes, it appears so.

Q.  We will go down about the fifth notation of yours, page 4564.  Again there's a notation he was manipulative, is that

Swerling - Cross                    731

correct?

A.  Yes, that would be -- and, again, an abstract or an extract out of the records that I --

Q.  Next page, the fourth full line, page 4516, appears that you're extracting, again, information, and it notes that Mr. Basham is manipulative, charming, and uses others to promote agenda?

A.  That's what the record reflected.

Q.  And, again, you are just simply taking what these professionals -- what the records from these institutions have noted in their records, I assume, is that correct?  There's no commentary, it's just simply --

A.  No, there's no commentary in here by me at all, it's just taking information out of the records and putting it down in a memo form.

Q.  The next exhibit would be 233, which is another short review of the records from a Ten Broeck Hospital?

A.  Yeah, that was another one of the institutions.  Hold on a second.  That's what I have noted out of the record.

Q.  And the fourth line down apparently one of the doctors notes he is manipulative.  Fourth line down?

A.  Correct, that's what was written in the record.

Q.  Let's go to Government's Exhibit 234.  Looks like you met with a Dr. Sadiq, I think is his name?

A.  Yes.

Swerling - Cross                        732

Q.  And you are talking about some psychiatric evaluation he did.  And looks like the bottom of the first paragraph, another notation of yours, that this doctor must have told you that Mr. Basham is manipulative and he tried to manipulate the drugs.

MR. BURKE:  I'm sorry to interrupt.  Can we, your Honor, let the record note Mr. Basham has indicated he's leaving, he will not be present?

THE COURT:  All right.  Mr. Basham is leaving now, it's about -- 10:41 a.m.

MR. DALEY:  He's still there, your Honor.

THE COURT:  All right.  Go ahead.

MR. BURKE:  He probably will be leaving, your Honor. He is just --

DEFENDANT:  I'm waiting for them to come get me, that's all.  I'm gone.

THE COURT:  Very good.  All right.  Please continue.

Q.   (MR. DALEY) Mr. Swerling, if you would take a look at Government's Exhibit 235, it's a three page document, and I want to just simply hand up a copy of it to you.  It's on the screen but I thought maybe having the whole document in front of you would be helpful.

   If you would review that for just a moment.

MR. DALEY:  Your Honor, I think you can now let the record reflect Mr. Basham did just leave.

Swerling – Cross                          733

THE COURT:  He did just leave at about 10:42 a.m.

Q.    (MR. DALEY) Two things.  Well, several things I want to talk about.  Do you know what this document was or is, what it was used for?

A.    It appears to be something generated by Paige Tarr to Donna Schwartz-Watts about has not changed behavior since arrest and has a list of some 48 observations, I would imagine they would be.  And the writing on there is my handwriting.

Q.    It looks like at least in the original it's in red, is that correct?

A.    Correct.

Q.    That's your handwriting so you would have gone through this?

A.    Yeah.

Q.    Do you remember if you went through it with Dr. Schwartz-Watts?

A.    Mr. Daley, I don't recall, you know, in actuality who I discussed it with.  I really don't.  It would be likely I would have discussed it with Paige, and if Donna's name is on that then it would be likely I did discuss it with her, but I can't say.  I have no independent recollection of it.

Q.    And do you recall, though, if you look at number eight on this list, being concerned and having to deal with the fact you were going to have to handle the issue of his manipulation, him being manipulative, she was going to have to

Swerling - Cross                                    734

testify about that and figure out what her testimony would be about that?

A.  It was -- I mean, it's there.  I'm trying to just put the document in context.  Could you give me a moment?

Q.  Absolutely.  Take as long as you like.

(There was a pause in the proceedings)

THE WITNESS:  Okay.  What it appears is, again, I do not have an independent recollection of something eight years ago, but it appears this was sort of like a checklist of things we were going to have to deal with or address.

Q.  (MR. DALEY) And besides number eight I would like for you to look at number three, which is on page three.  And I believe Dr. Schwartz-Watts actually testified about Mr. Basham playing chess.  Do you recall that testimony or do you remember that he could play chess, or just --

A.  I have a vague recollection of it but I couldn't give you any other details of it.

Q.  But, obviously, if someone could play chess you were going to have to deal with that issue, as well?

A.  Well, she must have felt, also, it was an issue that had to be addressed, but I really don't have -- on that particular issue I can't tell you exactly what I was thinking.

Q.  Okay.  Let me take that.

A.  I'm finished.

Q.  Are you done with that?

A.  Yes.

Q.  I'll take that back.  Thanks.

A.  It looks -- are you asking me still to look at the document on the screen?  47 talks about a whole life of manipulation since the age of eight.  I don't know if you were asking me to pull out this or not.

Q.  I wasn't.  I was just wanting to -- again, so it was something that you were going to have to deal with, obviously.

A.  Yeah.

Q.  The manipulation.

A.  This is apparently a checklist that was developed that we needed to cover, needed to address.

Q.  So, again, the allegation is you should have developed a mental retardation defense argument.  And your response -- I guess one of the questions, I guess, is you went and found every possible document you could find, correct, we're going to talk a minute about that in a minute or two, that you could find about Mr. Basham, isn't that correct?

A.  As far as I know.  I mean, I can not imagine a document that existed in this young man's life that we did not either get or attempt to get.

Q.  And you talked to everybody, friends, neighbors, teachers, counselors, people that were in hospitals, folks that were in jail with him.  I mean, you talked with everybody, is that correct?

A.   School bus driver, I mean, people -- Mr. Jay, people who had him -- we just -- we really tried to cover everyone or every aspect of his life from anybody who he had been involved with in his life.  And I would be, again, be surprised, we may have missed somebody but it was not because we didn't try. There's always a possibility you missed one person, but I have not heard of anybody who we missed.

Q.   And did any qualified psychologist or any other person who gave an IQ test, anybody say he was mentally retarded?

A.   No.  Other than what you have been showing me, I mean, which just references --

Q.   Besides -- not the lay people who opined about it, I'm talking about --

A.   I just do not recall anyone making -- any kind of any expert or any person qualified to say that he was mentally retarded.  I just don't believe it's anywhere in those records.

Q.   And --

A.   I could stand corrected if there was a document that says otherwise.  You and Mr. Burke have all the documents.

Q.   I understand.

         MR. BURKE:  We would like the record to reflect that Mr. Swerling does, as well.

         THE WITNESS:  Yes, I do.  Yeah.  I didn't say I didn't.

Q.   (MR. DALEY) If we could pull up Defense Exhibit 79,
please.  Dr. Brawley was retained as a neuropsychologist,
correct?

A.   That's correct.

Q.   And she was retained to do IQ testing and a number of
other things, correct?

A.   Whatever a psychologist does, including testing.

Q.   And as we're waiting, you wanted to give her all the
records that she wanted, correct?  I mean anything that she
needed you wanted to make sure she had, correct?

A.   That would have been our goal.

Q.   And on the second page of Defense Exhibit 79 in the middle
of the page there is a notation, send Dr. Brawley all hospital
records.  Do you see that?

A.   Yes.

Q.   In your handwriting?

A.   Yes.

Q.   And this was dated, if you could go back up on this
exhibit for me, please, it appears to be dated -- maybe we
have to go back to the next page, I'm sorry.  September 23 of
'03.  And this was in a conference, at least your note is a
conference, with whom?  Can you tell who all of --

A.   Donna Schwartz-Watts, Don Morgan, William -- Dr. Brannon,
Dr. Brawley, Paige Tarr, Greg Harris, and myself.

Q.   And we will come back to this exhibit for another purpose

Swerling – Cross                    738

in a moment.  But so you obviously had your experts, your team of experts together and y'all were talking about what the approach was going to be.  And you were wanting to make sure you explored everything, correct?

A.  Yes.

Q.  Let's go to the trial testimony, volume 25, of Tora Brawley.  I think that's October 26th.  In particular, if we can go to page 58.  And to highlight the answer after I did, Dr. Brawley's testimony at trial.  It appears she was asked for and was given certain records, is that correct?

A.  Reading here, yes.

Q.  And then if we would go down to the bottom of 58 and start of 59, if you would read the records that you provided to Dr. Brawley for her evaluation.

A.  She was provided by the office, one person or another, I mean I can't say I physically did it.  And I point out this is Greg Harris' direct examination of Dr. Brawley, not mine.  She said she had records from Hopkins County Board of Education, Rivendell Psychiatric Center, Neurobehavioral Medicine Associates, the Trover Foundation, Penny Royal Center, Columbia Hospital, Bourban General, Methodist Home, the Charter Ridge Behavioral Hospital, the Cardinal Treatment Center, Charter Behavioral of Evansville, and Charter Behavioral of Louisville, Western State Hospital, Edelson & Associates, Child and Family Services, and Butner Federal

Medical Center.

Q.   Now, a number of those were obviously institutions that we just talked about you reviewed the records and extracted certain information out?

A.   Right.

Q.   So these are the same records about manipulation, con artist and some of the things like that, is that correct?

A.   Those are the records I would have reviewed and made notes from.

Q.   And as part of the process of wanting to give her all the records, isn't it true you gave her all the IQ tests that you could find?

A.   I'm sure we did.  I mean, I can't tell you, have an independent recollection of it, but I'm sure we did.  And I think I said last Thursday, I seem to remember that there was a particular IQ test that she was trying to find that had been administered early on.  And we attempted to locate that and seems like we did but I'm not sure.  I just have a vague recollection of it, a specific test that she was looking for and we were trying to get.

Q.   So you not only were looking for the tests but then you sometimes would look behind the test to try to find the records behind --

A.   Yeah.  I just seem to remember that she was interested in a particular test but I can't remember the details.  I'm

sorry.  It's so long ago.

Q.  Well, do you remember how many IQ tests -- the record reflects there were seven IQ tests.

A.  No, I don't remember.

Q.  Okay.

A.  Whatever the record reflects I would concur in.

MR. DALEY:  For the court's information, pages 59 through 66 of this transcript, your Honor, Dr. Brawley goes through the seven IQ tests which were introduced as defense exhibits.  I'm not certain whether -- how easy those will be to recover if the court wants to review those for the purposes of this issue.  But I would just note it for the record, your Honor.

THE COURT:  All right.

THE WITNESS:  Could you scroll down a little bit?

Q.   (MR. DALEY) Certainly, certainly.  This is at the bottom of page --

A.  She actually lists the different IQ tests, different ages they were given.  That's what I was trying --

Q.  She does.

A.  Yeah, okay.

Q.  If you would like, I actually have an excerpt of it, if you wanted to review it for a second?

A.  I do have some other questions.  I was trying to see whether or not she actually went through the series of tests,

Swerling – Cross                    741

while someone's reading.  I can't remember everything, I've done so much reading.

Q.  I just know there was some testimony, it wasn't certain, how many IQ tests he had, how many he would have taken.  I think she's testified that seven is, I think, the most she's ever seen.  But, anyway.  And but Mr. Harris was primarily responsible for working with Dr. Brawley?

A.  Right, as -- at some point as we got closer to the trial, I can't give you a definitive date, we started concentrating on certain witnesses that he was going to do and that I was going to do.  And he was going to do Dr. Brawley.

Q.  And the bottom line on this mental retardation issue is you just didn't have anybody who was going to testify that he was mentally retarded, correct?

A.  To the best my recollection, we did not have anybody that was going to say anything about mental retardation, or had.

Q.  And there was an allegation that you -- not an allegation, there was a suggestion that obviously you went before the attorney general's death penalty review protocol group?

A.  Correct.

Q.  And that they said you can come back if you have any further information about the mental retardation issue, and you obviously didn't.  And why is that?

A.  I don't think it was -- apparently it was not developed. I remember the notation about being at the -- in Washington

that we looked at maybe last week.  But, you know, if I didn't
go back it's because we didn't have anything.

Q.  And isn't it true that you just didn't have an IQ -- in
fact, the lowest IQ you had prior to the trial was an IQ of
77, isn't that correct?

A.  Somewhere in that area.  I mean, I can not be specific,
but it was somewhere in that area.

Q.  And you don't dispute that at 17 years old and ten months
Brandon Basham was tested and had a full scale IQ of 89, do
you?  Do you dispute that?

A.  Do I?

Q.  Yes.

A.  No.  I have to say whatever's in the record.  I can't
possibly answer that, I'm sorry.

Q.  Okay, great.  Let's go to the fetal alcohol issue under
claim 19.  The allegation is that you should have developed
evidence of fetal alcohol spectrum disorder or fetal alcohol
syndrome.  If we would bring back up Defense Exhibit 79, and
if you would just blow up the nine -- the conference part,
9-23.  The bottom part.  I'm sorry, yeah, this -- that part
there.

    I think on direct Mr. Burke asked you about, number one,
it says, fetal alcohol component - Donna.  And he suggested,
and I just wanted to know whether you agree with it, whether
this notation actually meant that she had determined there was

a fetal alcohol component or that he may have it, or whether there was simply an assignment for her to look into the issue?

A. Well, I mean, I think using the word "component" would have meant to me, I believe it would have meant to me at that time that there was something to look at.

Q. Okay.

A. I mean it doesn't say --

Q. That he has it, obviously.

A. Right.

Q. So there wasn't a determination at that time that he had it.

A. Yeah. I mean, she must have used or someone must have used the word "component" as something that would indicate to me from reading this at this point that it's something to be looked at.

Q. Well, so obviously this is an issue that you at least looked at or thought about because it was out there.

A. I was gathering the information and leaving it up to the experts to come up with the diagnosis and following up on whatever documents they needed to either include or exclude that. So, I mean, that's really -- I mean, we just did everything we could to try and get supporting documentation one way or the other, either to include or exclude.

Q. And you knew about this defense, at least in part, or this issue that you might use in mitigation because it was used in

the Fulks case, isn't that correct?

A.   Right.  Alcohol and drugs in utero and the affect on him.

Q.   In the end Dr. Schwartz-Watts obviously determined that there wasn't a strong enough -- not strong enough evidence to support this defense or this -- try to use this in mitigation.

A.   If we didn't present it then, you know, I have to -- I would have to say that it was not there, we didn't have the information necessary to go ahead and do it.  But to tell you that I have an independent recollection of that now eight years ago, I can't tell you that.

Q.   So you relied on your experts.

A.   Correct.

Q.   And, obviously, if they needed something you would give it to them, correct?

A.   Right.

Q.   And their diagnosis, was their diagnosis -- you weren't going to try to manipulate that, were you?

A.   Absolutely not.  I thought I had three, actually four extremely qualified individuals working, Jan Vogelsang, Dr. Donna Schwartz-Watts, William Brannon, Tora Brawley, and Don Morgan, so five people, I just had a lot of confidence in and had been around the block on death penalty cases.

Q.   When you were concerned about an issue you obviously would send out your people to look at the issue, isn't that correct?

A.   We had, I mean, to do lists that required people to go

ahead and do certain things, and I was micromanaging.

Q.  Let's go to Defense Exhibit 65, please, page two of that. First let's bring up the first page so he can see it.  What is this?

A.  It's from Lesa Watson, and apparently interview with Connie Baker and Brenda Shaner, February 18, 2004.

Q.  Do you remember who these ladies were?

A.  I remember we had Shaner came in for the trial.

Q.  Um-hmm.

A.  I believe.

Q.  I think they may have been Methodist Home.  I'm not a hundred percent certain, I don't need to misspeak.  So let's go to page two now of that.  This is Lesa Watson interviewing people.  And if you look at the fifth paragraph, the paragraph starts Brandon reacted best to those who talked and listened?

A.  Yes.

Q.  And then if you look at about the fifth, fourth line, do you see there they did not notice evidence of fetal alcohol syndrome, but --

A.  Yes.

Q.  And so, obviously, you were sending people out, that people who were interviewing were looking for this issue, they were looking for evidence to try to gather about this issue, isn't that correct?

A.  Well, it would appear from that that Lisa, that was one of

Swerling - Cross                    746

the goals that she was going to accomplish is ask them about that.

MR. BURKE:  Your Honor, just so the record is complete could we have the witness read in that entire sentence, that they did not notice.

THE COURT:  Read the entire sentence, please.

Q.    (MR. DALEY) After the comma.  They did not notice evidence of fetal alcohol syndrome, but --

A.  You want me to read it?

Q.  Go ahead, sure.

A.  They did not notice evidence of fetal alcohol syndrome, but that was not fully recognized and not within their field of expertise.

Q.  And let's go to Government's Exhibit 235.  If you bear with us just a moment, we're having technical difficulties.

(There was a pause in the proceedings)

Q.    (MR. DALEY) 236, I guess.  Can you tell me what this is?

A.  This is a memo from Lesa Watson from an interview, I guess, yeah, Dr. Cheryl Rivard from the Methodist Home.

Q.  In fact, I think later on maybe you even interviewed her, too.  I don't know if you recall that.

A.  If the record -- I don't independently recall it, but --

Q.  Okay.

A.  -- whatever the vouchers say, or my notebooks.

Q.  And it appears that she's a psychiatrist.  Let's go to the

second page, and if you would go down to the first paragraph, the fifth line. Keep going. And the fifth line starting she was aware.

A. Okay.

Q. Can you -- would you mind reading?

A. She was aware of FAS, which I assume is fetal alcohol syndrome, at the time she treated him and does not recall thinking of that condition in reference to Brandon Basham.

Q. So you have, again, somebody on the ground, one of your mitigation people interviewing people who treated, took care of Mr. Basham when he was younger who -- you're investigating whether they thought he had fetal alcohol syndrome, is that correct?

A. Right. And they would have -- they would been given direction, or these people who were doing these interviews, to find out certain things, certain key points. So that obviously is what she was doing. That was one of the issues she was looking into, we were looking into.

Q. And, obviously, you didn't raise it because your experts didn't feel it was there. If they had felt that it could be raised would you have raised the fetal alcohol syndrome?

A. There would have been no reason not to.

Q. Okay.

A. If we had that information and that evidence we would have raised it. We really were basing our case on the mitigation

Swerling – Cross                           748

to try and save his life, and I thought we had put that compelling case to mitigation with his medical history and his family history and his social history and everything else that we knew.

Q.   Let's go to the broader now allegation about your failure to supervise, assemble and then supervise your capital defense team, okay?  We have already gone through the team, I know it seems like a long time ago, and I guess it was, the Exhibit 8 we talked about all the team members.  But now let's just go through how you dealt with your team.  Let's first, I guess, start with Carlisle McNair.  If you look at Government's Exhibits 65 through 70, 65, not 165.  Let me just --

          MR. DALEY:  May I approach, your Honor?

          THE COURT:  Yes, sir.

Q.   (MR. DALEY) Let me just hand you the exhibits.  We will scroll through them, too, but if you want to look at it.  These are exhibits that reflect Mr. McNair, Investigator McNair trying to contact, giving lists of law enforcement.  Exhibit 65 through 70.  Would you take a look through those very quickly?  Would you scroll through 65 through 70 for my benefit and the judge's, as well?

          (There was a pause in the proceedings)

          THE WITNESS: Okay.  I'm sorry.  One more.  Okay.

Q.   (MR. DALEY) I guess my first question is those reflect, I assume you would agree, that Mr. McNair was the primary

Swerling – Cross                                749

contact with law enforcement.

A.    Right.  I thought that he would be the best one because he had been a former detective.

Q.    Hoping that that would inure to your benefit, they might be more willing to talk to somebody who's a former police officer?

A.    Sure, sure.  He knew how to talk with police officers, law enforcement, and he had been one of them.  So I thought he would get -- obviously know how to do the interview with law enforcement and know what to ask.

Q.    Let's pull up Exhibit 64, please, Government's Exhibit 64.  It appears that he was the first -- did all the interviews in South Carolina that you could find in the discovery, so you sent him out apparently early on to interview all the fact witnesses in South Carolina, is that correct?

A.    Yes.  Excuse me, right.  He spent some time down at the coast interviewing witnesses.

Q.    I'm going to try to lump some of these together, and if I start to testify, Mr. Burke, you let me know.  Exhibit 60 through 63 are memos that reflect that Mr. McNair drove several routes.  So let's look at Exhibit 63 to start with.  Apparently -- well, let's go to the bottom part of that first, Gayle.  Sorry.

      If you would just read that very briefly, very quickly.

A.    Read it myself or out loud?

Swerling - Cross                          750

Q.  Sure, just read it to yourself.  My question with regard to all these exhibits is that Mr. McNair was charged with the duty of recreating certain routes that Mr. Basham and Mr. Fulks took throughout the crime.  Apparently this is the one, one of the ones where they were traveling the area of Conway up to North Carolina right after they abducted Miss Donovan.  Is that correct?

A.  That's correct, yeah.  I remember when Greg Harris went down there, and I, one of the things we were looking at is the correlation between the times, known times from certain documents like the ATM receipt, and what was -- had been described in the discovery.  So --

Q.  And as a result of some of this you actually got down to almost minute by minute certain times of what happened in the crime, is that correct, in some of your documents?

A.  We tried to, tried to have a time line as exactly what happened for most of the time that they were involved in this.

Q.  And Exhibits 60 through 62 are other instances where Mr. McNair drove routes.  For example, apparently he is driving in Kentucky to Indiana.  I guess this is another route that was taken at some point.  He's actually literally giving details down to the tenth of a mile?

A.  Correct.

Q.  He would have been doing that because you wanted to know exactly where they had been and how far it was and certain key

Swerling – Cross                    751

details about where -- where it took them, I guess, is that correct?

A.  I mean, he and I would have discussed that.  And at that point, obviously, we were trying to determine whether or not everything fit, all the times fit, and to see what was in the discovery, whether it was -- it could be disputed or not.  Or whether it was corroborated.

Q.  Let's go to Exhibit 73.  One of the roles that Mr. McNair played is that he went, and although not familiar with the West Virginia area the way Investigator Greg Cook was, he went up there, I guess, so that you had a team member up there while the different interviews and activities were going on in West Virginia, is that correct?

A.  Correct.  And it's generally better to have two people doing an interview, as well.

Q.  Let's go to Exhibit 74, please.  And this apparently is the activities that he did up there with Mr. Cook on the week of February 1, '04 through February 5, '04.  You were having folks not only give you memos but also summarize what activities they did during the investigation of this case?

A.  Yeah.  I mean, I'm trying to remember.  We were doing that also, you know, for voucher purpose, I mean, to make sure that everything was documented.  I mean, I was trying to supervise that.  I was supervising that, as well, make sure that whatever was being done.  I can't say clearly this document

was related to that, but I was trying to check when the voucher would be submitted that there was supporting documentation.

Q.  Exhibit number 76, please.  Again, this looks like he's in West Virginia investigating the case, assisting Greg Cook, is that correct?

A.  Yes.

Q.  So not only were you able to take advantage of the West Virginia investigator, but you also had your own investigator, isn't that correct?

A.  Correct.

Q.  Let's go to Exhibit 75.  Mr. McNair also played other roles.  He would check on addresses, I mean, it looks like in this instance he literally went back to where Mr. Fulks had lived in South Carolina and talked with the landlord and I guess the current residents of the house where Mr. Fulks had lived, is that correct?

A.  Yeah, it appears so.  I mean, if you will recall from the trial, the Myrtle Beach area was an area that Fulks was familiar with, as he was with most of the areas they went to. And we were trying to obviously show that, as well, that he had the contacts in these particular areas where they went from the escape to their arrest in West Virginia.  And so it was important to go back.  And we were also looking into Mr. Fulks' background, as well.

Swerling - Cross                     753

Q.  Exhibit 77.  At some point Investigator McNair went and viewed a videotape of an altercation between Mr. Basham and correctional staff at Alvin Glenn and then gave you a summary?  You remember sending him on that task or --

A.  I don't remember that.  Let me just read it.  I just honestly do not have an independent recollection of that event.

Q.  But, obviously, that would not be a surprise.  I mean, that's one of the things you would have sent him to do, to go into a correctional facility.  He would be more comfortable, familiar with trying to do that, I guess?

A.  Sure.  Oh, yes.

Q.  How about Exhibit 78 and 79?  Isn't it true that you tasked Mr. McNair with interviewing the correctional officers who might have something to say about Mr. Basham or Mr. Fulks, both in the Alvin S. Glenn facility and then later on at the FCI Butner facility?

A.  That's correct.  I mean, he did that, those interviews.  I believe also he may have done interviews when there were incident reports.  I think he was the one that followed up, we got him to follow up on whatever incident reports were at the institutions.  But, yes, he was the one -- he would have been one of the people to go down and talk to these individuals.

Q.  Let's go to Government's --

A.  I can't say he's the only one that talked to them.

Swerling - Cross                            754

Q.  Right.  No, I think y'all did some followups.  But he at least did the initial ones.  Let's go to Government's Exhibit 159.  I think those last two documents show that he interviewed between 50 and 55 officers and nurses in the different correctional facilities.

One of the people he did interview was an Eddie Ledford. I think the allegation is is that he didn't interview him well enough.  Mr. Ledford was one of I think 50, like I said, 50 or more correctional officers.  Mr. McNair was interviewing everyone you told him to interview, correct?

A.  Yes.

Q.  And doing -- and wanting to extract certain information, correct?

A.  Yes.

Q.  And --

A.  This was the gentleman who testified that Brandon boasted about not getting the death penalty.

Q.  Correct.

A.  If I recall correctly.

Q.  And, you know, do you have any -- I mean, he obviously didn't get that from Lieutenant Ledford.

A.  Apparently not.

Q.  Let's go to Government's Exhibit 178.  I know we have shown you these, they come from your file, just for the court's reference.  They have been admitted into evidence, we

don't plan to -- well, there's backup documents, I believe, there if the court wishes, but they are summary charts.

    And I know you, Mr. Swerling, have looked at this for a moment. Does it surprise you that this summary and the documents that back it up reflect that Mr. McNair did well over 200 interviews?

A. Doesn't surprise me at all.

Q. You were relying on him to do a whole bunch of things.

A. I had him out there all the time.

Q. And I think if we --

A. Well, let me qualify it. Not all the time. He was out there a lot, okay? I mean out there, I'm talking about different states investigating.

Q. All right. Do you ever recall a time where you felt like he wasn't doing his job, that he wasn't getting done what needed to get done?

A. No. Never felt that way about Mr. McNair.

Q. He was getting his memos in on time?

A. Yeah. And he would communicate with me, we had no problems at all. I mean Carlisle was a very -- two things about Carlisle. Well, several things. First of all, he had the experience and he was a good investigator. Second of all, he followed directions and, third, he was creative enough to follow through on things that maybe had not been told specifically but to try and follow through and get other

Swerling - Cross                            756

information, as well.

Q.  And --

A.  And then report back.

Q.  Let's go to Government's Exhibit 8 and go to the entry of where Mr. McNair is found.  Government's Exhibit 8.  One of the things that I think is in there is from the vouchers we were able to calculate that Mr. McNair spent 4400 -- 4,444 hours in this case?

A.  Yes, according to the chart.

Q.  Looks like he beat everybody as far as the amount of time he spent on the case.

A.  Yeah, he -- he was covering a number of states and law enforcement agencies and people.

Q.  And if we can pull up Government's Exhibits 146 through 158.  I'm not going to have you look at all of these, but I do think -- I'm not going to have you testify about all these but I would like for you to look through them very briefly and tell me what they are.  And I will tell you that I think they are the weekly summaries that you had Mr. -- Investigator McNair reporting to you about what he was doing.

A.  Well, I know I had him reporting to me what he was doing, I don't remember if it was weekly or not.  But I don't dispute that.  I just don't remember if it was weekly.  I know it was regular.

Q.  Okay.

Swerling - Cross                        757

A.  Did it say weekly?

Q.  It appears that there are -- it seems to be broken down, I
don't know --

A.  Okay.  Yeah, right, in weekly periods.  Okay.  I'm not --
okay.  Looking at the -- what exhibit number is this?

Q.  This is Exhibit 146, I believe.  It's 146.

A.  Yeah.  And 148 says it's a weekly report so I guess I was
doing it weekly.

Q.  You were keeping track of folks.  One of the allegations,
I mean, let's just get down to the bottom of it, is that you
weren't supervising him and that he was just off doing
whatever he wanted and investigating --

A.  Absolutely not.

Q.  -- certain things for prurient interest instead of for the
case, apparently.  That's their allegation.

A.  Yes.  I was in contact with these people a lot.  I was
reviewing what they were doing, I was sending them e-mails,
they were sending me e-mails.  Sometimes I was on the ground
with them myself.  And it's -- because I made a number of
trips myself.  So I was -- I believe that I was on top of all
of the people, making sure they were getting done what they
are getting done.  I was the one that had to sign on the
vouchers and I was making sure that whatever time they were
putting in that they were corroborating that and having
supporting documentation for that.  That was my job in the

Swerling – Cross                                    758

case.

Q.   Well, and what about the fact that he interviewed and was looking at certain things about Veronica Evans?  There's an allegation that he just was looking to find a videotape of her apparently engaged in some sort of sexual activity.

A.   You know, Veronica Evans I think was the one that had been married to Chad Fulks, and they had sort of a rocky relationship, and there was some child abuse allegations that had been made, I believe.  And so, obviously, she would have been a source of information to get information about Chad Fulks.  You know, as to a video or anything like that or, you know, sexual issues, I mean I just -- I can't remember.  And why he would have been -- leave it up to his discretion.  If there was something there to explore then he had the discretion to go ahead and ask about it.

Q.   Was there ever a point, again I think you've answered it, but was there ever a look you felt he was distracted from what he needed to do or did you always feel like he was accomplishing the tasks that you wanted him to accomplish?

A.   I felt he was accomplishing the tasks that I was asking him to do.  You know, he's the guy on the ground and, you know, he has to make decisions and judgments about what to ask for, what to pursue, what questions to ask and report back to me.

Q.   Let's turn to Paige Tarr.  I think we will be very brief

Swerling - Cross                    759

here.  She was a mitigation investigator, correct?

A.  She had worked on death penalty cases and she had worked with David Bruck and John Blume, I believe, as a mitigation specialist.  The Capital Center for Litigation or the Death Penalty Resource Center.  She was on this case before I got involved in the case, before I was appointed.

Q.  And at some point she wasn't getting some of her memos in as quickly as you wanted, correct?

A.  Correct.

Q.  Did you remedy that situation?

A.  I believe there is a memo there.  First of all, there would have been verbal communications about it.  I think I remember seeing an e-mail that where I told her she better do it.  I think I sent out several e-mails like that to different people, you know, I expect -- I expect what I expect and what I told you to do.  So I can't give you specific dates or contact communications, but there was a period of time where she was getting slow on the memos.

Now, the memos were important to me, but also the substance of what was in the memos.  So we did communicate, though.  So the absence of a memo right away didn't mean we weren't communicating.  We did.  Paige was up in Kentucky a lot, she had a great rapport with the family and a lot of the people we were contacting, family, school official, hospital officials.  So she was up there a good bit.

Q.   Let's pull up Government's Exhibit 33.  One the things that she played a role in was coordinating and making sure that subpoenas were issued, and tracking them, is that correct?

A.   Yeah.  Particularly I remember the hospitals and all those, but here we have mental health facilities, schools, detention facilities.

Q.   So you are communicating with her about making sure that you get all those subpoenas?

A.   Right.  That was September -- yes.

Q.   Some of the documents we talked about earlier today where you are reviewing the records, the documents where you noted numerous times about manipulation, manipulative, characteristics of Mr. Brandon in the records, those are the very records that we're talking about, that --

A.   Right.  We had gotten a forthwith -- I don't remember exactly when it was, but we had gotten forthwith orders from the court to get records and we got -- were getting them in and trying to review them.  And some came in slowly, some we had to go back for.  But it appears that she was the one keeping track.

Q.   Let's go to Government's Exhibit 41.  And at some point Paige was -- Paige Tarr was working with Jan Vogelsang.  Can you explain to the court how they were working together and why they were working together?

A.   Well, Paige was the mitigation, one of the mitigation specialists and she -- Jan was the doing this genogram where she was working on the history from the beginning to the present day.  So it would have been logical that they would have been working together.  And Paige knew everybody up in that area, she had been in contact with them all, and so I guess she probably helped facilitate Jan speaking with who she needed to speak with, as well, for her purpose.

Q.   Let's go to Government's Exhibit 50.  This looks like a list that Paige Tarr compiled of all the different teachers that might be of use, or maybe it's even a distilled list, I'm not sure.  Government's Exhibit 50.

THE WITNESS:  Judge, can I take two minutes to run down the hall?

THE COURT:  Yes, sir.  Let's take a recess, ten minute recess.

(A recess transpired)

THE COURT:  Please continue.

Q.    (MR. DALEY) Mr. Swerling, one other point about Mr. Carlisle McNair before we get back to Paige Tarr.  Was there ever a point where you wanted to call him, maybe, because there had been an inconsistent statement and you felt like you couldn't call him because of whatever had happened with the Lexington County Sheriff's Department?

A.   Apparently there's something was in evidence from Lesa

Watson about that.

Q.  No, I don't think that actually has been put into evidence.

A.  I don't recall the situation.  Somebody asked me about that last week or the last time we were talking, and I have no recollection of him -- the inability to put him on the stand. I just don't recall that.

Q.  Okay.

A.  And, you know, people talking about his personnel record, first of all, I don't know the court would have allowed any of that in there for impeachment purposes and so I don't know that I would not have called him.  So I don't know if that was an impediment.

Q.  And after this case you did actually continue to retain him?

A.  Well, I have.  And, you know, and I've used him in a number of cases since then.  So, you know, it's -- apparently there's some things in his personnel record the government provided us in April '04, it was subpoenaed in April '04. It's not affected my relationship with Mr. McNair or my ability to use him.

Q.  Let's go now to Government's Exhibit 50.  Do you remember Miss Paige Tarr compiling a master teachers' list, a list of teachers you might interview and descriptions where they came from?  This is Government's Exhibit 50.  Maybe you can blow

that up a little bit.

A.   This is not one of folders you left up here.  Okay.

Q.   Can you see it?

A.   Yes.

Q.   Do you recall her preparing that?

A.   I don't remember the document specifically, but it would seem like something we would have done and told her to do or that she initiated.  I mean, that's what her job was.

Q.   So you were giving these folks to do their job some instructions to do their job, is that correct?

A.   Yeah, as long as it went through me, they didn't -- again, if you have a person working for you you want them to follow directions, come up with ideas.  But you also want them to follow up with what they think they should do things, as well.

Q.   And, in fact, again, another one of these summaries of all the interviews she did.  She did at least, of the summaries that were in your file, over 70 interviews of people.  Does that sound like a --

A.   Sounds reasonable.

Q.   It doesn't surprise you?

A.   No, not at all.

Q.   And we won't bring it up, but I believe the Exhibit 8 which summarizes the hours people did, she worked over 1800 hours on the case?

A.   Right.  And she was in western Kentucky a lot.  And I

remember asking her when I would go up there to try and interview medical personnel, Paige was coordinating those meetings and attended them with me, as well. Also family. She had a great rapport with the family and she helped arrange those interviews. We drove around interviewing family, those who wished to cooperate. And got turned away a few times by those that did not want to cooperate. But Paige knew the area pretty well by that time.

Q. There was a point where she wasn't able to give as much time as you thought she had to give to the case. I don't know exactly why. Were you then able to obtain further funding for another person to help out, too?

A. Yeah. What I did, and I guess Greg and I discussed it, I don't remember whether -- it was probably a combination of reasons. But what we did is we took away some time from her and asked the court to allow us to hire Lisa Kimbrough and so try and split their time. Paige had certain things to do and Lisa Kimbrough had certain things to do.

Q. Is there anything in the defense in the mitigation case, investigation of this case, that was impacted by the time that she wasn't getting her memos in as quickly as you'd like or when she wasn't able to give as much time for a period of time to the case?

A. No. I'm not aware, nobody's ever brought to my attention anything that Paige Tarr didn't do or failed to do. Or failed

Swerling – Cross                            765

to uncover.

Q.  Let's just go through some of the other folks that did interviews in this case.  We have got the summaries here for the -- to speed things along I think I'll just refer to them and ask you, first, you did interviews?

A.  Yes.

Q.  And from the summaries it looks like over 60 interviews. Does that surprise you, you would have done over 60 interviews?

A.  No.  No, it doesn't.

Q.  And many of those would have been doctors or key witnesses that you felt you needed to eyeball?

A.  I think I remember going to western Kentucky and we tracked down some people.  There were several states -- let me just say that, without trying to guess, and medical personnel, also Tina Severance and Andrea Roddy, who I knew were going to be critical in the case and they were important government witnesses, we obviously wanted -- I wanted and I did cross-examine both of them, I wanted to be prepared for cross-examination.  Because what I was trying to bring out from them was that Mr. Fulks was the guy in charge, he was the one driving, he was the one that kept the money, he was the one that had the familiarities with the places.  So I interviewed both of them.

One of them was not very cooperative, she stood on the top

of a stairs and talked to me, I think in Boston or something like that.  But she -- I can't remember which one it was.  Just slipped my mind.  But we had the other one gave us -- this is terrible, I'm sorry.  We got a bunch of letters from one of the ones who had been dating Fulks, and it was -- I don't know if that was Tina, it probably -- yeah, I think it was Tina Severance, I apologize.  Teen Severance was the one that had been seeing Fulks, and she gave us -- we took her out for dinner one night and there was a bunch of letters she had given us that we eventually had a hearing on that were letters that Chad had written her.  So, I mean, I spent a lot time with her.  Andrea Roddy I think was the one in Boston that kind of stood at the top of the stairs and I talked to her but she wasn't particularly accommodating.

Q.  And so I think your summary of interviews is Exhibit 175.  Exhibit 176, Greg Harris did about an equal number of interviews.  Same situation, he wanted to be there --

A.  Right.

Q.  -- for critical witnesses?

A.  Yeah, he did.  And some of them were joint that we both felt we needed to be there.  Most of them were separated.

Q.  Lesa Watson, she was in Kentucky, she did, according to Exhibit 179, over a hundred interviews?

A.  Doesn't surprise me at all.  I mean, she was -- she was obviously recommended to us by resource counsel, and I believe

that's where she came from.  And she had had work experience in this area and she did a lot of the interviews in different parts of the geographic areas that we were involved in.

Q.   Carolyn Graham did over 50 interviews, as well?

A.   Correct.

Q.   And how did you end up using her to do interviews?  I guess she had been a paralegal and started to become more in the investigative side of things?

A.   Well, she was always an investigator, but I had her as a paralegal.  And so -- and she was very capable of doing interviews, as well.  And she's actually now, it's been a while, I think she's doing a lot of capital litigation as a result of this case.

Q.   That was, I guess, Government's Exhibit 180.  Government's Exhibit 181, Harrison Saunders did interviews?

A.   Yes.

Q.   And this was another attorney that you --

A.   Attorney in the office.

Q.   Right.  And --

A.   Limited number of hours.

Q.   Right.  Steve Hisker, another attorney?

A.   Yes, another attorney in the office.  Limited number of hours.

Q.   But he was able to do some interviews.  I think at one point they split up maybe Just Care and Alvin S. Glenn and

reinterviewed folks, is that correct?

A.  I don't remember who it is right at the top -- if you showed me I could tell you who they interviewed.  But they were given certain assignments and they carried them out.

Q.  And then Greg Cook up in West Virginia did some interviews in West Virginia.  Even though he was appointed on the Basham case up in West Virginia you were able to use him, obviously, to investigate up in West Virginia this case down here?

A.  Yeah.  Gary Collias was the lawyer up there and Cook was an investigator.

Q.  There's a number of exhibits that we have introduced that we will pass by, but there are a number that reflect the fact that you wanted things -- you wanted to see everything, you know, we have gone over a few of them, and when somebody didn't you would let them know about it, isn't that correct?

A.  Yes.

Q.  Let's go then when --

A.  Doesn't always run smoothly so you have to step on people sometimes.

Q.  Let's go to exhibit, for example, Exhibit 35, Government's Exhibit 35 just for a moment.  This is about a week or two after you had sent out the initial e-mail.  Apparently you're wanting to reiterate -- do you remember why you want to reiterate?  Just wanting to make sure you got everything?

A.  I like to reiterate a lot so I can't -- I can't tell you

what an event was, what event prompted this.  But, obviously, I sent it out and told them I wanted them.

Q.  Let's go to Government's Exhibit 36.  And when new team members came on or people you wanted to have in the loop you made sure they got put into the e-mail chain, isn't that correct?

A.  Yeah.  I mean, the purpose of the e-mail, the way that -- so everybody would know what was going on at the same time.  I mean, so everybody could share information and people saw what other people were doing, had input, had the information that other people were gathering so that could be a collective effort.

Q.  And here you added Greg Cook to the list.  I guess since he's up in West Virginia it's really critical he's on the e-mail, correct?

A.  Yes.

Q.  Let's go to Exhibit 42.  And it looks like Steve Hisker has been added so you want too make sure he's added to the e-mail list, is that correct?

A.  That's correct.

Q.  So you are continuing to make sure everybody is on the same sheet of music, isn't that correct?

A.  Tried to.

Q.  Again, the summaries that you wanted people to provide, let's go to Government's Exhibits 126 through 145.  Can you

look at Government's Exhibit 126 and tell me what that is?

A.   It's a weekly report from Lesa Watson.

Q.   And, again, you are doing this both for voucher purposes and to keep track of what they are doing, is that correct?

A.   Yeah, it was connected together.  Because I think, I don't remember exactly the procedure on the vouchers, I haven't seen them in a while, but there was, you know, documentation required, and I -- as I recall, I had to sign off on it.  So it's a combination of things, getting information up to date and also for the voucher purposes.  Which Jean Strickler was the secretary in the office who I gave responsibility to help me coordinate the vouchers.

Q.   And could you explain briefly Lesa Watson's role?  It sounds like she was a mitigation investigator and also I guess kind of a general investigator?

A.   I think she was both.  I think she helped on the mitigation part and she was investigating, as well.  And she accompanied me on several of the interviews I did, and she was doing her own interviews, as well.

Q.   All right.  Let's go to Government's Exhibit 160.  This is the exhibit we looked at a couple of different times, it comes from your vouchers, the amount of time you spent in meetings or phone calls with different people.

     Now we're talking about Paige Tarr and Carlisle McNair. So the second line it appears that between you and Mr. Harris,

you met with her or talked with her over a hundred times totaling almost, well, 126 hours, if you take away double counting. Does that seem about right? I mean, you were -- that's a lot of time talking with somebody.

A. Well, yeah. Of course, yes.

Q. Same thing with Mr. McNair, Investigator McNair. Looks like you talked with him less, but do you remember, were you communicating more with e-mail or --

A. I believe there's a lot of e-mails there. But, you know, when if you are talking about -- I just don't recall. I mean, it seems like that's understated. I think it would be more than that, but maybe not. But it's a lot of communication with him.

Q. All right. Mr. Swerling, we're going through these quickly, Exhibits 80 through 125. First, globally these are the -- I think we have noted several times the to do lists. You like to do lists, don't you?

A. Yes. It helps me keep up with things that have to be done and also who's supposed to be doing them. And we try and check them off as things are done. And the to do lists keep growing because as you get in reports you add to the next to do list. So it's constantly changing.

Q. This first one is obviously one that is directed to Lesa, I guess, and Paige, more than anybody else.

A. Right.

Swerling - Cross                       772

Q.  But it looks like the Ten Broeck Hospital, one of those hospital records that we saw earlier, that's one that you are wanting to make sure it gets listed in the records.  You obviously are looking to try to find all the different names of people that may have been involved with him, is that correct?

A.  Yeah.  I mean, my goal was to try and interview and get records from everyone that had contact with Brandon Basham.

Q.  And we will talk about the geographical charts and the cast of characters.  But obviously these were documents to help keep track of who all the people were that could potentially be witnesses in the case, is that correct, and where they were located?

A.  The geographical chart?

Q.  Geographical chart.

A.  Oh, yeah.  That was -- that was an idea that we devised, I don't know who devised it, but there was constant input into the geographical chart to designate certain areas of the states that were involved in this particular case and which witnesses were in those areas and when they had been interviewed, who interviewed them.  If I could see the chart it's pretty --

Q.  We can do that.

A.  Okay.

Q.  Let's go to --

A.  But it was designed to keep everything organized and accessible.

Q.  Let's go to Government's Exhibit 164.  What is Government's 164?

A.  This is something that we designated as a geographical index.  It's a compilation of witnesses and their geographical location, what their address was, who they were, whether or not they had been interviewed, whether or not at some point whether or not they had been subpoenaed, and what reference was made to that particular person in the discovery.  So that if we wanted to talk about Detective Matt Dillon, or Allen, I'm sorry, he was listed here.  He had an armed robbery charged on the defendant, Hopkins County Sheriff's Department. He was interviewed on March 23, '04, by who was he interviewed, and if there had been a reference in the government's discovery the page number, Bates stamp number would have been noted in the last column.

And this just helped me and everybody else keep up with the witnesses and what area they are.  The area, the reason we did a geographical index was to try and have people be able to go to certain areas when they traveled and try and interview people in certain areas.  So certain people would concentrate on certain areas.

Q.  Let's go to Government's Exhibit 34.  I believe this is the e-mail that was the genesis of the geographical chart,

Swerling – Cross                           774

also the cast of characters, and the timeline that you wanted to have done?

A.  Yes.

Q.  So these, the group 1 through 12, and I think if you can go to the next page it maybe goes to 16 or 17, these were the areas, the geographical areas in the geographical chart?

A.  That's correct, the areas that had been identified in the case.

Q.  And people needed to e-mail their information to Lesa to make sure she could update that, is that correct?

A.  Right.  I think she was the one keeping this particular document updated.  Of course, I had a copy, she had a copy, and it was sent back and forth.  But it was something we could work off of and keep us organized.

Q.  And it looks like there's also about, fourth paragraph, fifth paragraph down, Lesa would also use the information you send her to maintain an alphabetical list of every conceivable witness.  Is that the cast of characters that --

A.  It's just something I've used over the years.  I call it cast of characters, and it has a geographical -- and it's alphabetical by each witness.  Try to put as much information as you can there so that I can go to the cast of characters and tell who a person is, where he is, what's his relationship to the case, has he been interviewed, has he been subpoenaed.

Q.  I'm just handing you Government's Exhibit 169.  This is

the cast of characters, one version of the cast of characters.

A.   Right.  At this time it was integrated into the geographical index.

Q.   Right.  So it also had the geographical component to it.

A.   Right, right.

Q.   And, again, this is to keep everybody on the same sheet of music so everybody knows what everybody is doing, is that correct?

A.   Right.  And also, I mean, particularly me so that I could coordinate everything.  Because one of the big things here was the interviews, who was being interviewed, when they were interviewed -- not when they were interviewed but who was being interviewed, and also being able to go right to the discovery page in the government discovery as to whether a particular person was referenced or gave a 302 or a statement or something like that.

Q.   So let's get back to the geographical index, which is Exhibit 164, right?  That's the mammoth document, I think 98 pages, Government's Exhibit 164.  At some point as trial got closer morphed it down.  I think at one point there was a question about whether you were focused too much on all these details.  Did you get it down where you were filtering, I think separating the wheat from the chaff, as Mr. Burke said, and so the geographical index became a geographical to do list?

A.  Do you have that?

Q.  Let me pull up Government's Exhibit 165.  I think that's an e-mail from Lesa Watson talking about doing this very thing.

A.  I'm sorry.  Because I have just seen so many documents, just a massive amount.

Q.  I understand.

A.  Well, this was paring down the to do list.  It says I have updated chart with work.  McNair and Graham did this past week.  I have gone over line by line with Paige for whomever goes with her next week for that followup.

Q.  And here is Government's Exhibit 166, 167, 168.  These appear to be, and confirm for me if it's true, these appear to be the geographical index becoming a geographical to do list.

A.  That is what they appear to be, yes, different dates. One's dated July 13, it was apparently updated July 26, it was apparently updated on August 8, 2004, right before the trial.

Q.  Let's go to Government's Exhibit 166 just for a moment. In seems to have a lot of handwriting on it and is in red.  Is that your handwriting?

A.  Yes, it is.

Q.  Okay.  Let's go through some of the pages.  It appears that you've gone through each of these pages and you are coming up with things that either need to be done or have been done or crossing out things.  Is this just you continuing to

try to make sure that you are preparing for trial and things are getting done?

A.  If you go back to the previous page -- well, this page is fine.  I mean, if you look at the entry of Becky Hickland, for example, I was wanting a memo on that, I apparently did not see a memo when I went through the file so I was asking for a memo.  So that's what I was doing, going through this and trying to keep the information flowing and keep -- make sure that everything was being done that was -- should have been done.

Q.  So you've got interview here, you've got JBS check on another witness.  What's H/S, notation down fourth, fifth, next to Kenneth Holder?

A.  HS?  The only thing I can think of would be Harrison Saunders, but -- it's the only thing I can think of.

Q.  Okay.  But the bottom line is you were going through this witness by witness making sure that things are getting taken care of.

A.  Yes.

Q.  And it was updated, as you said, 166, 167, 168, showed that it was being updated continuously as you got closer to trial?

A.  That's correct.  This was -- I don't know if this was the last one, but this was the month before trial.

Q.  Let's go to Exhibit 48.  It appears that these -- the

geographical chart from time to time was actually used to help people know sort of the area, people that needed to be sure to be interviewed.  If you look under number one it seems -- it's got an e-mail to Greg Cook saying refer to cast of characters geographical area E.  So it was actually used to help people see what witnesses you were interested in trying to find even if they were, say, in Kentucky, or West Virginia in this instance.

A.   Right.  I mean, I think I said it before, I mean, if you were in an area working on a case and try to do what else is required in that area so that it would not be an overlap or unnecessary having to go back to a particular area.  I'm trying to just keep it efficient.

Q.   I see.  Yes.  Let's look at Government Exhibits 170 through 173.  A few other charts that you used were charts that were being used to keep track of a chronology, both a medical chronology and also a fact chronology of the entire case?

A.   Yes.

Q.   Do you remember that?

A.   Yes.

Q.   And that one of the people responsible for helping to make that happen was Shealy Boland?

A.   Right.  That was, I think, Greg's law clerk.

Q.   And let me just hand up to you Government's Exhibits 170

Swerling - Cross                                   779

through 174.  Let's just talk about those for one second.

Let's look at Government's Exhibit 171.

A.  Okay.

Q.  This appears to be a time line from Mr. Basham's birth
through mid-2003 after the arrest.  Looks like it was updated
last on 10-23-04.  Do you remember this document?

A.  Yes.

Q.  And it appears that from Exhibit 170 you instructed and
Shealy Boland was carrying out the desire to split the time
line into two parts.  One was one that ended at Mr. Basham's
arrest, which appears to be Exhibit 172.  And then also in
this e-mail it looks like a second time line was to start
after Basham's arrest, and that appears to be Government's
Exhibit 173.  Is that correct?

A.  Let me just check.

Q.  So my point is Government's Exhibit 171, eventually you
split the chronology into pre-arrest and post-arrest.

A.  Right, it was split up.  Yes, that's correct, 172 and 173.

Q.  And the purpose of having this minute by minute,
sometimes, time line was what?

A.  Well, to have access to something that would give us
answers we needed right away rather than having to go through
box after box of documents.  So having it in here gave us what
I thought was an efficient way of dealing with the massive
amount of materials, people, and discovery, mental health

records, whatever it was.  By having these documents I thought it was an efficient way to deal with that and for me to follow the case and for other people to follow the case. Particularly to access things, as well.

Q.  Let's go to Government's Exhibit 174, as well.  This is the one last large document we will talk about.  It's entitled Medical/Psychiatric Chronology of Brandon Basham.  I know there were a number of versions, but this one is September 21, 2004, and this was a chronology that encapsulated all of his -- basically all treatment, medical and psychiatric treatment, any -- any medical treatment he had, correct?

A.  That was the idea, to go ahead and do that and have something that was suitable to be able to refer to without having to go through every single document.  It gave us -- it just gave us the information readily -- it's a massive document, but it was a lot less than going through all the materials and having all the materials every time you wanted to go access something.

Q.  And, again, this is all to try to keep up with this.  Have you ever been involved in a case like this?  I mean, is this truly the largest, just documents and spanning the geographic areas, of any case you have been involved in?

A.  As far as documents and people involved, yes.  I've had some other trials that have lasted this long, a couple of them, but did not have the documents and the number of people

involved.

Q. Let's go to government's exhibit -- back to the to do list for a second.

A. Mr. Daley, you were asking me something about this, I guess it's 174.

Q. Yeah?

A. I mean, if you look at -- well, it's in evidence so the court can see it. I'm sorry, I was trying to explain it.

Q. Go ahead.

A. It's just an entry of what we did is it's daily, every day entry that there were records for and we just identified the date and then what the record was.

Q. So it's all the records, again some records you were reviewing, we talked about it earlier today?

A. Yes. It was a time line, as well. And then we did that with the discovery, as well.

Q. Again, a way to keep track of this mass --

A. Absolutely. Just to keep track and have an efficient way of access to the information.

Q. Now if we go to government's exhibit, one of the to do lists -- let's just go to Government's Exhibit 125. This appears to be a to do list about Jim Aiken, just taking this for example. Again, apparently you had least 41 to do lists in this case. This may be the last one that's actually numbered.

A.   At some point I started numbering them to keep track of them.

Q.   And the issue that Mr. Aiken was going to testify to was about future dangerousness, I guess, and about Mr. Basham being housed in a federal penitentiary and whether he could escape and things like that, and whether he would be a danger to folks?

A.   Yes.

Q.   And, actually, it looks like because of all the review of the records, you are saying as we know of him being manipulative.  Again you are using the records that you have to make sure that Aiken doesn't get caught short in cross-examination, is that correct?

A.   Correct.  I mean, he was going to be our expert and he needed to know the worst of the situations so that he would not be caught unprepared to respond.

Q.   And let's go to Government's Exhibit 120 just as another example.  It's a to do list number 37, it looks like.  It looks like you are assigning institutions, go to the first page, looks like assigning institutions to make sure people are responsible for different -- the records from different institutions.  Make sure, I guess, that you have everything and that it's all in order, is that correct?

A.   Yeah.  I mean, it says -- the document says that they are -- each of these people is to study the records from that

institution, review my memos in connection with those records.
And those were those things we looked at before when I was
extracting information from the records and follow through
with interviewing all of the designated people.  I said many
of the interviews can be done from Columbia by phone, but
doctors and psychologists who had substantial contact should
be interviewed personally.  When appropriate two people should
conduct the interviews.

Q.  And so, again, you are using this to do list to keep track
of what's going on and to make sure people do what they are
supposed to, correct?

A.  Yeah.  It was something I kept going over and revising,
updating.

Q.  Let's just do one more.  Let's do Government's
Exhibit 111.  This appears to be one that you've sent
specifically to Carlisle McNair.  And you want to have –– at
this time you were trying to interview some of Mr. Fulks' cell
mates in these different facilities, obviously for the purpose
of finding out information.  I don't think the case had been
severed yet.

A.  1-29, no, it had not.  1-29-04.

Q.  We're not going to go through all the to do lists, but
clearly you were on top of this case.

A.  I believe I was.  I believe I spent an incredible amount
of time in this case managing the case.  And, you know, I

think management is the best word, managing all the documents, all the people involved, and managing gathering information and interviews and making sure things got done not only by other people but myself.

Q.  Let's go to government's -- to the claim number 23.  And the allegation in that is ineffective assistance for you for failing to object to the presentation of inconsistent theories in the two different trials.  Did you object to the alleged presentation of inconsistent theories in this case?

A.  I don't believe there was an objection.

Q.  No, there wasn't.

A.  And I still, I don't believe that they were truly inconsistent theories.  The government was well prepared for that argument.  And I remember in August right before the trial that issue was being addressed before the court about us being able to put in certain evidence.  And what it came down to and, of course, you have to decide whether to object and whether not to object, and it's just as important not to object as it is to object.

But sometimes you draw attention to by objecting, sometimes you invite other responses which you don't want, and sometimes you win the battle but lose the war.  And in this particular situation the government's theory was that they acted as a team, that was throughout, that they, the two of them, acted together.  Fulks may have done more directing,

more driving, more the planning, but they, as far as the actual murder, they acted together.

Q.  Let's go to claim 24.  Again, it's a question about the jury instruction about causal connection.

A.  I've read that argument, I just don't see where that is. I was saying -- I believe during my argument I was saying to the jury that we're not saying his mental history or the factors for his mental history caused the crimes, what we were doing is we're saying this is mitigation we'd like you to consider.

The questions that were being asked by Scott Schools or Johnny Gasser were basically the same thing.  You are not saying, Doctor, or whoever it was, that this caused the crime. I don't believe anywhere in here there was any suggestion by the government that the jury would have to find a nexus between the condition and the crime in order to use that as mitigating circumstance.  So I really don't, still don't, understand that argument.  I don't believe that that's what was being said when you read it and you pick it apart.

Q.  All right.  Claim number 27 is the failure to investigate Juror Wilson's questionnaire answers.

A.  You know, I mean, I think we had somebody said, what, nine hearings on the juror issue?  The court gave us a lot of latitude.  Every time we came into court it seemed another issue developed.  We issued subpoenas for phone records, we

would come in there was something else developed, so eventually it took nine hearings to go ahead and resolve the issue.

I do not recall investigating, I mean I probably would have looked at it, but I don't recall investigating the juror questionnaire. And if the fact that she was -- reported a nurse, she was a nurse six months longer than she put on the questionnaire, or whatever the issue was, I just don't think is significant and would not have changed -- let me put it in this way, Mr. Daley. I don't know that anybody really thought she was telling all the truth because it kept developing over a period of nine weeks that this was something that was said that was not truthful. So her credibility was already well at issue. These things that are in the allegation certainly I don't think would have made a difference. And one of them about Stacey Burnett, I think was about one of the jurors, that she had communications with a juror, in actuality I think Stacey Burnett is also a friend of hers or someone she knew and that was what came out during the hearing. And she testified that she did not know of being in contact with Stacey as a juror but if she had been it would have been about planting some sod or something like that. So I think it was done exhaustively, the entire process.

Q. Let's go to claim 30, I think this is last one we will have to do, and it deals with the allegation that you didn't

provide your appellate files in a timely fashion.  Let's go to Government's Exhibit 186.  Can you see Government's Exhibit 186, Mr. Swerling?

A.  Yeah.  Let me get this out of here.

Q.  Let me get that out of your way.

A.  Too many things here right now.

Q.  Okay.  What is that?

A.  It's a letter from Tim Sullivan to me dated January 14, 2008 telling me he had been appointed along with Melissa Meister to represent Mr. Basham on the appeal.

Q.  And he's asking for access to the file, correct?

A.  Correct.

Q.  And to meet with you?

A.  He came down sometime toward the end of January or February, saw the file, and I believe what he said was I'm requesting you either provide me with a complete master set or in the alternative provide me access to the master set so it could be inspected and copied.  And, of course, he was provided access to it and I don't believe there was a request made for the file itself, unless there's some document that has been introduced since I last saw all these documents that there was a request to copy the file.

Q.  So to the best of your recollection you don't remember any request until we get towards the end of March.  We will get to those --

Swerling – Cross                          788

A.   I don't remember, but I could stand being corrected if some document has surfaced from Miss Meister.  I don't know. But my recollection is that between -- according to my records and my documents there was no contact between January 14 and March 25th or 26th, I believe.

Q.   Let's go to Government's Exhibit 189.  This looks like you have received a message from -- who is Linda Brown?

A.   Linda Brown is my personal secretary and --

Q.   Actually looks likes Kellie Switzer has --

A.   Yeah, the original message is here from Kellie Switzer to Jack, March 25 at 12:19, subject Melissa Meister, reference the Basham appeal.

Q.   Okay.  And then --

A.   I either called her that day or the next day, I can't remember.

Q.   Let's go to Government's Exhibit 190.

A.   Okay.  That's the e-mail is -- one of the e-mails is dated Wednesday, March 26th.  So that would have been the same day. Is that the -- was that the date on the first one?

Q.   The one below, the lower one is the March 26th, Wednesday, March 26th e-mail.

A.   Okay.  So --

Q.   In that it appears she's asking for certain documents out of the file.

A.   So she is saying pursuant to our conversation today here

Swerling - Cross                     789

is a list the items I need from the Basham files.  I'd
appreciate if you could find as many of the items as you can
by Monday March 31st and have them shipped overnight.  I'll be
happy to fly down and visit your office and make copies of the
following documents.

Q.   She's offering to come down Monday, March 31st, correct?

A.   Right.  I'm -- right, right.

Q.   I think from -- do you remember if you had left or were
leaving town for Florida during this time period, if not --

A.   I believe there's an e-mail in here from March 31st where
I say I'm just returning from -- that I had told you I was on
my way out of town and I've just returned on the evening of
March 31st from Florida.

Q.   Well, let's go to Government's Exhibit 192 then.

A.   And also I'll tell you this.  At this time one of the
problems with getting the -- she asked for them on March 26th,
of course that was a Wednesday, as I recall, and I looked up
the dates.  So I was on my way out of town.  No one in the
office, none of the paralegals who were in the office at that
time had been there during the Basham case.  It was a complete
change in personnel except for Linda Brown, who really only
did my personal typing on the Basham case, was not involved in
the case per se.  So there certainly was nobody to go ahead
and get into that 77 boxes, or whatever it is, to go ahead and
do this, and I was in Florida.

Swerling - Cross                    790

Q.  So the 31st comes and she sends an e-mail it looks like, if you look towards the bottom, at 8:38 at night.

A.  Correct.

Q.  Asking what the status of the records are and whether you've sent them, correct?

A.  Yeah.  I hate to be a nuisance, but I would like to find out the status of the records I had requested.  Of course, I hadn't been there, as I said.  I can send someone down to make copies.

Q.  So then your response a few minutes later, four minutes later it looks like, is?

A.  Yeah.  They did not, I have been in Florida and I'm just returning tonight.  And did not understand the urgency like that.  All of a sudden now it is a whole -- from March 26th to March 31st it seems like the world is going to end if she doesn't get these documents.

Q.  So then it looks like, if you look at Government's Exhibit 191, she also asks for one more thing, I think.  She's also asking for the order disqualifying Monckton and Littlejohn.

A.  She added that to the list.  And some things were sent.  I mean, we did -- I think we sent -- I've got a folder, I don't know, you probably --

Q.  I think we may actually get to some of that.

A.  Okay.

Q.  All right.  Obviously, this is 11:00 o'clock at night on the 31st.  Any indication that there's a problem that, you know, you're -- you know, that there's going to be any kind of -- that there's a problem, that she's stressed out to the point that she's going to demand files in any way?

A.  No.  Obviously, she was wanting to get these things and started on March 26th.

Q.  Let's go to Government's Exhibit 193.  Do you remember this letter that was sent on April 1st about 3:00 o'clock in the afternoon, 3:30?

A.  Yeah.  It was the next day.  I had gotten in from Florida, obviously e-mail was at 11:00 o'clock, that's not unusual for me anyway to be e-mailing at 11:00 o'clock.

Q.  The second page.

A.  Yeah.  This kind of got my goat a little bit.  First of all, she said the numerous requests that me and my co-counsel Timothy Sullivan had made for the trial files of our client Brandon Basham.  And, again, you have documents, and I turned over to Mr. Burke the documents I have in connection with this issue.  It only indicates the January 14th communication, visit by Tim Sullivan, and then the March 26th.  If there's another document I would like to know about it.  But so there were no numerous requests.  And then --

Q.  Let's go to Government's Exhibit 194.  This is your reply to that letter.

Swerling - Cross                      792

A.   Yeah.  I just said I didn't like her letter, in tone and content.  And I felt like she was trying to pass off her fault, or whatever she may have let down the issue of trying to pass it on to me in that letter.

Q.   Although --

A.   She said something about going to the Fourth Circuit, and I don't know if that's in this letter or not.

Q.   I think it was in the April 1st letter.

A.   In the April 1st letter.  It was just ridiculous as far as I'm concerned.

Q.   And you said, though, the last sentence here, you say I arrived home from Florida Monday evening and I'm trying to get you what you want.

A.   Right.  This is the next day.

Q.   And you are making efforts, actually it's that evening, you are actually -- that's the response.  The e-mail, the letter was faxed in I think 3:30 or 4:00 and you are responding an hour later with your response and also saying I'm trying to get you what you want, is that correct?

A.   Yeah.  And here's -- Mr. Daley, I said you contacted me Wednesday, last Wednesday.  I told you I was on my out of town.  You asked about certain documents.  I'm trying to -- trying to get them.  You were trying to get them from the court or other sources but in an effort to make it easier for you I said we would help and that's what we're doing.

Swerling - Cross                                      793

Q.   And so let's go to government's exhibit --

A.   I told her the files were here.

Q.   Okay.  Let's go to Government's Exhibit 195.  Again

April 1st?

A.   That's about 9:53, I guess.

Q.   Um-hmm.  And you make the offer that they can come down

whenever they want and copy whatever they want?

A.   Yes, come on down, which is what she volunteered to do.

Q.   So --

A.   And I said the files are and have been available for

reviewing and copying.

Q.   So if we look at Government's Exhibit 196, plans were made

for her to fly down on Thursday, is that correct?

A.   Correct.

Q.   Thursday April 3rd.  And then Government's Exhibit 197 --

A.   And if you notice in that particular exhibit, we had

already packaged up stuff to send her and she said just wait

until tomorrow when she got there.

Q.   And Government's Exhibit 197, looks like delivering some

things to her.  I don't know if these actually -- she actually

picked them, up but they were --

A.   I can't remember.  I think that she said something about

keeping it.  Instead of FedExing it she'd pick it up.

Q.   This was the CD of the --

A.   Fight.

Swerling – Cross                    794

Q.  -- September 20th fight with the marshals.  And then Government's Exhibit 198, you sent motions notebook, looks like three of them, looks like all the motions you had regarding Chad Fulks, and also all the orders that you had in the Basham case?

A.  Right.  These were big, huge notebooks, one, two, and three of the motions, all motions regarding Fulks and all orders.  So these were like five or six big notebooks that we had copied that she could have copies of.

Q.  So she is planning to come down Thursday, April 3rd.  Let's look at Government's Exhibit 199.

A.  Is this letter also dated the 2nd?  I can't see.

Q.  Let's go back to 197, 198.

A.  It was Wednesday.

Q.  That's the 2nd.  But I think you may have not -- may have held onto them and given her --

A.  At her request.

Q.  So let's go to Government's Exhibit 199.  We need the whole thing, actually, I think, Gayle, because I think it's a stream.

A.  Pardon?

Q.  I'm sorry, I'm talking to Gayle.  Can you highlight the bottom part first?  This appears she's been there that day, apparently she's pulled two boxes of materials to be copied and shipped.  They were handed off, fellow at Document

Swerling - Cross                                            795

Technologies, not Brandon Basham but a person at Document Technologies.  Is that a copy company, I guess, that she had --

A.  Somebody we -- I don't remember.  It might have been somebody we used in the past, but -- or they had wanted to use.  Maybe they had an account there.  I don't remember.  But I gave her access to the files in the conference, the room that y'all have had access to, and Mr. Basham's counsel, and she made these two boxes.  But I was, as I recall, I was not in the office when they were sent out there so I did not want them to stay overnight at the copy place.  So I simply said bring them back, we will send them back to you in the morning.  And I don't know, she seemed to have a problem with that.  But it was -- the delay was really no delay because it was at night.

Q.  And --

A.  Late in the afternoon.

Q.  The next page of Government's Exhibit 199, second page, she says -- at some point she talks about more details about the boxes and then the last sentence of her e-mail?

A.  Thanks again for the unfettered access on such short notice.

Q.  So originally she had planned, if possible, that she would travel down on Monday March 1st, but --

A.  31st.

Swerling – Cross                      796

Q.  I mean, and instead she ended up coming down on Thursday, April 3rd, is that correct?

A.  Correct.

Q.  Let's go back to the first page of 199.  And just your response to her in the middle, if you can just blow up the middle where Mr. Swerling is responding to her.  Thank you.

You say in here, you say you are welcome, and then you also say that you don't let files out of your office.  You said you've had a couple of bad experiences.  What's the -- what's your concern about keeping your files in your office intact, the originals?

A.  Well, I mean, ultimately, you know, certainly the client, it's the client's file and the client's entitled to the file. But ultimately I'm going to be the one that has to be -- I have to be responsible for the file, as well, to make sure what I have is intact.  You know, boxes get destroyed, things get lost, so I like to keep a copy of the file, or the copy or the original, doesn't matter, but I need to keep that myself, just like in this case, so I could make it available to myself and make it available to you.

And I said I have had a couple of bad experiences.  As a matter of fact, in this case there's one bad experience because motion notebook number one for Basham is gone.  I can't find it.  And, I don't know, I'm not accusing anybody but it's gone.  So somewhere along the line this notebook that

Swerling – Cross                         797

was in that conference room, out of a number of big notebooks, is not there.  And it may have been misplaced, but now I've got to spend some time -- I was trying to look for it last night.  I spent about two hours looking for it in the conference room and couldn't find it.  That's the kind of thing that concerns me.

Q.  After this happened and they get the documents that they wanted did you continue to consult with them and --

A.  Yeah, we communicated all the way through the end of May, I think.  I think there's correspondence.

Q.  And I think there's exhibits, we won't go through them, Exhibits 200 through 217 it looks like you, this is 17, 18 e-mails where they are asking you questions about certain things and you are trying the best you can, sometimes you are not able to, but providing them information, is that correct?

A.  Yeah.  And not only that, what I did is I told them if they had a specific question I contacted Greg Harris and see if he remembered the situation or if he had the document. Also John Blume, since motions, a lot of our motions were joint motions up until the time of the severance, so I would contact John to help them out to try and see if John had a particular document that they needed.

     And so the e-mails, they document that, that Greg and John I called in.  And, in fact, I invited her to call John but it seems like she could not get in touch with him, and I did and

got whatever information I needed, or the lack of information, that was being requested. So, I mean, I actively stayed involved, I believe, until sometime mid or late May trying to help her.

MR. DALEY: Your Honor, no further questions for Mr. Swerling.

THE COURT: All right. Redirect examination.

MR. BURKE: Your Honor, if I could pull some exhibits, please.

THE COURT: All right.

(There was a pause in the proceedings)

MR. BURKE: May I approach?

THE WITNESS: Could I add one thing, before -- just, Judge, if I could, I wanted to add one thing to the last question. I may have said it on last Thursday, but the only documents that Miss Meister did not have access to were the vouchers and my notebooks because they were in a filing cabinet locked in an unoccupied office. And I did not know they were not in the file, and I did not discover those until somebody rented that office and we looked in that file cabinet. So that would have been the only thing that she was not -- did not have.

THE COURT: I know what the vouchers are, what were the notebooks?

THE WITNESS: Just my handwritten, what you have been

Swerling – Cross                          799

seeing here, a lot of the handwritten entries.  They were just spiral notebooks.

THE COURT:  All right.  You may proceed.

REDIRECT EXAMINATION

BY MR. BURKE:

Q.  Those are the only things Miss Meister was not allowed --

A.  As far as I know, it was the -- not a -- it wasn't a question of not being allowed, it was a question of not realizing they were not in the file.

Q.  Okay.  Let's go back to the trial for a second, Mr. Swerling.  Why do you think the government repeatedly asked your expert witnesses about whether there was a connection between the mitigating evidence they were talking about and the crimes in this case?

A.  Because I think they were trying to argue that you have this evidence, the evidence is there, but it didn't cause the crime.  And which is exactly what I've said.  It didn't -- we weren't trying to argue to the jury that the condition, ADHD or whatever his mental illness was, caused the crime.  We were trying to say it's mitigation.  The nexus argument that I think is being made in the allegation is the government was saying well, you can't consider this as mitigating evidence unless you find a nexus between the condition and the crime.  And I don't think that's what's being said.

Q.  Did the government argue several times in its closing

argument that there was no connection between the mitigating
evidence that you had presented and the crimes?

A.  Yeah, but they didn't say that he --

Q.  Yes or no, sir.  We'll be here for weeks.  Yes or no, did
they?

A.  Did they?  I don't recall.  Point it out to me.

Q.  All right.  Well, were you concerned at any point that the
jury may begin to believe that the mitigating evidence you
were presenting was something that they really couldn't
consider unless they could find that it explained the crimes
in this case or it had some causal connection between the
crimes in this case?

A.  No, I don't read it that way.

Q.  Okay.

A.  I do not believe that's what was being said.

Q.  Okay.  Let's talk for a minute about your geographical to
do lists.

A.  Correct.

Q.  Now, we talked about Exhibit 167, which is your
geographical to do list.  And we don't need to bring it up,
that was one that was prepared in August of 2004, a month
before trial in this case.  Do you recall notations that you
made on that document?

A.  No.

Q.  Okay.

Swerling - Redirect                           801

(There was a pause in the proceedings)

Q.   (MR. BURKE) Mr. Swerling, do you recall Mr. Daley showing you a document or one of your to do lists that had red handwriting all over it?

A.   There was a list of red handwriting.

Q.   And that was in your handwriting?

A.   Yes.

Q.   Okay.  Mr. Swerling, I have in front of you, right in those manila folders, Government's Exhibits 237 through 244 that were admitted today.  And for the court's -- these are the mental retardation exhibits that were admitted under stipulation today.

     Mr. Swerling, I would like you to take a minute and look through those exhibits and tell me if there is a single notation or highlight on any of those documents.

          (There was a pause in the proceedings)

          THE WITNESS:  Through what number?

Q.   (MR. BURKE) 237 to 244.

A.   I mean, there's something here, 12-19-03 I signed my initials.  That's so 242.  And on 243 it says to read.  That's my handwriting, as well.

Q.   To read?

A.   To read.

Q.   Okay.

A.   Which meant I did.

Q.   That notation --

A.   I don't necessarily put red marks on things I read or highlight in yellow, I read.

Q.   When was this action decided, Mr. Swerling?

A.   I don't know.  We can look.

Q.   Yeah, let's do that.  Let's look at I believe Exhibit 240, but I'll check.

A.   What number?

Q.   240, please.

A.   Okay.  Handed down June of '02.

Q.   This is your copy of Atkins that was in your file, correct?

A.   I assume.  These are the documents from the file?

Q.   Yes.

A.   Okay.

Q.   Any highlights, any notes?

A.   No, apparently not.

Q.   Where did you get these materials from on mental retardation?

A.   They would have been gotten maybe from David Bruck or John Blume or from the resource counsel, or other people that I solicited information from.

Q.   I would like to have you look for a second, Mr. Swerling, at Exhibit 241, if you would.  That is a law review article dated August of 1998, so approximately four years before

Atkins was decided, and this was in your files.  And if you could look for me on page nine of that document, the number across the bottom is 31180, for a minute.

A.   Okay.

Q.   And do you see these -- the heading, finding and using an expert?

A.   Yes.

Q.   Could you read for the court the first two sentences of that paragraph?

A.   Mental retardation represents approximately two percent to three percent of the population.  It is a small, specific subspeciality for mental health professionals.  Typically these professionals have little experience and training with people who have mental retardation.

Q.   Okay.  And could you turn to Exhibit 243, Government's Exhibit 243 for us, please?

A.   Okay.

Q.   And that's the exhibit that you had marked to read, which you say meant you read it.  Could you --

A.   Well, it says to read, which means it was in the stack to read.  And I read it all sorts of hours.  So I mean --

Q.   I'm sorry, I thought you did say that you --

A.   I said I have read it.  But this says, I'm correcting, it doesn't say I read it, it says to read.

Q.   Okay.  Can you go to page 11 of that document for me,

please?

MR. BURKE:  And, your Honor, rather than bring all of these up I will just try to specify so that we can -- I would like Mr. Swerling to be able to go on with his life, so I'm trying to get this done as quickly as possible.

THE COURT:  You can ask leading questions because technically he's not your witness.  Technically.

THE WITNESS:  Page 11?

Q.   (MR. BURKE) Page 11.  And the top there says, working with a mentally retarded client, correct?

A.   Still trying to unfold the pages.  Yes.

Q.   Okay.  Do you recall reading the following description of a mentally retarded individual?  And it's at the bottom of the page and I'll read it for record.  Many clients are able to talk for hours on a single subject and appear to have extensive knowledge so long as the conversation remains within the area they have comfort.  For instance, one client was able to recite backwards and forwards starting at any point the kings and queens of Europe over hundreds of years and their relationships to each other.  This area of competence must be explored to assess the depth and width of the client's knowledge.  This client was not able to calculate change from a dollar he would get back after buying a 60 cent soda.  Do you remember reading that?

A.   No, I don't remember specifically reading that, no.  I did

read the document, though.  If it was in the box I read the document.

Q.  Do you remember it having any impact on you?

A.  Eight years later, nine years later, no, can't tell you what the impact was.  I can tell you I read the document, familiarizing myself with the areas of the things I was going to be confronting.

Q.  Let's turn to Government's Exhibit 226, please.  I'm not sure you have those, so just one second.

        (There was a pause in the proceedings)

Q.  (MR. BURKE) Mr. Swerling, I'm going hand you what has been marked 226 through 235.  They are actually admitted into evidence.

A.  Okay.

Q.  These are documents that Mr. Daley reviewed to you, were reviewed with you of your memoranda that you made when you were reviewing medical records for Mr. Basham.  And you testified upon questioning by Mr. Daley about the incidents of Mr. Basham's manipulation.  Do you remember that this morning?

A.  I remember he was referring to specific paragraphs that I had noted, extracted from the medical records.

Q.  Okay.  Could you turn to the second page of Exhibit 226, please?

A.  226.  Okay.

Q.  And midway down there's a notation made by you that we saw

earlier. I will read it. There is a note of a Dr. James Rozell, August 1, 1990. He talks about Brandon being quite obnoxious today. Brandon is referred to as manipulative and uncontrolled. How old was Mr. Basham in 1990, Mr. Swerling?

A. I don't know.

Q. You don't know?

A. At this time, no, I don't know. Do you, how old was he?

Q. He was nine years old.

A. Okay.

Q. Could you look at Exhibit 227 for me, please?

A. What number?

Q. 227. I hope I gave that to you.

A. I don't have that.

Q. Okay.

(There was a pause in the proceedings)

Q. (MR. BURKE) And, Mr. Swerling, Exhibit 227 is a memorandum made by you about your review of Hopkins County school records.

A. I don't have it.

Q. Oh, I'm sorry, I thought you said you did. Okay. You went over this with Mr. Daley, as well. There is a reference in here, that you write there is a note that he is manipulative, has poor impulse control, hyperactivity, and distractibility.

Would you agree with me, Mr. Swerling, that these notes

from 1989 would have meant Mr. Basham was eight years old when those records were created?

A.  He was a year younger than 1999.

Q.  1990.  You are not saying, are you, that a person with brain dysfunction can't me manipulative?

A.  Am I saying that?

Q.  Yes.

A.  I have no idea.  I'm not a doctor.

Q.  And you are not saying someone with an IQ of 68 can't be manipulative?

A.  I'm not sure I understand the question.  I am not -- I'm not saying -- that's a double negative.  Can you explain it?

Q.  Certainly.  Is it your opinion that a person with an IQ of 68 is incapable of being manipulative?

A.  I have no idea.

Q.  Okay.

A.  All I testified to is he is manipulative.

Q.  There was a reference --

A.  It went back, obviously, when he was eight years old, as you pointed out.

Q.  Do you have Exhibit 235 up there?

A.  Yes.

Q.  Okay.  Can we open that one, please?  And this is another document that Mr. Daley went through with you with regard to Paige to Donna.  And there was some discussion about Mr. -- on

Swerling – Redirect                              808

page three about whether Mr. Basham plays chess.  Did you ever play chess with Mr. Basham?

A.  I can't play chess.

Q.  So you can't --

A.  I play checkers, I never played chess.

Q.  So you never played with him?

A.  No.

Q.  And you don't know --

A.  I never said I did.

Q.  You don't know how he would have played chess, right?

A.  No.  I don't know where that information came from. Apparently there's a note somewhere he played chess.

Q.  Let's turn to the first page of that exhibit, entry number 14.  Blames others.  And that is your handwriting afterwards, is it not, that says like five or six years old?

A.  That's my handwriting, right.

Q.  Okay.  And then on the next page under item 21, subsection C, there's grandiose thinking, and in your handwriting it says psychosis, is that correct?

A.  Correct.

Q.  And then number 23 says, choose wrong.  And can you read your note for me there?

A.  Does not have capacity.

Q.  Can you look at --

A.  I don't know what that means.

Swerling - Redirect                    809

Q.   Can you look at page -- the final page of this document for me, numbers 40 and 41?  It says can he help himself?  Research.  Can he control it?  Research.

A.   Um-hmm.

Q.   Do you recall what those issues were, if those issues were ever researched?

A.   I cannot -- do not recall whether they were or they were not.  The file would reflect it.

Q.   You provided Dr. Brawley or someone on your team provided Dr. Brawley with the IQ scores for Mr. Basham, the seven or eight IQ scores, right?

A.   I believe they were provided based on -- my recollection is based upon what I was shown in the testimony and having read the testimony.  I don't have the individual communications with Dr. Brawley that I can put my hand on right now.

Q.   If the record in this case contained only the IQ scores themselves in most instances but not the tests themselves would that indicate that that information was not provided to Dr. Brawley?

A.   I can't answer that.  I don't know.

Q.   You ever ask Dr. Brawley to re-score any of the prior IQ tests?

A.   I have no recollection of conversations with Dr. Brawley about that one way or the other.

Q.  Can you tell us the standard of proof for Atkins proceedings in federal court?

A.  Not right now I can't.  I haven't looked at Atkins in nine years, eight years.

Q.  Now, you would agree with me, wouldn't you, that in 2003, 2004 with regard to Mr. Basham you had a client who your expert was saying had an IQ of 68.

A.  I'm sorry?

Q.  Would you agree with me that your expert stated that Mr. Basham had an IQ of 68, correct?

A.  If that's what it was, 68, then that's correct.

Q.  Did you know that your client had never obtained a driver's license?

A.  Yes.

Q.  Did you know he had never held a steady job?

A.  That I don't remember.  I remember about the driver's license.  We brought out the fact he did not have the ability to drive and he never had driven.

Q.  Who on the Basham team would have had the ultimate responsibility to make the decision whether to request an Atkins hearing?

A.  Greg Harris and I.

Q.  And in this case you had two of the three elements of an IQ diagnosis present.  An IQ below 70, correct, and evidence of deficiencies in his adaptive behavior, correct?

A.  Say that again now?  I just didn't understand your question.

Q.  That's fine, that's fine.  It's been a long day for all of us, so -- if you could look again at Government's Exhibit 243 for me.  And, Mr. Swerling, 243 is one we looked at, is a newsletter for defense counsel in federal capital cases dated April 2003.

A.  Correct.

Q.  April in 2003 is when you were appointed to this case, correct?

A.  Yes, I think so.

Q.  The bottom of that first page references a training on mental retardation being held by the Administrative Offices of the Courts on May 1st and 2nd of 2003.  Did you attend that training?

A.  Not that I recall.

Q.  I would like to turn for a moment to the Jackson versus Denno hearing in this case.  You mentioned several times during your testimony a December 29, '03 memo that's Exhibit 12 in this case prepared by Greg Harris regarding his interviews with Barbara McGuire, Richard Hughes, and a Mr. I believe Hewlett in Kentucky?

A.  Right.

Q.  Did that memo play a significant role in developing your strategy with regard to the Jackson v. Denno hearing?

A.   No.

Q.   No?  Okay.

A.   It just -- it was just something that you -- obviously, we couldn't call Barbara McGuire because of the other things she had said.  I think it was a danger of some of that stuff coming out, her impressions.

Q.   Barbara McGuire was a member of Mr. Basham's defense team in Kentucky, correct?

A.   No.

Q.   She was not?

A.   In Kentucky?

Q.   Yes.

A.   I thought it was in Ashland.  I don't remember.  Do you have a document?

Q.   I guess the location isn't all that important.

A.   Well, she was appointed, the public defender was appointed on the Ashland arrest.

Q.   And she was an investigator or paralegal with the public defender, correct?

A.   Correct.  And Ashland, not -- as I recall, I don't remember it being in Hopkins County.

Q.   My concern is simply her role, she was on --

A.   I'm trying to find out what you were --

Q.   She was a member of the defense team, correct, for Mr. Basham's case, for Mr. Basham in Kentucky, not your defense --

A.  Not Kentucky.

Q.  Then I think --

        MR. DALEY:  I think it is, actually.  I think it's Ashland, Kentucky.

        THE WITNESS:  Okay.  I'm sorry.  I thought -- I was thinking of West Virginia for some reason or another.  I apologize.  That's why I was asking for a clarification. Okay.

Q.  (MR. BURKE) Would you normally call a person who had confidential privileged communications to the stand in a Jackson v. Denno hearing to testify?

A.  I just said I wouldn't call her.

Q.  And you said because of the memo you wouldn't call her.

A.  Well, that, too.

Q.  Okay.  Do you remember when you first revealed this memorandum to my co-counsel and myself?

A.  Well, we discussed -- I asked you a couple of times whether or not you had seen that and you -- two of you were in my office and because nobody ever mentioned it.

Q.  Can you tell us when?

A.  Absolutely not, I can't tell you when.  You can tell me.

Q.  Could it have been in June of 2012?

A.  It's possible.  But let's remember this, Mr. Burke.  You never went over to see Greg Harris' file and that's where it was.  It was not in my file.  And I pointed that out to you,

because I said to you, have you seen -- you've never commented on the Richard Hughes memo that Greg did. And that's when we realized it was not in my file.

Q. So you did not have this memo in your file --

A. It was not in my file, and you know that. And I told you that Greg Harris had it but you never went over to see Greg Harris prior to that time and look at his file. And I called him right away and I said, in fact, get me that Richard Hughes thing because apparently we don't have it, they have not seen it. And then you went over there on Friday to go ahead and review it.

Q. Were you privy to the conversations that Miss Stone and I had with Mr. Harris about who had all of his records in the case?

A. Mr. Harris has about -- has several couple dozen boxes, as well.

Q. And you never had a copy of this memorandum in your file --

A. I didn't say I did or didn't. It wasn't in the file when you copied it and I don't know why it was not there. I told you that. And I got it for you. I told Mr. Harris to make me a copy and give you copy, because I was concerned that you had never mentioned that memo. So I was the one that brought it up. And you never tried to even interview Mr. Harris or I or that would have been revealed, had you or Miss Stone tried to

Swerling – Redirect                                     815

even interview us, which we certainly would have been glad to.

Q.   Well, let's talk about that for second.  Did I not introduce myself to you in early 2011?

A.   You did, I met you.

Q.   That was not an interview?

A.   I don't believe you interviewed me.

Q.   Okay.  Well, we will let that --

A.   Never went over anything with me in the case.  I certainly was available, and so was Mr. Harris.

Q.   Let's go back to this memo again.  Let me ask you another question.  You made yourself available, did you make yourself available to my standard of care expert?

A.   No.

Q.   Okay.  Thank you.

A.   I told you that --

Q.   I don't have a question, Mr. --

A.   Well, can I explain my answer?

Q.   If you want -- if the government wants to do it on redirect --

THE COURT:  Go ahead and explain your answer.

THE WITNESS:  You asked me whether or not I would make myself available to your standard of care expert, and I thought that the fact that you had never interviewed me was preposterous and so therefore I just said no, I was not going to be interviewed by your standard of care expert.  Just

like -- and I just felt like I wasn't going to do that.

Q.  Under oath is that what you told me on the telephone the day we had the conversation?

A.  Say what?  What part of it?

Q.  That you were not going to speak to my standard of care expert because I had not --

A.  I didn't say the last part of it.  I said that's what I was thinking.  I told you I was not going to speak to your standard of care expert.  And I'm telling you one of the reasons why is I thought it was pretty ridiculous that you and Miss Stone never sat down with me or Mr. Harris and interviewed us about the case.  Still don't understand that.

Q.  Do you also recall saying to me that you didn't want to speak to Mr. Hammond because he'd obviously already made up his mind?

A.  I may have said that.  But I did not -- I didn't have to submit to an interview with him.  And I didn't.

Q.  Okay.  Let's go back to the memo regarding Miss McGuire. And did you feel that the memo was relevant in any way to your decision to conduct a Jackson v. Denno hearing?

A.  Was it relevant?  What was relevant about it, and I think I explained that yesterday or today, I can't remember anymore I'm so tired, but what it was relevant to was the main statements, the ones that dealt with the disappearance of Burns and her location and the disappearance and what happened

to Donovan and her location, were given when Miss McGuire was already involved in the case and told him to shut up, when Mr. Hewlett told him to shut up, who was the public defender, when Richard Hughes advised against it but shared the information said by Basham against it.  And then when Monckton and Littlejohn were involved.  So those statements, when all of those lawyers were involved, there was just no way that we were going to be able to show that those were not voluntary statements.

Q.  Were any of those three witnesses, McGuire, Hughes, or Hewlett, qualified to tell you what the effect of Mr. Basham's low IQ would have on his ability to knowingly and intelligently waive his rights?

A.  I don't believe that was the issue for me.

Q.  Was that not the issue in the Jackson v. Denno hearing?

A.  It was -- yes, but I'm not -- I said calling them, or are you saying that I think they were qualified to give that, that was not the issue for me.

Q.  Okay.

A.  They advised Mr. Basham.  None of them said he was incompetent, none of them said he didn't understand his rights, none of them said he did not understand what their admonition was not to speak with law enforcement.

Q.  Now --

A.  So that was --

Q.   That reminded me of some of your testimony yesterday, that none one of the prior counsel ever suggested there was concern about Mr. Basham's competency.  Are you aware that Mr. Monckton in fact took notes about Mr. Basham being dazed and confused?

A.   I'm not aware of that now, right now.  I may have been aware of it way back.  But if he testified to that or if he has testified, I'm not aware of it.  What I did say yesterday, and I qualified it, is that there was a motion filed by Mr. Littlejohn and Mr. Monckton about a competency hearing.  And that's what I remember.

     But I also said yesterday, even though I was tired, that I do remember this, that I said that I did not believe, knowing Mr. Littlejohn or Mr. Monckton, that they would have allowed him to participate in a full-day search looking for a woman's body who he was accused of murdering if they believed he was not competent at that time.

Q.   Okay.

A.   That's what I said yesterday.

Q.   Okay.  You mentioned with regard to the Jackson v. Denno hearing that Mr. Basham told you, I believe on the second morning of the hearing, that he ingested cocaine.  Do you remember that?

A.   Yes, I think we went over that yesterday.

Q.   And he was tested for cocaine and it was negative,

correct?

A.  As I recall, yes.

Q.  Do you recall saying that just shows he wasn't telling the truth?

A.  If I said it, I said it.

Q.  Okay.  Isn't it possible that Mr. Basham ingested a substance he thought was cocaine that day?

A.  I don't know what's possible.

Q.  Perhaps the substance an inmate told him was cocaine but he was too gullible to --

A.  I have no idea, Mr. Burke.

Q.  It's not possible?

A.  I didn't say it was not possible, I said I have no idea.

Q.  Let's turn to your concession of all the elements --

A.  Obviously he had not ingested cocaine.

Q.  That's what the -- yes.  But it is not as obvious that he was not telling the truth.

A.  He was not under the influence of cocaine.  Couldn't have been.

Q.  Let's talk about your concession of all the elements of the offenses against Mr. Basham except for the intent element of carjacking.  You requested an ex parte hearing before Judge Anderson in which you discussed with the judge that you had informed -- discussed with Mr. Basham about your strategy and that Mr. Basham had agreed, correct?

A.    The record would reflect it.

Q.    Can you tell me how this on-the-record waiver benefited Mr. Basham?

A.    How the waiver benefited him?

Q.    No, how the on-the-record discussion with the judge was of benefit to Mr. Basham, your client?

A.    I don't know that it had -- I don't know if that was the purpose of making a benefit for Mr. Basham, it was a purpose of making a record about it, and that was a recommendation that had been -- other lawyers had been making for a long time now.  Because clients often will come back later and say that they did not authorize that.  So I put it on the record. Didn't hurt him.

Q.    Did you explain to Mr. Basham your strategy for conceding all the elements except for intent and kidnapping -- excuse me, carjacking?

A.    I don't remember those complete discussions.  I told Mr. Basham what my strategy was, and the strategy was revealed in my opening statement and what I said before the court.

Q.    Did you have any concerns that your client who had an IQ of 68 might have had difficulty understanding the nuances of the federal carjacking and hijacking statutes?

A.    I don't think that he had the -- I don't know that Mr. Basham had the intellectual capacity to understand all the things that you and I understand and Mr. Daley understands and

the court understands about the judicial process or the law, but I have no trouble communicating with Mr. Basham.

Q.  And, finally, can you tell us specifically what in the government's closing argument in Mr. Fulks' case was more damaging to Mr. Basham than the evidence that they presented at Mr. Basham's case?

A.  I'm sorry.  I don't understand what you are saying.  I apologize.

Q.  You testified you had concerns that if you attempted to bring in the government's statements about Mr. Fulks, about Mr. Basham in Fulks' trial, that you had concerns about whether they would be, under the concept of completeness, they would be able to admit the entire closing statement or argument for Mr. --

A.  No, I never said that.  I never said the entire closing statement.  I said it would be inviting a response and possibly something from that.

Q.  And what from that was -- was more damaging to Mr. Basham than the evidence that the government --

A.  It was a factor, which I believe is what I testified to. And I can't possibly remember now.

Q.  Thank you.

A.  I have not read the Fulks transcripts in years.

          MR. BURKE:  No further questions.

          THE COURT:  All right.  I assume no recross.

MR. DALEY:  No, your Honor.

THE COURT:  All right.  Thank you, Mr. Swerling.  You may step down, you are excused.

All right, you said you think your next witness will be up about a hour on direct?

MS. STONE:  I think.  I'll try and keep it to that. I actually said yesterday about 90 minutes, about.  I'll try and be conscious of the time.

THE COURT:  Y'all want to break to lunch for an hour today to save time?

MR. BURKE:  Your Honor, can we also just briefly address, Mr. Daley and I spent yesterday to discuss issues with closing argument.  It may assist the court, we were actually able to agree on several claims in which we'll just submit on the briefs.

THE COURT:  All right.

MR. BURKE:  So that would give the court the opportunity to begin going forward with those claims.  And I could identify those now, if you would like.

THE COURT:  All right.  Claims on the brief only.

MR. BURKE:  Yes, I will read the numbers for you. Three, ten, 13, 14, 17, 21, 22, 25, 26, 27, 29, 32, and 33. So those are 13 of the claims that we are agreeing to submit on the briefing.

MR. DALEY:  And claims eight and --

823

MR. BURKE:  The two claims have been withdrawn. Claim eight --

MR. DALEY:  And I think it's 31.

MR. BURKE:  And I believe claim 31.

THE COURT:  All right.

MR. BURKE:  In the event that Mr. Hammond's testimony goes longer today, he does have a flight scheduled for the morning.  So I don't know if we would be able to get to the argument.

THE COURT:  If we can't, we just can't get to it.  I was thinking it might be helpful, but, to be frank with you, I told you I'm having some vision problems and I have been pretty tired when we adjourn.

MR. DALEY:  Your Honor, it will not really hurt either of our feelings.  I feel I can tell you that I don't know that anybody is -- we're pretty tired, too.  We might give --

THE COURT:  Let's plan on coming back after lunch and finishing the last witness and not doing arguments.

MR. BURKE:  Thank you, your Honor.

MR. DALEY:  Thank you.

THE COURT:  All right.  You want to -- let's say an hour 15 minutes.  Come back at 2:30.  All right.  We will be in recess until 2:30.

(A recess transpired)

824

THE COURT:  Ready to move forward?

MS. STONE:  We are your Honor.

THE COURT:  Call your next witness.

MR. BURKE:  The defense calls Larry Hammond to the stand.

(Larry Hammond duly sworn)

DIRECT EXAMINATION

BY MS. STONE:

Q.  Good afternoon, Mr. Hammond.

A.  Good afternoon.

Q.  Let me start out by apologizing to the court reporter. I'll try and speak as strongly as I can.  My voice is pretty weak today.  How many years have you been practicing, Mr. Hammond?

A.  43.

Q.  And where do you currently work?

A.  In Phoenix, Arizona with a private law firm.

Q.  And let's talk briefly about your educational history. Starting with your undergrad, can you tell us a little about that?

A.  Yes, I started out at the University of New Mexico in 1963 as a Russian major, transferred eventually to the University of Texas, obtained my undergraduate degree in government and then my law degree at the University of Texas in 1970.

Q.  And you've had some judicial clerkship experience?

A.  Yes, I have.

Q.  Can you tell the court about that.

A.  Yes.  I had three clerkships.  I clerked initially for the Honorable Judge Carl McGowan on the D.C. Circuit Court of Appeals in Washington.  And then I was a law clerk to Hugo Black who passed away while I was clerking.  I then clerked for -- I was the first law clerk for Lewis Powell and clerked for him for two years.

Q.  And during the time that you clerked for Justice Powell did you work on death penalty cases?

A.  I did.

Q.  And was it a particularly interesting time in death penalty jurisprudence?

A.  Well, I was a law clerk for Lewis Powell and for Hugo Black when Furman versus Georgia was decided.

Q.  And did you work on that case?

A.  I did.

Q.  After your judicial --

        THE COURT:  Did Justice Powell write that decision?

        THE WITNESS:  I'm sorry?

        THE COURT:  Did Justice Powell write the Furman versus Georgia decision?

        THE WITNESS:  Every justice eventually wrote.  There were nine opinions.  It's now very public knowledge that Justice Powell believed for many, many months that his opinion

Hammond - Direct                              826

that I worked on with him was going to be the court opinion. It eventually was not, it came out to be a five-four decision the other way and his opinion, which he hoped would be the court opinion, wound up being a dissenting opinion.

Q.    (MS. STONE) After your judicial clerkships where did you go?

A.    I went to work for Archibald Cox in the office of the Watergate special prosecutor.

Q.    And did you work for the Carter administration?

A.    Yes, I did.  When Jimmy Carter was elected I was asked by Griffin Bell, who was the incoming Attorney General, to come to the Department of Justice, and I worked at the Department of Justice throughout that administration.

Q.    And during your time at the Department of Justice did you have any work or any connection to death penalty work there?

A.    Yes, we did.  I was the deputy in the office of legal counsel, and during the administration President Carter asked that our office do what was then known as a white paper on the death penalty so that he could consider the history of the death penalty in making public statements about capital punishment.  And I was the supervisor in charge of the team that put together that white paper.

Q.    And after your time with the Department of Justice where did you go?

A.    I had -- I had been for three years in Phoenix, Arizona

with a law firm and I returned to that law firm in 1981.

Q.   And that was where -- the Osborne Maledon firm there?

A.   The name has changed but it's the same core law firm that's been there over 35 years now.

Q.   I want to move now into some of the professional organizations you are involved in.  I know if I focused on everything we would be here past when we would like to be so I would like to just focus in on organizations that deal with capital punishment or wrongful conviction.  Can you tell us a little bit about some of those organizations?

A.   Yes.  I think probably chronologically the oldest of the organizations I have been affiliated with on the death penalty has been the Arizona Capital Representation Project, which was founded in 1989.  I was one of the founding members and have served on the board either as an officer or a board member for as long as that project has been in existence.

Q.   And what does that project do?

A.   That started out, much as other projects around the country, as a resource center funded by the federal government.  After federal funding was taken away in the mid '90s the project became a nonprofit organization that attempts to assist lawyers who have death penalty cases in Arizona, people have who have been convicted and sentenced to death in Arizona.  They do some direct representation, but most of their work is counseling and assisting others who were doing

Hammond - Direct                                    828

death penalty work.

Q.  Are you also involved with an organization called The Justice Project?

A.  Yes, the Arizona Justice Project was founded in 1998.  I was one of the founding members of the criminal defense association in Arizona that created that project.

Q.  And tell us a little bit about that project.

A.  The project, which is now nearing it's 15th anniversary, is the fifth oldest innocence project in America.  It's patterned very much like the one that Barry Scheck and Peter Neufeld started in New York a couple of years earlier.  We attempt to assist inmates who have significant claims of actual innocence or of some very manifest injustice.  We started out as an all volunteer organization, we now have the benefit of modest funding from several sources and have a staff of lawyers.  We have reviewed over the last 14 and almost 15 years over 4,000 cases, and the project has filed and is involved in somewhere between, have been or currently involved in somewhere between 50 and 100 cases.

Q.  And is ineffective assistance of trial counsel one of the many issues the Justice Project looks at when trying to determine if a case --

A.  Yes.  Among the principal causes of wrongful conviction we have found pretty common knowledge these days that the ineffective assistance of counsel, both the incompetence and

Hammond - Direct                            829

in some cases the failure to abide by the Strickland

standards.  But they are often under-funded and

under-resourced lawyers.

Q.  Are you also involved with The Judicature Society?

A.  Yes.  I began serving on the board of The American

Judicature Society back sometime, I don't know, but a long

time ago.  I became the president in 19, I'm sorry, 2004 to

2006, and I still serve on the, what I think they call the

forensic science reform committee of AJS.

Q.  And tell us a little more about The Judicature Society.

Who composes that group?

A.  It's -- it's a nonprofit volunteer organization.  Over

half of its members are judges.  It is an organization created

in 1913 to assist in improving the quality of our judicial

system, but also the respect it deserves in the community.

Q.  And can just anyone join that society?

A.  Anyone can, and there are -- there are nonlawyers who are

members, that are journalists who are members.  But at least

when I was aware of the details I would say that most of the

people were lawyers, and most of them senior lawyers.

Q.  And does the Judicature, excuse me, difficult to

pronounce, Judicature Society also look at issues of wrongful

conviction when looking at the integrity of our legal system?

A.  Yes.  And, by the way, there's almost nobody who can

pronounce judicature.  But, yes, it has been involved in

attempting to look at questions of wrongful conviction and ineffective assistance of counsel.

Q.  And let me ask you, we throw around the term wrongful conviction, does that term refer to innocent people that are convicted or does it also refer to when penalty phase or when the inappropriate penalty is imposed?

A.  The term wrongful conviction, as we have used it both with the Justice Project and these other organizations, includes cases that I would consider to be cases of injustice, not cases, very often not cases of an actually innocent person.

Q.  And are there any other professional organizations I've missed that you are involved with that deal with capital punishment?

A.  I think the other one that I was going to say dogs me, but that wouldn't be the right phrase, I was appointed as the chair of the Arizona State Bar Indigent Defense Task Force in 1995.  I have been the chair of that task force for 17 years, and most of the work of that task force has been related to the death penalty in Arizona and to questions of establishing standards for the competence and quality of lawyers who are appointed by the court to capital cases in the state of Arizona.

Q.  Have you published articles relevant to capital defense?

A.  Yes, numerous articles.

Q.  And, again, we would be here for a long time, but some of

the organizations or newspapers you have written for?

A.   Well, I think there is a list of the publications somewhere in our law firm's resume, but articles have been published in the Arizona Attorney which is the state bar journal, the ASU, excuse me, Arizona State University Law Journal, the University of Arizona Law Journal, Judicature Magazine that's off the TAJS magazine, and I know there are others, but those are the principal ones that come to mind.

Q.   Have you also had teaching experience with regards to the death penalty?

A.   Yes.  I have taught, I hesitate over the word taught, I'm not sure there's more to be taught than there is to be learned, but I have taught the death penalty course at the undergraduate level at Arizona State University and at the law school level at Arizona State, and I taught courses that dealt with the death penalty, along with other topics, both at Arizona State, New Mexico, and the University of Arizona.

Q.   Have you also done a visiting professor at Elon University?

A.   Yes.  In 2008 I served as an adjunct or visiting professor in the fall semester and taught a course there called The Failures of the Criminal Justice System, in which we attempted to focus, among other things, on ineffective assistance of counsel and on the death penalty.

Q.   As a result of all of your work and publications and

teaching in this area have you received some honors and awards?

A.   Yes.

Q.   Can you go through some of those, some of the more recent ones, perhaps?

A.   Let me do the oldest one first.  That's not a recent one, but I don't like to talk about a lot of these things, but I've always said I was proudest of being named the Exceptional Service recipient by Department of Justice in 1980.  So that's a very long time ago, but they give that award to one person every year, and I've always looked back on that as the award that I value most.

I've also been the recipient of the American Judicature Society's Justice Award for lifetime service.  I was given two years ago by the University of Alabama and the Morris Dees Institute of the Southern Poverty Law Center an award called the Morris Dees award.  I have been given the Samaritan Award by the University of Alabama.  And I have been named, I should have said this first, I was named the Dirty Shirt Lawyer of the Year by the Arizona Criminal Defense Lawyers, an award they give out for lifetime criminal defense service.  I think I was the seventh person in Arizona to receive that award.

Q.   And now I want to focus on your work history.  And, again, so that we can get through this want to focus specifically on your work history in capital cases.  Do you have trial

experience in capital cases at the state level?

A.  Yes.

Q.  Can you talk about some of those cases a little bit?

A.  Sure.  Let me try to give you a short --

Q.  Let me see.  Maybe I can home in a little bit.  You previously -- I'm going to lead a little bit to try to get us there, if you think I'm going too far.

    You had a conversation with the government about your opinions in this case?

A.  Yes.

Q.  And I think in that conversation we talked about three cases that actually went to trial.  And those were the Knapp case, Burch case, and the Democker case?

A.  Yes.

Q.  Can you briefly speak about your experience with those three cases?

A.  Very, very briefly.  John Henry Knapp was the first of those death penalty cases that ultimately became a jury trial.  It was a man convicted of burning his babies to death, pouring a gallon of Coleman fuel on them while they slept.  I began representing him when he was on death row.  We obtained for him a new trial, and eventually I was part of the defense team that represented him at his jury trial in 1992.

    I then did the Dale Burch case, which went to trial in 1995, I believe, an anesthesiologist that was charged with

bludgeoning his former wife to death.  And then most recently we did the death penalty trial, began as a death penalty trial but death was taken off the table after jury selection, in a case involving a man named Steven DeMocker whose case went to trial in Prescott, Arizona in 2010.

Q.  And, obviously, not DeMocker, but did any of those cases go to a penalty phase?

A.  Yes.  The only one that went to a penalty phase was the Burch case, and at that time in Arizona, Rain versus Arizona had not yet been decided by the United States Supreme Court so we had judge sentencing and we had a separate several day sentencing hearing before an Arizona state court judge.

Q.  And although the other cases did not go to penalty phase did you prepare for penalty phases in those cases?

A.  Yes, we prepared for penalty phases from the day that we were appointed in those cases.

Q.  And have you had, and I don't want to go into specifics, but have you had other cases where death was a consideration at some point in the trial?

A.  Well, yes.  And at the state court level you are asking now?

Q.  Yes, still at the state court level.

A.  Yes, there are -- there's a significant number of them.  I wouldn't be able to know to tell you exactly how many, but certainly somewhere in the eight to 12 range.

Q.   Let's move now to federal death penalty experience.  Can you tell us about your experience with federal death penalty cases?

A.   Yes.  I have been appointed as what is known under the federal statute as learned counsel in eight or nine federal death penalty cases, the first being shortly after the criminal code was amended in '94, so it must have been in '95 or '96 was the first one of those I did.  I have been appointed as counsel in New Mexico, Nevada, Arizona, and California in federal death penalty cases.

Q.   Have you ever dealt with mental retardation issues in federal court?

A.   Yes.

Q.   Can you describe that briefly?

A.   Well, let me say only one of those eight cases actually went to trial.  But in I think all of the cases the issue of mental state, and particularly among the mental state issues mental retardation was an issue that our defense teams focused on from the outset of each -- I believe each of those cases.

Q.   Have you ever had a case in federal court where you had to bring concerns about your client's competence to the court's attention?

A.   Yes.  In the one case that I mentioned that went to trial it was in federal court, a prison killing case, and death came off the table shortly before trial.  But we did have a very

significant client competence issue that we litigated.  And that eventually went to the Ninth Circuit.

Q.  Have you had experience with death penalty cases beyond the trial level?

A.  Yes.  I have been involved in death penalty cases at -- I believe I said the other day that I could not recall a direct appeal in a death penalty case that I had done.  I actually have thought of one or two, but I think it's fair to say that I've done every phase of death penalty post-conviction litigation, both in state post-conviction and federal, and clemency.

Q.  And those are areas that you continue to practice in?

A.  Yes.

Q.  Do you keep up on death penalty jurisprudence through training and seminars?

A.  I try to.

Q.  And have you previously testified as an expert on standard of care for what we call a Strickland expert?

A.  Yes, I have a number of times.  And we tried to go through those in the interview.  I don't know exactly how many there are, but I think we came to something like seven, or something like that.

Q.  Is there anything about your background in capital defense that I have neglected to bring to the court's attention that you think is relevant for today?

A.   I don't really think there is anything that we haven't touched on.

MS. STONE:  Your Honor, at this time we would offer Mr. Hammond as an expert in the area of standard of care, also known as the Strickland expert.

THE COURT:  Any additional voir dire by the government?

MR. JOHNSON:  No objection, your Honor.

THE COURT:  All right.  I find the witness qualified to give opinions under Rule 702.  You may proceed.

MS. STONE:  Thank you, your Honor.

Q.   (MS. STONE) Mr. Hammond, let's start with the materials you reviewed for this case.  Can you address that for the court?

A.   Yes.  I have reviewed the 2255 petition, response and reply.  I have tried to look at the exhibits that were referred to in those documents and other attachments.  I could not begin to tell you that I have read them all but I have tried to look at a fair number of them.  I've read the published opinions both in this case and in the Fulks case.  I have read the openings and closings from both the guilt innocence phase and the sentencing phases of this case.  And I've reviewed other materials that are not coming to mind, but I know there are others.

Q.   And do you recall when we retained you on this case?

A.   Yes.  I think, I think Mr. Burke first tried to get in touch with me in July of this year, but I believe that I wasn't actually retained until sometime in August.

Q.   And partially because of that short timeframe did we ask you to focus in on specific claims raised in the petition?

A.   Yes, you did.

Q.   And did we in a meeting with the government, did we let them know what those claims were?

A.   Certainly, insofar as I was involved in the interview.  I think we did identify the claims I was focusing on.

     MS. STONE:  And for the court's information, those claims will be one, two, five, nine, 15 and 16.

Q.    (MS. STONE) And then did we also discuss having you opine on the mental retardation claim, as well?

A.   Yes.

Q.   Before we get into the individual claims, how do you approach evaluating a case as a standard of care expert?

A.   Well, I think, like everybody in this field, I think you have to start out with Strickland versus Washington.  That has been the guiding principle now for almost 29, 28 years.  It couldn't be that long.  So I think you have to start with looking at the objective standards of reasonableness.

     In that connection, to the extent that there is literature or knowledge gained from experience, you need to look at that. I often have worked with and consulted at the ABA about its

guidelines where they are applicable.  But, generally speaking, you look for the standards that are known to and should be well-known by criminal defense lawyers generally. And you also try to keep in mind all of the things that we have learned about the Sixth Amendment and the right to effective assistance in the cases that have been decided since then.

Q.  In your experience have you found that even very experienced lawyers make errors that fall below the standard of care from time to time?

A.  Yes, I don't believe that I know of criminal defense lawyer or a death penalty lawyer who does not believe that she or he has fallen below the standard of care.

Q.  And specific to this case, are you aware of any claim that these attorneys didn't put sufficient hours in?

A.  No.  And, in fact, in sitting here the last couple of days my impressions on that topic have been confirmed.  I said to you earlier that there have been cases in which the principal issue was effort, time spent.  That is not -- that has not been in any way my impression here.

Q.  Is it also your impression this is also not a case where attorneys were denied resources to do their job?

A.  Yes.  And I must say I was very glad to see that.  I wish I could say that in all of the other cases that I have been around or have been involved in there has been the same

Hammond - Direct                    840

ability to get and pursue the assistance of investigators, mitigation specialists, and experts.

Q.  Let's move specifically to the claims, individual claims in this case.  And I want to start with claim one.  That's the claim where Mr. Basham -- where Mr. Basham was allowed to walk off alone with Sheriff Hewitt during the Thanksgiving day search for Miss Donovan's body.  Can you talk about what troubles you about this claim?

A.  Yes.  The circumstances confronting Mr. Littlejohn and Mr. Monckton are certainly troubling and in many ways maybe unlike what lawyers would typically encounter.  But the first thing that bothers me about it, before we get to the details of what happened during the search for the body of Alice Donovan, the idea that lawyers would agree or consent to allowing a client who they did not know well, for whom they had just been retained, to communicate with the government under any circumstances is I think for most criminal defense lawyers would be a very serious question that would have to be thought about with some intensity.

But even if one were to conclude that there might be some discernible benefit in communicating with the government, I think lawyers would want to have a very clear understanding with respect to the use of any information obtained and the benefit to be realized from that cooperation.  And as I've looked over the information about that claim it became clear

to me that the lawyers never really got that kind of assurance.

Q. By assurance are you talking about a proffer agreement?

A. Yes. And I understand from reading the papers, and I'm certainly not a South Carolina lawyer, but there may be some unique aspects of the term "proffer" as used in this jurisdiction. But certainly in my practice we would use a phrase like that to say you would want some kind of very clear assurance signed off on by the government with respect to the use of information and to the consequences of being less than -- government deciding you were less than truthful.

Q. And just to be clear, that's your opinion about this issue even with the understanding that there was what's been called the race to the body or Chad Fulks was possibly giving information, as well, and so each defendant wanted to help first?

A. I'm sorry. I understand that that may have been one of the things that motivated counsel at that time, to have been encouraged, I think actually the public defenders may have first encouraged Mr. Monckton and Littlejohn to go forward for that reason. So I know it was -- that was what they thought was an animating reason.

Q. That would not alleviate your concerns about letting your client talk with law enforcement?

A. No, and I don't think it would for most lawyers. I mean,

these gentlemen knew this was a death penalty matter from their very first association with it.  While that always produces a desire to want to find a way out of the death penalty arena, it certainly heightens the importance of careful decision making.  And I frankly do not think they could have gone through the process of careful decision making, particularly with this client, in the short amount of time that they had available to them.

Q.  And you stated that there were two troubling circumstances for you with this claim, the first being what you just described.  What's the other issue for you in this claim?

A.  The other is the confusion, maybe I shouldn't call it confusion, but uncertainty about what exactly the arrangement was, this difference between saying you may not interrogate Mr. Basham but you may ask him to assist in giving directions.

I think if we posed that question to a law school class and asked them whether that was a distinction that could survive even if you had a very, a very talented and resourceful client who understood your instructions, I think most of us would say that just almost couldn't be accomplished.  And the prophesy I think was fulfilled by seeing how that trip and the search for the body unfolded. Which then leads, I don't want to go on here, but --

Q.  Let's --

A.  Leads to the question about getting away --

Q.   And let's focus in on that, where Mr. Basham apparently wandered off with Sheriff Hewitt at some point during the search.  Can you talk about that aspect of the claim?

A.   Yes.  And I don't know if this is a legally appropriate word, but I was horrified by that part of the transcripts. The idea that a client could be out in the field with numerous law enforcement people, by the way, I think all of whom these defense lawyers were not personally acquainted with, or at least many of them my impression is were not acquainted with, and to have a circumstance arise where their client could have been some distance from them and could have been having a conversation with someone from law enforcement is just totally unacceptable.  I think the Supreme Court decided a very long time ago that those kinds of communications initiated by law enforcement are inadmissible and inappropriate.

Q.   When we have spoken previously about this case you talked about an umbilical cord between the client and lawyer.  Can you explain that a little bit?

A.   Yes.  I think any time a lawyer, and I think this is a rule in any serious criminal matter but certainly in death penalty cases, there is not a circumstance that I can really imagine in which I would allow my client to be separated from me in any way.  And that's why I used the umbilical cord analogy.  I would want to be that close to my client that no communication could come between us that I wouldn't be aware

of.

Q. And is it sufficient just to advise law enforcement that there will be no questioning of your client if you were out on such a search?

A. No, I think the answer to that is of course not. And not because of bad faith. The police, please don't get me wrong here, sometimes perfectly well-meaning law enforcement officers, police officers, sheriffs, FBI agents, will communicate thinking that there may be nothing wrong with it. So I think that makes it doubly important to not allow there to be any separation between lawyer and client.

Q. Is it your opinion the attorneys -- the original attorneys in this case as to this claim fell below the standard of care?

A. Yes, for the reasons I summarized.

Q. Let's move on to claim two, that's the Jackson v. Denno hearing, some of which involved statements recovered at that search. Based upon your review of the record do you agree with defense counsel's approach in this case?

A. I'm sorry, with --

Q. With defense counsel's approach in this case, and, more specifically, defense counsel's approach not to vigorously challenge the statements?

A. No. No, I do not.

Q. And can you expand on that a little bit?

A. Yes, a little bit. The Jackson v. Denno hearing, as

defense counsel has testified here, is -- first of all, it's always an opportunity to gain discovery and to pin witnesses down. So when one I think starts with, and competent lawyers typically start with the idea that the Jackson v. Denno hearing is a very important opportunity to gain precision and understanding about what the government's position is going to be.

The idea that there could be some significant downside to pressing thoroughly and aggressively not in a confrontational way, but in a thorough way, the examination of witnesses at a Jackson v. Denno hearing is I think not something that lawyers would do. And that the specific question here based -- I understood the topic of being concerned about taking a position at the Jackson v. Denno hearing that would be different from trial I do not think would weigh heavily in the scale --

THE COURT: Let me interrupt here, because I think I might have been the one that injected that notion, and I might have been wrong. But you say it would not be inappropriate for a capital defendant to move to suppress statements in a Jackson v. Denno hearing and argue that the statements were coerced or not voluntary, and if convicted to then argue to the jury at the penalty phase that they should be given credit for making voluntary statements. The court would have no ability to do anything about that? I'm just asking. I never

had that come up before.

THE WITNESS:  Well, and I don't think in this particular context I have either, but I think --

THE COURT:  It's unique because only in capital cases does the jury get to look at sentencing.  I'm thinking if I have a case I try and I have a suppression hearing where the defendant says the officers beat me and beat the confession out of me, and the officers testify contrary to that and I resolve the credibility in favor of the law enforcement officers and say there was no coercion, the defendant gets convicted, then he comes back before me at sentencing, I'm not going to let him argue he should get credit for voluntarily giving the information to the officers so that the trial wouldn't be necessary.  I mean, it just seems to me it would be the same thing with a capital sentencing jury, wouldn't it?

THE WITNESS:  I don't think so, and I may tell you why.

THE COURT:  I might be wrong, I just never had it come up.  But if there was error there I might have partially caused it.  Was I the one that raised it or did someone else raise it?

MS. STONE:  Your Honor, it may have been you, it may have been the government.  I honestly --

THE COURT:  I think I was careful to say that wasn't a ruling, but I just raised the question.

Hammond – Direct                              847

MS. STONE:  That's correct.  I am confident there was no ruling, it was a concern that was raised.  And I just don't recall if it was you or the government who initially raised that concern.  But there was no ruling.

MR. BURKE:  Your Honor, for the record, by your recollection of the record is it was you who raised the question and asked would this become an issue.

THE COURT:  Right.  All right.

THE WITNESS:  And it may be easier, your Honor, if you -- if we focus on it not just in the hypothetical of a law enforcement officer beating a confession out of someone and then later defense lawyers arguing it's voluntary, but if you think about the --

THE COURT:  Not that it's -- but they should get credit for helping law enforcement solving the case.

THE WITNESS:  But take his reduced mental state for just a moment.  If at the Jackson v. Denno hearing they had raised the voluntariness of the client because the client couldn't appreciate the consequences of his conduct, if you had ruled against counsel on that issue and said no, I think it was voluntary, I think it was knowing and intelligent, I would be very surprised if when we get to sentencing I wouldn't be able to stand up and argue to you as the judge, or to the jury, that his statements were voluntary, to the extent he could make a voluntary statement I ought to get full

credit.

THE COURT:  Because I would have made a fact finding it was voluntary.

THE WITNESS:  You would have made a fact finding it was voluntary and I -- I think even though I had argued vehemently to the contrary I don't think I should be foreclosed from --

THE COURT:  All right.  I understand.

BY MS. STONE:

Q.  And that leads into my next question.  That case where a client has issues like you've heard some of Mr. Basham's are, or least are alleged to be, do you think there is a special duty of care for a lawyer in a capital case?

A.  Yes, I think that, and in sitting here for the last couple of days has been a very brisk reminder to me of the importance of the responsibilities of a lawyer in a case in which there are serious mental state issues involving the client.

Q.  Do you feel that that duty of care was observed in this case, at least as to the Jackson v. Denno hearing?

A.  No.  At the Jackson versus Denno hearing I think it's pretty clearly no.  I think they decided not to put into issue the voluntariness of the client's statements and his mental capacities at the time of his Thanksgiving day statements, and I believe in doing that they fell below the standard of care.

Q.  Beyond potentially challenging the statements based on Mr.

Basham's mental issues, in your opinion should there have been a potential challenge based on Sheriff Hewitt's conduct?

A. Yes. And that's the same conduct I mentioned earlier with respect to claim one. That whole factual issue about what Brandon Basham said and how he said it, whether he made a statement or made a demonstration, exactly what he did and said I think should have been challenged. And I don't know this is the only way, but certainly it raised in my mind a very important Edwards versus Arizona issue. That was not ventilated at the hearing.

Q. And you've read, as you said, the portions of the transcript and openings and closings. Would you agree that Sheriff Hewitt's statement was damaging to Mr. Basham's trial?

A. I think everybody now agrees with that. When I first became involved in this case I didn't know, but I think it is quite evident now that his statements were of great importance.

Q. And would a reasonably competent defense attorney vigorously challenge that statement?

A. I would think so.

Q. Anything else about the Jackson v. Denno hearing we failed to cover?

A. Nothing that comes to mind right now.

Q. Let's move on to claim five, that's the competency claim. Do lawyers have a continuing duty to assess competency of a

Hammond - Direct                                    850

client to proceed?

A.  They absolutely do.

Q.  And a subpart of that, is it a duty of defense counsel to communicate with their experts in a case about challenges with communication or other challenges they may have with their client?

A.  Yes, I think -- I think for several reasons that's certainly one of the things that defense counsel needs to consult with his consultants and experts about.

Q.  And why is that so important?

A.  Well, I think that the most important thing is that communication between lawyer and client is critically important.  And it's not just a matter of being able to speak to your client and have your client speak to you, it is -- it is important that you have some significant understanding about whether your client is really comprehending what you are saying at every stage, whether it's a plea negotiation or whether it's strategy for preparation for trial.

Q.  In your experience trying death penalty cases, would you be concerned if to keep your client under control during trial you had to provide your client markers and coloring books?

A.  Yes.  I think there are just a host of factual questions like that.  But certainly needing to distract a client so that they don't misbehave or interfere with the proceedings would be a cause for concern.

Hammond – Direct                               851

Q.  How about if a client was perseverating on specific issues and you had difficulty discussing important aspects of the case with him?  Would that be a cause for concern?

A.  I must say I hadn't heard the word perseverating in several years until yesterday, so I'm not sure I can recall it.

Q.  Fixate.

A.  Well, obsessing, fixating.  I certainly have encountered, and many other lawyers have, that kind of behavior from a client.  And it's very, it's very troubling, not only because of what it does to the dynamic between lawyer and client but what it tells you about the mental state of your client.

Q.  How about a client who is slurring their words or unable to stay awake or groggy?

A.  Well, I said there was a host of factors that have been talked about here.  Those are certainly among them, the inability to stay focused, the changes in speech pattern, all of those kinds of things would be of concern.

Q.  Some of what was discussed by trial counsel was that Mr. Basham had events of incompetence.  What are a lawyer's duties when a client has what's been described as events of incompetence?

A.  Well, I think there are two duties.  One is that you need to be able to be sure at all times that your client is competent to communicate with you and to assist in his defense

at that time.  But I think those episodes of apparent incompetence tell you -- they certainly raise huge red flags about whether there may be deeper or more serious problems about competency over a longer period of time.

Certainly, as you said earlier, competence needs to be evaluated at every moment.  But they aren't isolated moments.  Those events of incompetence of a client should be telling defense counsel that there could be much larger problems.

Q.  If a client is found incompetent for an afternoon of trial and competent the next morning, is the problem fixed?

A.  No.  For the reason I tried to say it wouldn't be fixed, it would be a cause for continuing concern.

Q.  Can not raising competence ever be a strategy decision?

A.  I don't think so.  And I don't think so either as a matter of competent counsel or as a part of counsel's ethical responsibility.  I don't think that there's anything else you can weigh against having an incompetent client.

THE COURT:  Let me jump in here and ask that.  Because I don't want to sound partisan, but a capital defendant who realizes he's in for a tough fight, he's on video abducting the victim, and so forth, what is to keep him from pretending to doze off and asking for coloring books just to create a competency issue?  Are there any telltale signs of malingering or such as that?

I guess I'm saying could that ever backfire on

defense counsel to say to the jury my client's incompetent because he has a coloring book and because he's sleeping, when some jurors might subjectively say he's just putting on a show for us. And I'm not saying that's what happened here, I want to hasten to add, but I'm just asking could that blow up on you sometimes?

THE WITNESS: I think it certainly could. I think if you posit a situation in which -- in which the lawyer -- let me stop. Lawyers can't do this alone, this is one of those areas where the assistance of qualified professionals is just critical.

My views of the competence of my client are pretty dadgum important but they are not the only thing. And so when I've been involved in cases, and many of the federal cases they have all been I think multiple defendant cases, and there have been other defendants in cases that I've been involved in who I would say may have adopted, your Honor, the kind of strategy that you are talking about, that I'm either going to misbehave so much or I'm going to appear to be so out of it that I will either gain sympathy with the jury or I'll stop this trial.

And I think that the lawyers representing those kinds of clients have a very difficult job, and it's a job that they cannot perform by themselves, they need the help of experts. But if they think their client is essentially acting out and

if qualified professionals confirm that, then certainly that's a matter for lawyer/client communication to talk about. But I would hope that no competent lawyer would seek to have his client declared incompetent based upon essentially nonsense kinds of things. I hope I responded.

Q. (MS. STONE) And you reviewed the testimony of Mr. Harris, I believe, and you sat through Mr. Swerling's testimony. Are you aware of times they spoke to the court with concerns about Brandon's -- about Mr. Basham's inability to stay awake?

A. Yes.

Q. And is it your impression that they sincerely believed he was having those problems?

A. I have no reason to doubt that they were sincerely reporting what they thought was a problem with the client's staying awake.

Q. And the same goes for any other issues that they reported with Brandon's problems focusing?

A. Yes.

Q. And staying calm?

A. Yes. And, by the way, I read the portion of Mr. Swerling's testimony that I did not see from last Thursday, and I have read all of Mr. Harris', and I have no reason to think that at any moment they were either exaggerating or gilding the lily, if you will, with respect to their concerns about their client's behavior and competence in the courtroom.

Hammond – Direct                    855

Q.   If you were Mr. Basham's attorney would you have had concerns about his competency?

A.   I would have had deep and abiding concerns about his competence.

Q.   And can you expand on that a little bit?

A.   Well, I know at some point we're going to talk a little bit about the mental retardation issue, so let me just say that you start out with a client who has a very doubtful intellectual quotient, his IQ is not great.  You have a whole host of other factors that become very evident, and they certainly were to this defense team and to their experts. There were all kinds of issues going to his reduced mental state.  Those same issues are ones that would I think call for a lawyer to be concerned about whether his client was really competent to assist in the defense.

Q.   And what's your opinion as to the lawyers' conduct in claim five on whether or not they performed as a reasonably competent attorney would?

A.   Well, I want to say I think they had a hard job, but my opinion is that the standard of care was not met here.

Q.   Let's go ahead and move to mental retardation now, since we were just discussing that.  We all agree that the Atkins decision came out before this case and that imposes an absolute bar to the death penalty to those who fall into the Atkins category.  Is there a special duty of defense counsel

Hammond – Direct                               856

to pursue these types of claims where there is an absolute
bar?

A.  I don't know that I would call it a special duty, it's
certainly a very significant duty and it has become over the
years a critically important part of representing clients in
death penalty cases.  The duty to thoroughly investigate and
determine whether your client is mentally retarded is an
obligation that knows no compromise.

Q.  And is it enough to gather, simply gather the records and
previous IQ scores?

A.  Well, it clearly isn't.  You looked earlier today at some
of the literature from the late 1990s and early years of this
century, and I think there is now a wealth of information
available to defense lawyers that should tell us all that you
need to do a lot more than simply look at someone's IQ score.

Q.  And you mentioned the information earlier, we saw
Government's Exhibits 235 through 244, which were Mr.
Swerling's materials from his file in Atkins.  Based on your
experience, is that consistent with the type of information
that was available to defense counsel around the time of Mr.
Basham's trial?

A.  Yes.  And particularly with lawyers who have been blessed,
as Mr. Harris and Mr. Swerling were, and as I was, by having
the federal resource center available.  Many of the names you
heard today are among America's most qualified death penalty

lawyers.  They have worked very hard to make sure that people who are drafted to do the jobs that they were, these gentlemen were drafted to do and that I have been drafted to do, have the assistance of somebody who can at least help you get started in looking at these fundamental questions of mental retardation.

Q.  Would you agree with me that in the death penalty world the Atkins decision was a huge deal?

A.  Yes, it was a very much a big deal.  And it was a big deal before Atkins was decided.  You don't -- I don't want to dwell on this, but for the Supreme Court of the United States to rule that evolving standards of decency in a civilized society tell us that we cannot execute the mentally retarded has to be seen as one of the three or four most important decisions of the Supreme Court in the last 20 years.

Q.  In going back to investigations, if counsel has IQ scores is there a duty to try and recover the raw data and have that scored by appropriate experts?

A.  Yes.  Well, step one is gathering the data, and an impressive amount of at least the first level data appears to have been gathered here.  But just knowing the IQ scores isn't going to get you where you need to go as a criminal defense lawyer, particularly as a death penalty lawyer.

Q.  Is anecdotal evidence about some of the client's deficiencies and everyday functioning also an important part

of preparing for Atkins?

A.   Yes.   I think those anecdotal experiences, and you talked about a number of them here, are very important deficiencies. There may be nothing more important, Miss Stone, in this area than having available an expert in mental retardation.  There are lots of other kind of experts that are available to us in the psychiatric and psychological field, but the people who deal with mental retardation on a daily basis are a very highly specialized group.

Q.   And in your view of the record and listening to the testimony you've heard, is it your understanding that kind of expert was retained?

A.   I think I've heard testimony in this proceeding that such an expert was not available to the defense, is the phrase I think I've heard.

Q.   And what is your opinion on counsel's conduct regarding pursuing mental retardation with a client with a 65 IQ and with Mr. Basham's deficits and not pursuing an Atkins claim in this case?

A.   I'm not sure it was 65 --

Q.   68?

A.   It might have been --

Q.   You know the record better than I do.

A.   It might have been 68.  But I think this, unfortunately, fell well below the standard of care.

Q.   Let's move to claim nine, the conceding guilt claim.

THE COURT:  Before we move on, could we stop and let me get a complete list of the medical experts that were retained by defense counsel and what their profession was?  Because he just told me that the five that I heard about, none of them were qualified.  So can y'all --

MR. DALEY:  The government has a document, I think it's Government's Exhibit 8, that gives the list of I believe all --

THE COURT:  I think it's Government's Exhibit 8, and if that's it we don't need to put it on the record now.

MR. DALEY:  I'm pretty sure it has all the experts they were -- Dr. Schwartz-Watts, Dr. Morgan, Dr. Tora Brawley, Dr. William Brannon, and then Jan Vogelsang who was I think actually an MSW, but those I believe were the five.

(There was a pause in the proceedings)

MR. BURKE:  Yes, your Honor.  I think Government's Exhibit 8, which is a document created by the government, accurately states the experts that were retained by defense counsel.

THE COURT:  Well, I just want to make it clear that the witness, you looked at the professional qualifications of all five medical experts and none of them were trained in diagnosing mental retardation?

THE WITNESS:  I think that is the correct.  The

closest might have been, I'll mispronounce her name, Tora Brawley, she may have been the closest. And I have not worked with her, but I do not believe, and from the testimony here I think it was confirmed that she is not an expert in mental retardation. She was a psychologist, but I do not think her speciality was mental retardation.

THE COURT: You can be a psychologist, but without that specialization you would not recognize mental retardation issues?

THE WITNESS: Yes. And I must say this was a learning experience for me the first time I had one of these --

THE COURT: Well, it is for me, too. And I'm not trying to argue with you, I'm trying to make sure I understand your testimony.

THE WITNESS: Yes, the world of mental retardation is a very, very specialized world. The understanding of what the IQ tests meant at a particular time, what form of tests were being used, how old those tests were, how much -- how much creep was going on with respect to the things we talked about, I heard talked about here like the practice effect, those kinds of things are very highly specialized and most psychologists, at least in my experience, will tell you that that's not their field.

THE COURT: All right. Go ahead.

MS. STONE:  Good.

Q.    (MS. STONE) Let's move to claim nine.  Do you agree with defense counsel's strategy to concede guilt on everything but the intent factor on the carjacking in this case?

A.    No, I have a hard time with this claim, as well.

Q.    And taking a step back, it's my understanding that at the evidentiary hearing in the Fulks trial their standard of care expert testified it's never an appropriate strategy to concede guilt.  Do you agree with that statement?

A.    No, excuse me, no, I don't.

THE COURT:  If I recall correctly, she told me that her view was undisputed by any criminal defendant expert in the country and I rejected it and the Fourth Circuit rejected it.

MS. STONE:  Sounds like Mr. Hammond is rejecting it, as well.

THE COURT:  She would lead me to believe every single Strickland expert agreed with her on conceding guilt is a bad thing to do, or pleading guilty, rather.  All right.  Go ahead.

THE WITNESS:  I know Andrea Lyons and I respect her a great deal, and I have her book.  And I have thought a lot about the things that she said and there's great merit in it, but as an absolute it simply is not correct.

THE COURT:  All right.

BY MS. STONE:

Q.  In this case then why was conceding guilt concerning?

A.  Well, first of all, I think you would concede guilt only -- only, I mean, it would take a lot, I think, for a defense counsel in any case to concede guilt and go to trial. But if you were going to do that I would hope that there was some very clear, discernible benefit doing that.

And let me just say I have a particular difficulty with very experienced, qualified courtroom lawyers taking the position that Mr. Swerling took here.  The idea that with a very highly qualified defense counsel, courtroom lawyer, that the jurors would in some way hold it against you if you put the government to its proof I cannot accept.  I think good courtroom defense lawyers can always explain to a jury why you go through the innocence/guilt phase of a trial.

Q.  And you talked about taking advantage of concession.  In your review of this case and this claim did you see much advantage that Mr. Basham got out of this concession?

A.  Well, he clearly didn't get a benefit out of it.  But the goal to achieve that benefit is the word ephemeral comes to mind.  I can't understand what real value there was in conceding guilt to the kidnapping elements, which made this a capital offense, and not going forward to trial on that but knowing you were then going to have a penalty phase.

Q.  And in your review of the case did it appear that the case

proceeded with the prosecution's presentation of evidence as if nothing had been conceded?

A.   Seems to me quite obvious that's that what they did throughout the case.

Q.   What about the strategy of putting the strategy on the record?  Is there any benefit to the client by doing that?

A.   I cannot understand this at all.  I'd simply, and I don't want to be too blunt about this, but I cannot see a reason under which in the representation of a client I would -- I would tell the court that I had conferred and that my client had agreed to my strategy.  I do not see how that serves the client's interest at all.  It serves only my interest as a lawyer and not that of my client.

Q.   Is it your -- what is your opinion on defense counsel's performance in conceding guilt to a death eligible offense?  Did that fall below the standard of care?

A.   I think it did fall below the standard of care.  And let me just say one other thing.  Given the tremendous resources that were available to a quite able defense team I would have hoped to have seen a great deal more in the way of consultation and careful analysis of this particular.  Obviously, it's a fulcrum point in the trial, that particular strategy.

Q.   Let's move now to claim 15, that's the intrinsic evidence or 404(b) evidence and information about Samantha Burns, the

West Virginia victim.  Would you agree that this was particularly damning evidence in Mr. Basham's case?

A.  I think that's undeniable.

Q.  Do you agree with the approach that Mr. Basham's team took in this case?

A.  I'm sorry.  Could you say that again?

Q.  Do you agree with the approach Mr. Basham's team took towards that evidence in this case?

A.  No, I don't.

Q.  And what issues do you take with how they handled this?

A.  Well, first of all, the decision that the Samantha Burns evidence was intrinsic to the crime is itself a debatable point.  But let's assume for a moment that a decision had been made prior to trial focused on the 404(b) question and intrinsic evidence and a decision had been made that the Samantha Burns evidence was intrinsic.  Assuming that had happened, and I don't really think that did happen here, but if it did happen then I think the lawyer's next responsibility is to limit so far as reasonably possible the development and use of that, of that evidence in the trial.

Q.  And in your review of this case and listening to the testimony did you see any efforts by defense counsel to limit the use of that evidence?

A.  No.  And the way -- what I was looking for would have been requests primarily out of the presence of the jury.  I accept

the idea that in front of a jury a defense counsel may very well not want to be jumping up and appearing to try to throttle evidence, and particularly from grieving loved ones. But outside of the presence of the jury I would have expected to see very straightforward and detailed arguments by counsel to limit the number of witnesses and the nature of testimony.

Q.  And you basically answered my next question, but I just want to make it clear, one of the strategies for not challenging was they didn't want to object during the testimony of grieving parents and family members.  Am I to understand there are other ways to challenge that testimony?

A.  Well, I think that there is, and I'm sorry for getting --

Q.  No, that's fine.  What about the argument that they wanted to front load the damaging evidence and it was all going to come in at the penalty phase anyway?  Can you address that aspect?

A.  I understand the idea of drawing the sting and going ahead and letting the jury hear about evidence that they may later find damaging, but I think that reasoning is really fraught with difficulty.  Now, what actually happened here, at least in the portions of the record that I spent time looking at, is that the Samantha Burns story gets told, I guess told many more times, but it gets told twice to the jury, and in terms that I'm sure defense counsel knew were going to be graphic and gripping for the jury.  So rather than removing the sting

from it they doubled the intensity of that information.  And I think that was foreseeable, frankly.

THE COURT:  Let me jump in again.  I haven't read the transcript, I read your briefs, but you are saying that the jury was allowed to hear victim impact-type statements from Miss Burns' family?

MS. STONE:  Our argument is it was akin to victim impact statements.  The government argued I think at trial, as well, that the idea was to show that she didn't just run away, she had actually been murdered by Mr. Basham and Mr. Fulks. We countered that wasn't a defense raised by the defense team, and it wasn't just the type of testimony but also that victim after victim after victim came in and testified about their loss, not being able to ever have her sleep in the room of the house they were building and that she wouldn't be able to finish the career that she was studying for.  That, in our opinion, was victim impact-type evidence that put up very unlimited Samantha Burns disappearance could have been discussed by an officer.  There were many, many ways that that evidence could have come in under that intrinsic evidence argument and not been so prejudicial.

THE COURT:  All right.

BY MS. STONE:

Q.  Anything else on claim 15, Mr. Hammond?

A.  Not that comes to mind right now.

Q. Okay. Let's move into the puppet statement in claim 16. Do you agree with defense counsel's decision not to pursue, aggressively pursue, bringing in the puppet statement by the government in Chad Fulks' closing into Mr. Basham's case?

A. No, I don't.

Q. And do you agree with that even if the government was consistent with their theories of the case with Mr. Fulks and Mr. Basham that they still should have pursued bringing in the government's words?

A. I still would want to bring it in. I don't share their view that they were entirely consistent positions, but setting that aside, the power of statements by the government, the power of those statements on juries shouldn't be discounted. There is I think almost always greater value in a statement by the government, by the very people who are prosecuting a case, than almost any other witness.

Q. Is it a fair statement that it's very important in a penalty phase when there are codefendants to examine relative culpability?

A. Well, it is in any case. It's particularly true in a federal death penalty case where we recognize reduced role in the offense as an identified mitigator and also allow it as a general mitigator.

Q. Can you find a tactical reason for failing to ask the judge a second time to -- failure to re-urge the puppet

statement issue?

A. Well, I certainly don't think that there's a tactical issue for failing to raise it again with the court.

Q. And you heard --

THE COURT: Let me jump in again. Again, I don't want to sound like I'm being adversarial. We're going to argue this case back later in December and I want to be sure I'm on top of everything while you are here. But as I understand, the government's position is, or Mr. Swerling's position, that if they had asked me to admit selected portions of Johnny Gasser's closing argument about the puppeteer and the puppet I would have probably enforced the evidence rule that says you can't take something out of context, you've got to put in the full context, which might have led to a good chunk of the entire summation from the Fulks case being read to the jury in this case, thereby giving the government essentially two closing arguments. You don't put any weight to that?

THE WITNESS: Well, I understand the rule of context and I certainly think that there was a -- that there was a risk that by asking you to allow in the puppeteer-related statements that the government would say and you would agree that broader context would be necessary. I do not think that the rule of completeness would lead a court to conclude that most of the closing argument would be admitted.

Hammond – Direct                          869

But, frankly, if that were the court's conclusion, if the court were to tell me since you want the puppeteer's statement in I'm going to put in, I'm going to allow the prosecution to put in the whole closings, if you had so ruled I would then have an important decision to make.  And my decision at that point conceivably could have been all right, your Honor, I withdraw my request.

THE COURT:  It would have been at least fleshed out and discussed.

THE WITNESS:  But it certainly should have been, my use, certainly should have been addressed.  And, frankly, your Honor, even if court had ruled that the large portions, indeed, maybe all of the closing could be admitted, given the breadth and depth of argument that was allowed I don't think that one more rendition of the closing --

THE COURT:  The Fourth Circuit held in the appeal of the Fulks 2255 petition that the government did not take inconsistent positions.  And even once the -- went so far as to quote Mr. Gasser in each case where he was saying it took both of these men to make this crime succeed.  Basically, in substance that's when he said.

THE WITNESS:  And I have read that.

THE COURT:  Right.

THE WITNESS:  But I don't think that, I don't want to disagree with the Fourth Circuit, but at least as I have read

the materials from the Fulks case, and I haven't read very much of them, but certainly looking at the government's position in that case and reading with care the closing arguments of the government in this case, I think they are distinctly different and competent defense counsel would have wanted to argue those differences.

Yes, in Fulks the government said that they were a team, but they made very clear in that case that Fulks was the leader of the team and they pressed on that with some intensity. In this case they dropped the Fulks had the -- had the leadership role. They didn't drop it but they didn't score with it, and then they very well emphasized -- and, by the way, I thought it was an eloquent closing argument to treat these guys as if they were the American hockey team, as if they were all members of the same team with a common goal and common expectation, which puts them all on the same playing field.

THE COURT: One more question and I'll shut up. I read Sheriff Hewitt's testimony, trial testimony from the Basham case over the weekend. And he admitted, I think, in his testimony that his interaction with Mr. Basham on that fateful day on Thanksgiving day, that Mr. Basham was a follower and Mr. Fulks was the leader. I mean, I don't think that that concept didn't -- I think that concept did creep in the case to some extent, at least through Sheriff Hewitt, if

not other places.

THE WITNESS:  I think you are entirely right.  I think I was inartful when I said they tried but they didn't score.  I think that concept of Basham as the follower was there, and I take Mr. Swerling at his word that they tried to breathe that into the defense.

But let me just stop for a second here.  If you talk about closings and if you talk about the government's position in closing, I think that particular information has such elevated power that it should have been used in this case, even if there was evidence of the concepts of difference there --

THE COURT:  Because I tell them several times in my jury charge that what the lawyers say is not evidence, the evidence comes from the witness stand.  I emphasize that in every trial, really.

THE WITNESS:  But the position that the government has taken in another case is of a different character.

THE COURT:  All right.  Okay.  I understand.

THE WITNESS:  That's my argument.

THE COURT:  I apologize for interrupting so much, but while he's here I want to get all the information I can.

MS. STONE:  I appreciate that, your Honor.  I actually don't have any other questions on claim 16.  Is there anything that I didn't cover with you?

THE WITNESS: Not that I recall right now.

Q. (MS. STONE) And just a couple final questions, because I think it will probably come up with the government. What's your position on capital punishment? Do you agree with it?

A. Today I do not.

Q. Has that opinion evolved over time?

A. It has. I began believing that it was possible to envision a system of capital punishment that would involve competent counsel adequately funded and an ability of government to differentiate, the system of criminal justice to differentiate the worst of the worst, and I think it's now become evident to me and to a lot of people that that just can't happen.

Q. Because of your opposition to capital punishment would you find ineffective assistance of counsel in any case you were asked to help with?

A. No.

MS. STONE: May I have just a moment to confer with counsel?

(There was a pause in the proceedings)

MS. STONE: No further questions, your Honor. Thank you.

THE COURT: All right. Cross-examination.

CROSS-EXAMINATION

Hammond – Cross                          873

BY MR. JOHNSON:

Q.  Good afternoon, Mr. Hammond.

A.  Good afternoon, counsel.

Q.  Now, I know you're already aware, but just for the record my name is Jeff Johnson, and about a week ago, last Monday October 8th, I believe it was, I had the pleasure of interviewing you over the phone.  Do you remember that?

A.  Yes, I do.  And I do recall your name.

Q.  All right.  So thank you.  And if for no other reason I always remember that interview because I learned a new word, and today we have been talking about perseveration and how you don't hear that one too often.

During our interview you told me that I had a mellifluous voice and I had to go back and look that one up to see if you were insulting or complimenting me.  As it turned out you were complimenting me, as I understand the word, and I appreciate that.

So we sat down and had an interview last Monday night, October or -- afternoon, morning your time, October 8th.  And habeas counsel were present in the room and you were there by phone.

A.  That's correct.

Q.  I want to start with one question that Miss Stone finished off with, which is that you are now personally opposed to the death penalty, correct?

A.  I am.

Q.  And, in fact, as Miss Stone asked you rather extensively during the beginning of her questions, the death penalty is obviously a topic in which you have immersed your life throughout your career, and particularly as of late, would that be fair to say?

A.  As of -- I don't know about as of late, but, yes.

Q.  Certainly throughout your career then.

A.  Yes.

Q.  And you've written extensively on the death penalty, you've taught courses both at the undergraduate and law school level about the death penalty.  And one of the articles that you authored, and I think it's appeared in several places, one of which is the Arizona Republic.  Is that the name of the major newspaper there in Phoenix?

A.  Yes.  It's the only major newspaper in town.

Q.  And did you write an article that appeared in the Arizona Republic entitled "Why Should you Oppose the Death Penalty?"

A.  I believe I did.  I didn't pick that title, they don't let you pick your own titles, but I think I did.  There is an article that has had that title.

Q.  And in that article you spelled out a couple of reasons for why people should oppose the death penalty.  And was one statement that you made that for the death penalty to be carried out capital defendants have to have competent lawyers,

adequately funded?

A.   Yes.

Q.   Now, in this case your testimony is not that any of the attorneys involved at the trial level were incompetent lawyers generally, is it?

A.   That's absolutely correct.

Q.   You are not contending that Mr. Swerling or Mr. Harris are incompetent lawyers.

A.   I am not.

Q.   And there has not been a claim made in this case, has there, that they were inadequately funded, has there?

A.   I have not heard that.  In fact, I heard the opposite, that all of their requests for funding were granted.

Q.   And didn't you say on direct examination that, thankfully, this case is different than a lot of the cases that you see and talk about and write about in that these lawyers were competent lawyers and that they were adequately funded?

A.   I think I did say that.

Q.   And so in many respects the case about which you have been asked to offer expert testimony today is a lot different than many of the ineffective assistance cases that you dealt with throughout your career.

A.   It's different in that respect.

Q.   And because you are not contending that they are incompetent lawyers, generally, your opinion is based on the

decisions that they made and didn't make during the trial of this case, correct?

A.   Both them and their predecessors.

Q.   Mr. Swerling and Mr. Harris along with Mr. Littlejohn and Mr. Monckton.

A.   For the limited reason I discussed earlier, yes.

Q.   Given that your opinion today is based on their performance during the preparation for trial and the trial of Mr. Basham's case I would like to talk about your experience, and particularly your trial experience.  Now, I know you have been practicing for a long time, over 40 years, is that correct?

A.   43.

Q.   And in the course of those 43 years you have tried about 25 criminal cases, is that correct?

A.   That have actually gone to trial, yes, I believe so.

Q.   25 cases that have gone through trial?

A.   I think that's what I estimated when we spoke.  I told you I'm not sure of that number, but I think that's a fair estimate.

Q.   And of those 25 criminal cases that you've tried I think you testified on direct today that you had tried three capital cases, correct?

A.   Three cases that began trial as capital cases, yes.

Q.   And all those were in Arizona state court?

A.  All three of those are in Arizona state court.

Q.  And just to make sure I'm not missing anything, that was the trial of John Henry Knapp, the trial of Dale Burch, I believe it's pronounced?

A.  Yes.

Q.  And the trial of Steve DeMocker?

A.  Yes.

Q.  Those are the three?

A.  Yes.

Q.  And of those three only one, the trial of Dale Burch went to a penalty phase, correct?

A.  Yes.

Q.  And in the Burch case, the penalty phase, did I understand you to say during your direct testimony that the penalty phase was tried before a judge?

A.  Yes.

Q.  And so of the three criminal capital cases that you've tried, none of them had a jury sentencing component.

A.  That's correct.

Q.  And so to this day you haven't tried a death penalty case to a jury as far as it concerns sentencing.

A.  Yes.

Q.  And I believe you said you had eight to 12 other state death penalty cases that didn't go to trial?

A.  I think the eight number was federal death penalty cases,

Hammond – Cross                          878

but that it may be -- it may be eight to 12 state and eight federal. I don't know. Something like that.

Q. Okay. Now, you said that you had reviewed the -- I know that you sat through a portion of Mr. Swerling's testimony, and I believe you said that the part you didn't sit through from last week you've reviewed the transcript.

A. I did.

Q. And you reviewed the transcript for Mr. Greg Harris?

A. I did.

Q. And are you aware that Mr. Greg Harris has tried about a hundred criminal cases?

A. Mr. Harris has?

Q. Mr. Harris.

A. I believe there was a number like that, I don't remember how it was characterized, whether it was criminal cases or homicide cases, or -- but certainly a substantial number.

Q. And did you read or hear Mr. Swerling's testimony that he has represented between 150 and 200 murder clients?

A. I heard that.

Q. And did you also become aware that Mr. Swerling has tried dozens of those cases?

A. I heard that, too.

Q. And did you also become aware that Mr. Swerling has tried seven capital cases?

A. I don't recall the exact number.

Q.   Now, three state cases that you tried, capital criminal cases, and then I believe you testified just a moment ago that in federal court you served as learned counsel in about eight to nine federal capital offenses?

A.   That's right.

Q.   I would like to go through those, if I could, if you can remember them.  I have a -- when we were doing our interview last Monday night, in lieu of a CV or a resume Mr. Burke provided me a copy of a declaration that you provided in the case of Wendi Elizabeth Andriano.  Do you remember providing a declaration in that case?

A.   Yes.

Q.   And I believe that you provided this declaration, it's signed, and then I can show it to you if you would like, February of 2012, does that sound correct?

A.   Yes.

        THE COURT:  Let me interrupt.  I should know this, you start off saying he had practiced over 40 years, participated in 25 trials, of which three cases began as capital cases all on the Arizona state court level.  But then he was appointed learned counsel in eight to nine federal capital cases, is that right?

        THE WITNESS:  That's right.

        THE COURT:  And did any of those result in a trial?

        THE WITNESS:  One of them went to trial, but by the

time it went to trial death had been taken off the table by the government.

THE COURT:  I think you covered that earlier.  Thank you, sir.

BY MR. JOHNSON:

Q.  In the declaration you state, consistent with what you are saying today, that you have served as trial court counsel in eight federal death penalty cases, two in New Mexico, one in Nevada, four in the district of Arizona, and one in the District of Southern California.  Does that sound correct?

A.  I think it's at least that.  I know I've had some -- for some reason I think nine, there might have been nine cases, but I think eight is what I can recall.

Q.  And having heard and read the testimony of Mr. Swerling, at one point in the early phase of Mr. Swerling's testimony Mr. Burke asked Mr. Swerling prior to Brandon Basham's case how many federally charged capital defendants he had represented and I believe that Mr. Swerling's answer was none. Do you recall that?

A.  Yes, I do.

Q.  And then Mr. Burke also asked Mr. Swerling, are you aware that our expert counsel retained in this case has represented at least seven federally charged capital defendants?  Do you remember reading that?

A.  Vaguely.

Hammond - Cross                                      881

Q.  I would like -- I tried to figure out who the seven clients were and so I went on Pacer to the different districts that you mentioned in your declaration and searched by your name and tried to see if I could find the cases on which you had worked.  And I would like to just go through those to see if I'm looking at the right ones.  And if you don't remember, that's fine, or if you could just tell me whether or not I'm on the right track here.

And I believe you said that you started doing this in the mid '90s.  Do you remember handling a case representing a gentleman named Oscar Villa, or Villa?

A.  Yes, Oscar Villa.

Q.  And would that have been in the time period 1995 to 1997 in the District of New Mexico?

A.  I told you I wasn't sure, but that must be it.

Q.  Okay.  Now, in that case prior to trial the government filed a notice not to seek the death penalty, is that correct?

A.  Yes.

Q.  And that case was resolved by a plea agreement?

A.  I think the charge against my client was dismissed without a plea.

Q.  So that one didn't go to trial at all?

A.  No.  Well, the rest of the case went to trial.  There were eight defendants, I believe.

Q.  And did you represent any of the other --

Hammond – Cross                   882

A.   No.   When my involvement ended on behalf of my client I left that case.

Q.   And in this next case, looks like it had a rather tortuous journey, do you remember representing Mr. Filipe Cisnaros?

A.   Tortured is a good word, Mr. Johnson.   I do remember it.

Q.   And as I understood this, this actually began in the District of New Mexico around 2001 to 2003?

A.   Approximately.

Q.   And in the New Mexico federal case the government actually dismissed all the charges so it could re-file in Arizona, is that correct?

A.   Eventually they dismissed all the charges.

Q.   And then you represented him when the charges were filed in the District of Arizona, as well, correct?

A.   I was appointed by the federal court in Arizona to represent Mr. Cisnaros again.

Q.   And when you represented him again those charges were resolved by way of guilty plea, is that correct?

A.   Yes.

Q.   Did you represent a gentleman named Gregory Nikai in the District of Arizona?

A.   Yes, and I think that was the name I couldn't recall.   I think this is a shooting of a police officer on the Navajo reservation.

Q.   It would have been 2001 to 2003?

A.  I would have thought it was earlier, but I can't tell you.

Q.  But you do to the best your ability recall representing Mr. Nikai?

A.  I think that's the gentleman's name, yes.

Q.  Is that the one -- well, in that case the government also filed a notice not to seek the death penalty, correct?

A.  They had first said they were seeking it and then they withdrew the notice.

Q.  So prior to trial they ended up filing a notice not to seek the death penalty?

A.  They did.

Q.  And did that one actually go to trial?

A.  No, it did not.

Q.  Did you represent a gentleman named Vincent Cling in the District of Arizona between 1996, 1997?

A.  That's the confusion I was having.  Yes, Mr. Cling, I'm sorry, I have gotten this backwards, Mr. Cling was the man who was charged with killing the Navajo police officer, I believe.

Q.  And in that case also the government filed a notice not to seek the death penalty prior to trial.

A.  That's the case in which they first noticed and then withdrew the notice.

Q.  But they also filed a notice in Mr. Nikai's case, as well.

A.  They did eventually, yes.

Q.  And it's after the government withdrew the notice to seek

the death penalty that Mr. Cling's the one that went to trial.

A.   No, neither of those cases went to trial.  I'm sorry.

Q.   Jesse Rothchild Moore?

A.   Yes, Jesse Moore.

Q.   And that was in 2003 to 2008 in the district of Arizona. Would that be about right?

A.   Yes, about that time period.

Q.   And also in that case the government filed a notice not no seek the death penalty, correct?

A.   Very shortly before trial began, yes.

Q.   Is that the one that went to trial?

A.   Yes.

Q.   And he received a life sentence after the jury trial, correct?

A.   He did.  And that's the case that went to the Ninth Circuit and was reversed by the Ninth Circuit.

Q.   All right.  I've got one more here, and I'm going to do my best to pronounce it.  Francisco Javier Arellano-Felix?

A.   Yes, that's exactly how his name is pronounced.

Q.   And he's in the Southern District of California?

A.   Was.

Q.   And that case was resolved by plea agreement?

A.   Also on the eve of trial.

Q.   Okay.  So that's seven that I have.  Now, you mentioned one -- so far I've covered the District of New Mexico,

Hammond - Cross                                885

Arizona, and the Southern District of California.  You
mentioned that you have one in Nevada, and I certainly don't
dispute that, I just wasn't able to find it in Pacer.  Do you
know which -- which ones I'm leaving out, if any?

A.  I'm delighted you can't find it.  The one in Nevada was on
behalf of a man named Steven Cino, C-I-N-O.

Q.  And what happened with his case?

A.  Mr. Cino was charged in a conspiracy in Nevada with a
capital murder, and eventually he also entered into a plea.
And I don't know, Mr. Johnson, whether the death penalty
committee at main justice had yet decided to seek death or
not.  I just don't remember.  Mr. Cino had a heart attack on
the day he was arrested and spent the next six months in
Springfield, Missouri having a quadruple bypass and recovering
from it.

Q.  That brings us to eight if we count Filipe Cisnaros twice,
in both districts.  Are there any others I'm leaving out in
which you were learned counsel?

A.  Well, I think there's one other, but I can't tell you what
it was.

Q.  Okay, fair enough.  But in all of the cases that we have
discussed, either prior to trial or the government filed a
notice not to seek the death penalty or it was resolved by way
of plea agreement, correct?

A.  Yes.

Q.  So there aren't any cases where you went to trial in federal court when the death penalty was still on the table.

A.  That's correct.

Q.  And in only one of these did you go to trial at all, correct?

A.  That's correct.

Q.  I would like to ask you this question.  As I said, Mr. Burke asked Mr. Swerling toward the beginning of his testimony, prior to Mr. Basham had you represented any federally charged capital defendants and he said no.  Is that relevant to whether Mr. Swerling or Mr. Harris, because my understanding is that he didn't have federal capital experience prior to this case, is that lack of experience relevant to their performance in this case?

A.  It could be.

Q.  How?

A.  I think the federal resource center people would tell you, and I would agree with them, that having experience in federal death penalty cases and the management of those cases is an important skill.  And let me just give you one, or an important experience.  Let me give you one example from Mr. Swerling's testimony.

        There was testimony about the defense team going to Washington to meet with the death penalty committee, and acknowledging that the mental retardation issue was one that

they asked about at main justice. And that Miss Griffey said if you have other information you want to bring to us feel free to come back.

I think, respectfully, and ultimately it may not matter in the details of this case except for on the MR issue, but that's a huge red flag. Had a very experienced federal death penalty lawyer been aware of those conversations, a federal death penalty lawyer would have said you need to really dig into this MR issue.

THE COURT: It's time to take that recess. We have been going a pretty good while. We will take a ten minute recess.

(A recess transpired)

THE COURT: Please continue.

MR. JOHNSON: Thank you, your Honor.

BY MR. JOHNSON:

Q.  Mr. Hammond, the last question I left off with was to what extent, if any, was the experience of Mr. Harris and Mr. Swerling in federal capital cases relevant. And I believe that your answer was, as I understood it, and you can correct me if I am wrong, is that you offered an example of the mental retardation issue and said that if they had been conversant with the resources available to federal capital litigators they could have drawn on more research and resources in investigating the mental retardation issue. Is that what you

Hammond - Cross                                888

said?

A.  Well, yeah, that's sort of -- that's one way to summarize it.  I think my point was maybe less specific even than that. What I'm saying is that I think for anyone who had been in the crucible of federal death penalty cases at that time the knowledge that there was a concern about mental retardation would have opened up I think more focus on getting down to the details of the MR argument.

Q.  So what I understand you to be saying is at that time mental retardation was a hot topic, if you will, among federal capital litigators due to the recent Atkins case and so that would have been more in the forefront, maybe, of their thinking?

A.  Might be.  And some of the articles that Mr. Daley used I think are good examples of that.

Q.  But looking at -- looking at that and the other claims that have been raised that you have been asked to testify about, mental retardation itself is not a topic that's peculiar to the federal system, correct?

A.  No.  It was at one time but it's not anymore.

Q.  And Jackson v. Denno hearings aren't peculiar to the federal system?

A.  That's correct.

Q.  Determining whether your client is competent to stand trial happens in both state and federal court.

Hammond - Cross                              889

A.  Yes.

Q.  Determining which issues to concede and which issues to contest is not peculiar to the federal criminal jurisdiction, is it, capital jurisdiction?

A.  No, it's not unique to the federal system.

Q.  Whether and to what extent to object to prior bad act evidence is not peculiar to federal capital cases, is it?

A.  No.  I mean, the rules vary from state to state but, no, I think the general notions are common.

Q.  And deciding whether to argue that the government has taken inconsistent positions in related cases is not peculiar to the federal capital system, is it?

A.  No.

Q.  I want to talk about the kinds of materials and resources that you consult when you are determining whether an attorney has provided deficient performance in a particular case.  And determining whether an attorney has provided deficient performance is really in all cases a very fact-dependent inquiry, would that be fair to say?

A.  I don't know if I would say in all cases, but I think the general proposition is correct.

Q.  Okay.  Now, I think in our interview I asked you this same question.  When you are trying to determine whether an attorney has been deficient, what resources do you look at and on what authorities do you draw and who do you consult?  And I

think one thing you said that you would do is that you would talk to specific resource individuals, I think is the term that you gave it, is that correct?

A.  Yes.

Q.  So talking to people, like maybe people you mentioned earlier, who are knowledgeable in the field of federal capital litigation?

A.  Right.  And the names you've heard here in this case are certainly among those.

Q.  Would David Bruck be one of those names?

A.  Certainly.

Q.  Kevin McNally?  Are you familiar with him?

A.  Very.

Q.  David Ruhnke?

A.  Yes.

Q.  So these would be the kinds of individuals that you would want to consult in determining whether an attorney has been deficient in a capital case.

A.  They are among the kinds of attorneys, yes.

Q.  And have you consulted any of those three individuals that I just mentioned in preparation for your testimony today?

A.  No.  In fact, I decided not to contact any of them.

Q.  Did you contact any resource individuals that I haven't listed?

A.  No.

Q.   I think another thing that you said you would consider is consulting secondary literature.  What is secondary literature?

A.   Well, for example, the articles that were talked about earlier today that deal with the mental retardation issue, as one example.  But there are in the death penalty area, every year there are very intense conferences on the development of mitigation, on integrating the penalty phase with an innocence guilt phase and there were materials at all of those conferences.  So that kind of material is what I was thinking of.

Q.   So secondary literature would be things like law review articles, medical journals that are relevant to the topic, that kind of thing?

A.   Yes.

Q.   And have you read any secondary literature specifically in preparation for this case?

A.   I think I read a couple of the articles that, read superficially, I should say, a couple of articles that came up I think it was yesterday or today.

Q.   Okay.  So you read maybe the law review article that was shown to Mr. Swerling?

A.   Yeah.  One of those articles I know I had read years ago when it came out.  And a couple of others I looked at.

Q.   But other than those, no?

Hammond - Cross                                          892

A.  No, no, no.

Q.  I think you said you didn't consult anyone from the federal death penalty -- and, I'm sorry, there are so many organizations and sometimes I get, you know, the alphabet soup confused.  But David Bruck and Kevin McNally, they are with Federal Death Penalty Resource Counsel?

A.  The name has changed over time, which is one of reasons I may be a little confusing, but I think it's now called the Federal Death Penalty Resource Center.  I'm not positive of that.

Q.  And you haven't contacted anyone from there?

A.  No.

Q.  Okay.  And I think you said you didn't, no one else.

A.  No one else with the Federal Death Penalty Resource Center.

Q.  Any other resource individuals, though?

A.  Well, yes.

Q.  And who would they be?

A.  Well, among them would be my partner Anne Chapman.

Q.  Okay, Anne Chapman.

A.  Um-hmm.

Q.  And she's your partner there at Osborne Maledon?

A.  She is.

Q.  What does she do at Osborne Maledon?

A.  She's a criminal defense lawyer, but her background is

death penalty work.

Q.   And what, specifically, did you consult with her about?

A.   I consulted with her about the reduced mental state issues and the competency issues.

Q.   And I think when we had our interview last Monday on the 8th you said the same thing.  I think I asked you have you consulted with anyone other than Mr. Basham's habeas counsel about the claims that they asked you to testify on and I think you mentioned Miss Chapman's name.  So you had consulted with her at least some prior to that date, correct?

A.   I had.

Q.   Anyone else besides Miss Chapman?

A.   I do think there's somebody else, Mr. Johnson.  I can't remember who it is.

Q.   If secondary literature consists of law review articles and journals and that sort -- those sorts of materials, then would primary literature be things like cases, or is there such a thing as primary literature?  Is that even a term?

A.   It's a great question.  I'm not actually sure that I know for sure.  But I think of the primary sources as things like the cases that you are involved in, and maybe the reported cases would fit under the banner of primary resources.

Q.   So as an expert if you are trying to figure out whether a particular attorney has been deficient, then the case law would be something that you would want to look at, correct?

Hammond – Cross                                894

A.   Yes.

Q.   And I think you mentioned ABA standards and guidelines --

A.   Yes.

Q.   -- would be other material.  Have you looked at any particular ABA standards or guidelines in preparation for your testimony today?

A.   Not particularly in preparation for this testimony.

Q.   Have you consulted any cases in preparation for your testimony in this case?

A.   I did look at a number of cases.

Q.   Which cases did you look at and what claims did they relate to?

A.   Well, I went back and looked at Tennard, which you will have to tell me the claim number, but I think it's -- is it 24 or --

Q.   I think that's correct.

A.   I looked at Atkins again, I looked at Edwards versus Arizona, which I mentioned earlier.

Q.   And that's in the Fifth Amendment context, Sixth amendment, about counsel and -- invoke the right to counsel?

A.   Yes.  And what happens once you exercise that right to counsel.

Q.   Any others come to mind?

A.   There are others that might come to mind, as well, but --

Q.   Okay.

A.   Oh, Strickland.

Q.   Strickland?

A.   I always go back and reread that case, and I did it here, too.

Q.   I think another resource that you said you sometimes consult outside of counsel when trying to determine whether an attorney was deficient would be mitigation specialists, if you are dealing with a claim involving mitigation, obviously.  Did you consult any mitigation specialists in preparation for testimony today?

A.   Not in preparation for this testimony.

Q.   I think you testified on direct that Mr. Basham's current attorneys contacted you about serving as an expert in this case in August of this year.

A.   I think they tried to contact me in July and I think it was August before we actually met.

Q.   Do you know what date in August?  Early or late in the month?

A.   I do not.  I think -- no, I shouldn't guess.  I don't know.

Q.   So two to two-and-a-half months ago, would that be a fair estimate?

A.   That's pretty fair.

Q.   Did you -- I know in your declaration from this case where you signed a declaration back in February, in that case you

said that you had been contacted in a certain month and then you signed -- the engagement was confirmed in a written agreement sometime later.  Do you have a similar written agreement with Mr. Basham's attorneys?

A.   There is a written agreement that I signed.

Q.   And would that also have been done in August?

A.   I don't know.  It was sometime after we started being involved in the matter.

Q.   And I think you testified on direct that, or Miss Stone asked you, they provided you with a list of the particular claims on which they wanted you to offer expert testimony, is that how it worked?

A.   No, if I said that I got it wrong.  They asked me initially to read the through all the claims, and then after that we had conversations that resulted in paring the list down to what turned out to be seven or nine claims.

Q.   And what was the basis for determining which claims you would testify as an expert on and which claims you wouldn't?

A.   I would describe it as collaborative.  There were a number of claims that they were particularly wanting me to focus on, given the short amount of time available.  There were a couple in addition that I thought ought to at least be talked about.  So I think it was mostly issues that they wanted me to focus on plus a couple others.

Q.   So are there claims in the petition that you declined to

offer expert testimony on because you felt like you couldn't

opine that the lawyers had violated the standard of care?

A.   There was at least one claim that I did not want to

address.

Q.   What claim was that?

A.   I didn't feel comfortable addressing the claim about

whether Mr. Swerling had a personal conflict of interest.

Q.   Fair enough.  Any others that you can recall that would

fall into that same category?

A.   There may be some, but none come to mind.

Q.   Talking again about your preparation, and in this case in

particular, now, obviously, you were here earlier this

morning, and during a portion of that time Mr. Basham was

available by video teleconference.  Was that the first time

you've ever seen Mr. Basham?

A.   Yes.

Q.   So you've never met him.

A.   No.

Q.   Have you ever talked to him on the phone or had any other

communication with him?

A.   No.

Q.   Have you ever communicated or spoken with any of his

family members?

A.   No.

Q.   And I think there has been, or I know there has been some

testimony throughout this hearing that you have not had an opportunity to speak with Mr. Swerling or Mr. Harris before your testimony today.

A.   No.  I think you know that we wanted to do that, but it did not happen.

Q.   What about Cam Littlejohn?

A.   No.  I have not spoken to any of those lawyers.

Q.   Did you attempt to talk to Cam?

A.   No, I did not.

Q.   What about Billy Monckton?

A.   No.  I have read his testimony.  I should have --

Q.   Mr. Monckton's testimony, and obviously Mr. Littlejohn hasn't testified yet.  Some of the issues in this case involve either mental retardation, incompetency, and you understand that Mr. Swerling and Harris have retained Donna Schwartz-Watts as one of their psychological/psychiatric experts?

A.   Yes.

Q.   Have you spoken with Dr. Schwartz-Watts?

A.   Not about this matter.

Q.   Do you know her from other matters?

A.   She may not know that I know her but I do.  She's involved in a case that I'm counsel for in Arizona, I'm local counsel for.

Q.   A case that's going on currently?

A.  Yes.

Q.  And in that capacity what's the nature of -- what information do you have about her?  What types of information do you have about her from that other case?

A.  Well, this is a capital post-conviction relief case pending in state court in Arizona in which there was a concern that the client might want to volunteer to terminate all proceedings and to be executed.  There was an effort to find a competent expert who would assist in communicating with the client.  Among the names that were considered was Donna Schwartz-Watts, and she ultimately agreed to become involved in the matter.

Q.  So, if I understand this correctly, you represent this defendant or are on the team representing him?

A.  I am.

Q.  And this client has talked about or expressed interest in going ahead and being executed?

A.  Yes.

Q.  Similar to what Mr. Brandon Basham has done in this case.

A.  Well, similar in form, yes.

Q.  Okay.  And you wanted to make sure that this client was competent to make that kind of decision, or you had concerns about their competency.

A.  The team did, yes.

Q.  And so in retaining an expert to help determine that

competency Dr. Schwartz-Watts is one of the individuals that you considered and you ultimately retained her?

A.   She was retained.

Q.   But you have not spoken to her about this case?

A.   No.

Q.   The Brandon Basham case.

A.   No.   I haven't spoken to her about the case in which she was retained.

Q.   So she has been retained but you didn't speak to her?

A.   I haven't spoken to her personally.

Q.   Have you read any evaluation reports or materials that she prepared in Mr. Brandon Basham's case?

A.   I think I have read a couple of the things she did in this case.

Q.   Okay.   And what -- from trial transcripts or things outside the testimony?

A.   Maybe they were in -- not even her reports, but summaries of what she had said that were in the record here.   I can't tell you that I've looked at any specific thing that I know she wrote.

Q.   And when you say they were in the record, does that mean they were either in the trial transcripts or that they were part of the exhibits?

A.   Or part of what's happened in this proceeding itself, yes.

Q.   It could have been something you saw during the hearing.

Hammond - Cross                                    901

A.   Yes.

Q.   Or read from last week.

A.   Right.

Q.   What about Dr. Tora Brawley?  Have you spoken with her?

A.   No.

Q.   Have you read Dr. Schwartz-Watts' testimony in the Brandon Basham case?

A.   I don't believe so.

Q.   Have you read Dr. Tora Brawley's testimony?

A.   No.

Q.   Read any reports or materials prepared by Dr. Brawley?

A.   I can't say with any more specificity than I did about Dr. Schwartz-Watts.

Q.   Are you familiar with Dr. Thomas Hyde?

A.   I'm familiar with who he is.

Q.   Are you aware that he has been retained by habeas counsel as an expert in this 2255 proceeding?

A.   That's why I'm aware of him, yes.

Q.   And have you spoken to him about this case at all?

A.   No.

Q.   Did you review his testimony from last week?

A.   No.

Q.   And I take it you haven't seen any reports prepared by him.

A.   No.

Q.  I want to go through a few more of these.  And I'm not trying to be tedious.  Carlisle McNair was Mr. Basham's defense team investigator during the trial portion of this case, and I assume you've heard some things based on the testimony that's gone on in this hearing about Carlisle McNair.

A.  Yes.  And I have read what was said about him in the 2255 petition response and reply.

Q.  All right.  Are you familiar with the testimony from this proceeding and what was said about him in the filings?  But other than that did you read any of his memos?

A.  No.

Q.  And I take it you never spoke with him.

A.  Correct.

Q.  Other than what is in the 2255 filings and what was said in this hearing, have you reviewed anything prepared by Paige Tarr?

A.  No.

Q.  And the same -- other than the 2255 filings and what's gone on in this hearing, have you spoken with or reviewed anything prepared by Lesa Watson?

A.  No.

Q.  So is it fair to say that other than what's gone on in this hearing and what may have been attached as exhibits or part of the files in this 2255 case, you have not spoken to or

consulted any materials prepared by the defense team in the trial portion of this case.

A. I believe that's right.

Q. And I understand that you have had a lot going on in your life recently. I want to preface this question by letting you know this is not intended to question your integrity or work ethic in any way because I know you've had a lot going on in your life. But during your interview last Monday night on October 8th I asked you how many hours you had spent in preparation for your testimony in this case up until that point, and you replied not enough, isn't that correct?

A. I do remember I said that.

Q. Okay. And I think that you had estimated you had spent less than 50 hours in preparing for your testimony as of that point.

A. If you recall that's what I said, I accept it. I remember the not enough response but I don't recall exactly what I said about time.

Q. And also at the time of our interview one week ago I asked you which materials you had reviewed and which materials you had not reviewed, and I believe that at that time you said you had not reviewed any of his mental health records or other information concerning competency other than what was in the filings, is that correct?

A. Yes.

Hammond - Cross                                    904

Q. And in the week since then, other than what was in the filings have you reviewed any of his mental health records?

A. Not with particularity, no.

Q. And other than what was in the filings and what's been said in court this week and last, have you reviewed any other information concerning competency?

A. Well, I may well have. I mean, I have tried in the last week to read as much as time permitted, and I certainly have spent more than 50 hours in the last week alone. So how much of that I had touched before and how much of it now, I couldn't tell you.

Q. But concerning competency, would those have been materials that were -- would it be fair to say the materials you have seen in past week which would be all of the competency materials that you've looked at? Because I think you haven't looked at any as of last Monday. Is it fair to say everything you looked at in the past week has been in the record in the way of filings or transcripts?

A. I think that's right.

Q. And the same would be true for the mental retardation issue. Everything that you've reviewed this past week would be in the filings or the transcripts?

A. I believe so.

Q. Well, other than the filings and the transcripts, I know that's kind of a mantra, has been becoming one, have you

reviewed any of the discovery in this case?

A.   Not apart from those things.  I don't think so.

Q.   All right.  Obviously, Chad Fulks was tried before Brandon Basham and he pled guilty so there was only a penalty phase trial for him.  Have you read the entire transcript of the Fulks trial?

A.   No.

Q.   Have you read any of the transcript of the Fulks trial?

A.   Not -- if you call that a primary resource, I haven't read it as a primary resource, I've read things where portions have been incorporated in other documents, but I haven't read the transcript itself.

Q.   For example, you may have read excerpts from the Fulks trial that were included in the pleadings but not the transcript itself from Fulks.

A.   Correct.

Q.   Have you read the entire transcript in Brandon Basham's trial?

A.   No.

Q.   What portions -- have you read any portions of the transcript other than what were mentioned in this hearing this week or what was in the filings?

A.   Well, I may have.  I tried to look at the places that were identified as having been in the transcript where there were references to Brandon Basham's behavior in court.  And I can't

tell you whether all of those things are actually attachments or not.

Q. Okay. So if, for example, there was a reference in the filings or what we have been talking about this week to something that happened in the trial, you may have gone to the transcript and then looked at that. You know, there's a citation to whatever, you may have gone and looked at that excerpt but otherwise you didn't review his trial transcript.

A. Yeah. And almost all of it is the latter, is the review of what was attached to something in support of a claim.

Q. All right. There was -- bear with me one second and I think we can start moving into actual claims and get away from this.

THE COURT: Let me interrupt here. I have a program I have to go to at 6:00 o'clock tonight. Are we going to finish today? Both sides underestimated yesterday when I asked about predictions, so --

MR. JOHNSON: Yes, your Honor.

THE COURT: Had I known that we might have worked harder yesterday or started earlier this morning or something.

MR. JOHNSON: I think we can move a lot more quickly and --

THE COURT: I don't want to rush anybody, don't get me wrong. We can -- we can adjourn at 6:00, come back tomorrow. We can adjourn at 6:00 o'clock and if y'all want to

Hammond - Cross                              907

put this witness on telephone for the rest of his testimony, y'all are the ones that have got travel plans tomorrow.

MR. BURKE:  Your Honor, Mr. Hammond has made clear to me and as Miss Stone that if he needed to be here tomorrow to testify he can be.  So if the court is available and that's necessary -- is that correct, Mr. Hammond, you can be here tomorrow?

THE WITNESS:  Yes.  I really don't want people to rush themselves for that purpose.

THE COURT:  I'm not trying to rush you at all.

MR. JOHNSON:  I'm fairly confident I can finish by six without --

MS. STONE:  My redirect is really brief.

THE COURT:  Let's go ahead, but don't -- I'm not trying to push anybody.

MR. JOHNSON:  Beg the court's indulgence for one second.

(There was a pause in the proceedings)

BY MR. JOHNSON:

Q.  Have you gone through the government's exhibits and looked at all those?

A.  No, only the ones that have been talked about here in court or that were referred to last week.

Q.  Only the ones that have been mentioned this week?

A.  Yes.

Q.   I'm going to go ahead and move into the claims themselves.
Claim one is about the purse strap demonstration Mr. Basham
made when he was with law enforcement officers on the
Thanksgiving day search for Alice Donovan's body in 2002.  And
when we talked last week on October 8th you told me that you
didn't want to be dogmatic about this issue because the facts
are disputed.  Is that true?

A.   I think I told you that that claim particularly bothered
me, that it wasn't just because it was the first claim,
because I know you and I talked about the claims were roughly
chronological and I didn't want you to misunderstand what I
was saying.  And I didn't want to be sounding to you like I
was dogmatic about it, but this claim really bothered me.  I
hope that's what I communicated.

Q.   So you are saying that when you said you didn't want to be
dogmatic about it, you didn't want to -- you didn't want me to
think because it was the first issue that you were just coming
out of the box against everything.  Is that --

A.   I didn't -- I didn't want you to misunderstand me or me to
miscommunicate to you that I thought there was no circumstance
on earth where a lawyer could ever have his client talk to the
government.

Q.   But you did say -- you wouldn't deny saying that you
didn't want to be dogmatic because the facts are in dispute?

A.   Well, if that's --  I don't dispute that that's what I

could have communicated.

Q.  How far away physically was Brandon Basham from his attorneys when he gave the purse strap demonstration?

A.  You know, I have been obsessed by this question.  In some testimony there was some reference to a potted plant in the back of the courtroom, and I have been looking at this potted plant for the last couple of days and wondering if when people were referring to the potted plant in the back of the courtroom they were referring to this one, and I think they were.

And so I heard some testimony that said 25 to 30 feet and then I heard one of the witnesses say as far as I am from the potted plant.  Looks to me like more than 25 or 30 feet.  But those are the estimates that I think I've heard talked about.

Q.  So but it's fair to say that there is some question about how far he was away from his attorneys.

A.  Well, yeah, there's uncertainty about that.  At least from what I could glean from the transcripts.

Q.  What is the standard, we're talking about the standard of care here, what is the standard for how far a defendant can be from his attorney when they are searching for a body?

A.  Well, what I told you today and in response to Miss Stone's questions is that I think whenever you are with your client and law enforcement is around there must be an umbilical cord between you.  And I intended to imply a very

small distance, small enough so that there could not be conversations that you couldn't control, you as counsel couldn't control between the client and law enforcement.

Q.   Is the phrase "umbilical cord" something you got from a case?

A.   No.

Q.   Is it something that you got from an ABA standard?

A.   I don't think that there is a specific ABA standard that says how many feet that the client can be away, but I think there is a lot of literature that says you cannot be out of communication and control of your client when the client is speaking to the government.

Q.   And there's also not a standard for any specific length of time that a defendant can be away from his attorneys during the search for a body, correct?

A.   Well, I don't know of any standard that says a minute or 30 seconds.  I say no time.  And if there is going to be time someone has to go to the restroom or something there needs to be a very clear understanding that no communication will occur.

Q.   So based on your umbilical cord theory your opinion is that the distance should be zero distance?

A.   Should be as close to zero as you can get it.

Q.   As close to zero as you can get it.  And the time should be as you just said, no time.

A.   That's what I would start as my operating premise.

Q.   So if any separation of measurable length, whether it be in distance or time, violates the standard, then isn't it true we're no longer really talking about a standard of reasonable care?  Because it sounds an awful lot like strict liability. How is this not a strict liability standard?

A.   Well, I don't know whether -- I haven't thought about it as a strict liability standard, but it should be a strict standard.  I mean, Mr. Johnson, clients are in the control of law enforcement and out of my control very often on almost a daily basis in the work I've done over the years.  That happens.  But when it happens, whenever it happens there's a very clear understanding that nothing the law enforcement says to the client or client says to law enforcement is going to be part of any proceeding.  The problem here is that there wasn't that clear understanding.  Or a problem here, not the only one, but a problem here was there wasn't any clear understanding.

Q.   Let me ask you this:  In determining whether the separation of a client from his attorneys violated the standard of care, wouldn't it be important to know what caused the separation?  Because we're talking about a claim that the attorneys were negligent for allowing the separation to have occurred.  So isn't it important to know exactly how far away the separation was, how long it lasted and why it lasted?

Hammond - Cross                                    912

Wouldn't those be important factors to consider in determining whether deficient performance was rendered by the attorneys?

A.  They would all be relevant factors, but I don't -- I think at the end of the day, as I tried to tell you, I don't think there are very many excuses for allowing your client to have uncounseled communication, particularly at this phase of a death penalty case.

Q.  So you would agree that they are relevant factors, and you would also agree that you don't know with any certainty how any of these factors play out.  You don't know how far it was, you don't know how long it was, and you can't say exactly why it occurred.  So on these important relevant factors you can't say what the answers are to any of these questions, can you?

A.  I can only tell you what's in the record here.  And I have seen and the record here says at least 25 to 30 feet, and maybe longer if it's as far away as that potted plant.  And it was some period of time while the lawyers were distracted talking to members of law enforcement who were there at that time.  That much I clearly know.  And at least one of those lawyers, and probably both of them, couldn't hear, were far enough away they couldn't hear or communicate at that moment with Brandon Basham and Sheriff Hewitt.

Q.  But how do you know for certain?  You seem to be taking it as a given that the interaction occurred when the attorneys were some distance away huddling with law enforcement

officers.  How do you know that?

A.   That's what I read in the transcript.

Q.   Where in the transcript and whose testimony was that?

A.   I can't tell you for sure which one, but I think this was in the transcript at the Jackson v. Denno hearing.  But I wouldn't be able to tell you without spending more time on it.

Q.   And you are aware, aren't you, that at the time this search for the body occurred Brandon Basham had already made several statements to various law enforcement officers?

A.   I am.

Q.   And have you read all those statements?

A.   I don't know that I have.  I don't know that anybody even knows all the statements.  But I think I've read about the ones that have been talked about here in the transcript, in the case.

Q.   For example, I think we have shown several times Government's Exhibit 12, which is a memo from Greg Harris to Jack Swerling that recounts statements Brandon Basham made to Dick Hughes and Barbara McGuire in the public defender's office in Kentucky.  Is that one of the statements that you've read?

A.   Oh, I'm sorry.  I thought you were talking about law enforcement communications.  Yes, I have read that.

Q.   You read that one?

A.   I have.

Hammond – Cross                    914

Q.  And I'm talking about the statements Basham made to all the police officers that he talked about, and there were several.  Have you read all the others?

A.  I don't know that I read them all, but I've read a number.

Q.  But you are aware that he's already made several statements.

A.  I'm aware now that he had already been talking, apparently, to anybody who would listen to him before Thanksgiving afternoon.

Q.  And you understand, don't you, that there was some degree of urgency in what the attorneys for Mr. Basham were trying to do, in that they understood the body of Alice Donovan may be in this area and their concern was that if Brandon Basham was unable to help them find this body they would lose, potentially, a powerful argument in mitigation, isn't that correct?

A.  I understand that that's one of the concerns that they had.

MR. JOHNSON:  Just one second.

(There was a pause in the proceedings)

Q.  (MR. JOHNSON) I think one of the things you testified about on direct was that you were concerned -- one of the things that gave you concern, among others, was that when they set off on this journey on Thanksgiving day to find a body there was no proffer agreement in place.  Isn't one of the

Hammond – Cross                                   915

concerns you had?

A.   There was not a proffer agreement in place.

Q.   Right.  There was not a proffer agreement and so that's one of your concerns.  Are you aware that they had, the attorney for Mr. Basham had spoken with Rose Mary Parham of the U.S. Attorney's Office and she had already told them that no proffer was going to be given, correct?

A.   Well, I have read that.  And I've also read Mr. Monckton summarizing what he thought was his conversation or someone's conversation with Miss Parham in which she apparently said Carolina will do right by you.  And there's another statement in there that says nothing Mr. Basham says is going to be used against him.  I would say that the record is pretty confused on what the agreement was or wasn't.  Which is part of the problem here.

Q.   Well, have you read any of the 2255 proceedings that went on with Mr. Basham's codefendant Chad Fulks?

A.   Not unless they have been incorporated here.

Q.   Well, one of the things that went on in the Fulks case is -- and you are familiar with John Blume, correct?

A.   Yes.

Q.   And he would -- he's kind of in that camp with the federal death penalty resource gang, right?  He's now at Cornell, or has been.  He's at Cornell?

A.   Yeah.  I'm not sure I would call him part of the resource

gang, but I know who he is.

Q.   Okay.  And he was one of Mr. Fulks' attorneys in Mr. Fulks' trial.  And in Mr. Fulks' 2255 there was a very similar claim, that Mr. Blume had allowed Chad Fulks to give statements that they had hoped would be mitigating for Mr. Fulks, spare him the death penalty, and that those statements should not have been made without a proffer agreement.  And are you aware that that claim has already been rejected both here in the District Court for South Carolina and it's already been -- the denial of his 2255 petition has already been affirmed on direct appeal?

A.   Yes.  It's not my impression those are very similar claims, though.

Q.   Well, they're both claims involving statements given to law enforcement in hopes of providing a mitigation specialist's argument that were not protected by a proffer and therefore it was ineffective assistance to provide the statements, correct?

A.   Right.  But we talked about the particularly troubling circumstances of this case, and I hope I've tried to make that clear.

Q.   All right.  Just one second.

         (There was a pause in the proceedings)

Q.   (MR. JOHNSON) All right.  I'm going to move on to the claim two, which is the Jackson v. Denno hearing.  You heard

Mr. Swerling's testimony, correct, that they did not have any witnesses who would testify that any of the statements Brandon Basham made to law enforcement officers were coerced, correct?

A.   I did hear him say that.

Q.   And you don't have any information that that's not true, correct?  You don't know of any witness that he could have called would have said the statements were coerced.

A.   And I think the way he was using that word coerced is a little bit like the way the judge was characterizing a hypothetical earlier about a claim that law enforcement beat an answer out of someone or coerced in that sense.  And I certainly accept that there was no witness available who would say that -- who would say that Mr. Basham was coerced in that way, physically threatened in some way.

Q.   So your concern would not be there's information in the record they should have used of actual coercion in the sense that we usually think of when we think of a statement being involuntary, but your concern is directed more towards Mr. Basham's competency and state of mind in whether this was a knowing and intelligent statement?

A.   Those are the words I would use, knowing and intelligent.

Q.   Knowing and intelligent.  I think you said in your October 8th interview with us that lawyers should approach a Jackson v. Denno hearing "with special care" when their client appears to be compromised, is that correct?

A.   I think that's a fair summary of what I said.

Q.   Having their client evaluated by a psychiatric expert, Dr. Donna Schwartz-Watts, the same expert that you have retained in this other case, that would be taking care, correct?

A.   That would be one step, yes.

Q.   And reviewing your client's entire medical history would be special care, would it not?

A.   It would be a step.

Q.   And reviewing prior statements made by the client in circumstances under which they were made, that would be taking care, correct?

A.   That would be relevant, too.

Q.   And spending extensive client -- excuse me, spending extensive time with the client himself would also be a form of taking care, correct?

A.   I agree all of those are relevant.

Q.   Wouldn't you agree whether you -- let's take the general principle rather than the specific.  I understand that on the specific you do not agree, as you've discussed with Judge Anderson, that there would have been an estoppel issue from using the statement later.  But wouldn't you agree that it is a strategic decision that Mr. Basham's trial attorneys made when they decided to use the Jackson v. Denno hearing to preserve the issue of voluntariness and knowing and intelligent, have the judge make a ruling on it, and still

Hammond - Cross                               919

preserve their ability to argue at sentencing that he made the statements voluntarily and that the jury should consider that in not giving him a death penalty?  That's a strategic choice they made, correct?

A.  I'm not sure I followed that question.

Q.  It was long.  You understood Mr. Swerling's testimony to be we wanted the judge to have a finding on the Jackson v. Denno issue but we didn't want to argue strongly that it was involuntary, because if we argued strongly that it was involuntary if we came back later at sentencing and said hey, jury, give him life, not death, because he voluntarily helped the cops look for the body, they were concerned there would be an estoppel issue.  They wanted to preserve the mitigating argument for the jury at sentencing, and all of that is a strategic decision, correct?

A.  Well, I guess you can call that a strategic decision. It's in the world of trial strategy.

Q.  Will you pull up Government's Exhibit 9?  Can you see that on your screen there?

A.  Yes.

Q.  Towards the bottom of this e-mail there is an e-mail that was sent from Mr. Swerling's e-mail account on February 19, 2004.  And can you read that paragraph or those couple of sentences that begin, a lawyer challenges?

A.  Yeah.  You would like me to read it?

Hammond – Cross                              920

Q.   If you would, please.

A.   Lawyer -- so this is a question.  A lawyer challenges the voluntariness of a statement in a Jackson v. Denno, no allegation of coercion.  The lawyer does not argue voluntariness before the jury.  Does anyone think that the defense would be estopped from arguing later in the trial that the defendant tried to help law enforcement in mitigation?

Q.   All right.  Do you understand this was sent on February 19th, which was a few days before the actual Jackson v. Denno hearing in this case?

A.   Yes.

Q.   So this was before Judge Anderson raised any question about estoppel from the bench.  Are you familiar with a person with last name of Niland or Neeland with the Texas Federal Defender organization?

A.   I am.

Q.   Who was that?

A.   He was at that time the ahead of the Texas Defender Organization, which was a resource center in Texas.

Q.   Would you read his response to the bottom e-mail at the top?  It begins, I think?

A.   I read this yesterday, but I will read it again.  I think that this is good strategy and works very well in the Jackson v. Denno area because in the suppression hearing the cop will be anxious to tell how cooperative and willing the client was

during the taking of the statement.  He will not likely understand the goal at trial is to use the client cooperation as mitigating, and with a good leading question examination you will likely be able to get him to spend hours describing how "they couldn't have done it without your client's cooperation."

Q.  So Mr. Swerling floats this idea out there prior to the Jackson v. Denno hearing and wants to know what do you guys think about the validity of this strategy, and he gets a response back from the head of the Texas Public Defender that not only is this a strategy, it's a good strategy.  At least that's what Mr. Niland said, right?

A.  Well, I think you are reading a lot into that.  I wouldn't -- I mean, if you are saying that a death penalty lawyer ought to rely on this kind of e-mail exchange with as little background as he had given, I think any person who responds, and I'm on this same list, have been for years, I think it would be wrong for us to sit here and say that that was advice that a lawyer could rely on.  And particularly when we're now four, five days before the hearing.  And, frankly, I'm not sure what Mr. Niland is saying.  I do not think that's a non-ambiguous response at all.

Q.  I don't want to debate the meaning of the e-mail, and Judge Anderson can read it, take it for what it's worth.  But, with all due respect, isn't it fair to say, though, that you

were prepared to say Mr. Swerling and Mr. Harris lacked any valid strategy in doing this even though you haven't read all the statements and you don't have all the background, and you don't know all of the medical information that Mr. Swerling knows?

I mean, it seems that you are saying that Mr. Niland couldn't have provided any advice on whether it was a good strategy, but you can opine as an expert whether it was no valid strategy at all.

A.   Absolutely not, Mr. Johnson.  Having been a member of this organization for now well more than a decade, and having been on the list serve, I think if Eric Friedman, the center of this website list serve, were to be here he would be deeply offended at the idea that a lawyer on the eve of an important hearing in a death penalty case could be sending out an e-mail that is this cryptic and expecting to get responses on which he can rely.

If you need that kind of advice and you need it in anticipation of a hearing that is about to come up this is not the way you do it.  Or this isn't the end of it.  If Mr. Swerling had said I picked up the phone and called Mr. Niland and we reviewed the whole case with him that might be a different circumstance.  But I don't believe that's what happened here.

Q.   So if Mr. Niland knew what you knew then he would be

saying what you're saying now and not what he said in this e-mail?

A.  I don't know what he would say.  But I would hope he would say the same thing I'm saying now, and think he would.

Q.  Can we go to Government's Exhibit 10?  Let's go to the one at the bottom that starts -- it's from David Ruhnke, February 26th -- 22nd.  And I will just read it.  It says, Jack, unfortunately I can see the argument that the defense can't have it both ways, i.e., the statement was involuntary but the defendant was voluntarily trying to be helpful.  He says, I don't know enough about the facts to weigh in, though, like whether the client actually said or signed anything in support of the motion.  But that kind of argument is probably a Simmons versus United States analogy that raises a legal argument or providing the factual basis for legal argument should not come at a price.  This is from David Ruhnke who you mentioned as with the Federal Death Penalty Resource Center, correct?

A.  Yeah.  I don't know if he was -- I hope I didn't say he was with the Federal Resource Center.  He may not have been at the time.

Q.  Okay.  But --

A.  He's a very experienced, very experienced death penalty lawyer, though.

Q.  So he also says he can see the argument defense can't have

it both ways.  He agreed at least that it's a concern.

A.  But, again, are you sure that they are talking about involuntary in the sense of not knowing and intelligent versus coerced?  It might make a huge difference, and I think if David Ruhnke were here he would want to know what are you talking about.  If it's the way we think of involuntary reflexively is the way the judge thought of it today.

Q.  But isn't it also true that what's at issue at a Jackson v. Denno hearing, if, if you argue the client didn't know what he was doing and then you come back later and say, yeah, he does know what he was doing, he was trying to be helpful, it's still inconsistent in the same basic way, isn't that correct?

A.  But I don't think that kind of inconsistency can be held against you.  That's what I was trying to say earlier.  I don't think that an argument you make on behalf of your client at a pretrial hearing, whether it's a Jackson v. Denno hearing or some other hearing, can then foreclose you from advocating on behalf of your client based upon whatever the court rules.

Q.  If we can briefly look at the e-mail at the top here.  I'm not going to try to read the whole thing.  And this is from -- well, there's one here in the middle that's from Kevin McNally in response to David Ruhnke and Jack Swerling is -- is copied on it.

    And he says that the tactical advantage of getting the police officers on the record about the statements before

Hammond – Cross                    925

trial argues for making the motion.  And then at the top David
Ruhnke replies, Kevin makes sense, as well.

            (There was a pause in the proceedings)

Q.    (MR. JOHNSON) All right.  Hear's what we do know.  We
know that this was an issue that Mr. Swerling thought it was
important to raise prior to the -- prior to the hearing.  We
know that David Ruhnke saw concerns, we know that Kevin
McNally saw concerns, we know that Mr. Niland saw concerns,
and then, in fact, without having been privy, of course, to
any of this that's going on Judge Anderson had concerns about
the issue, as well.  And so that suggested it was a difficult
decision that Mr. Swerling, Mr. Harris had to make and one
that was a strategic decision on how far to go in the Jackson
v. Denno hearing.  It was a question up for debate, wasn't it?

A.    Well, it's a question you can debate, I don't argue that.
But I simply don't think at the end of the day a court would
foreclose you from making a mitigation argument.  I just,
frankly, I think it's almost unimaginable that you would be
prevented in the mitigation phase of your case from arguing
anything that might be of benefit to your client.

Q.    But it was certainly imaginable to Jack Swerling and it
was imaginable to Mr. Niland and imaginable to Mr. McNally and
Mr. Ruhnke and it was imaginable to this court, isn't that
true?  Because they talked about it.

A.    I don't think so.  Again I say you are reading way too

much into these e-mails.  And I think if you had these gentlemen here they would say the same thing.

Q.  And you don't -- although I understand what your opinion is, you don't have any cases or AB guidelines to cite to the court that an attorney doesn't have to worry about that when he's in a Jackson v. Denno hearing.

A.  No.

MR. JOHNSON:  I'm going to move on claim five, competency.

THE COURT:  Mr. Johnson, you still think we're finishing at 6:00.

MR. JOHNSON:  I'm going try.

THE COURT:  I'd rather not rush through, I really would.

MR. JOHNSON:  And I apologize.  You know, I'm not a trial lawyer so my estimate of what time testimony --

THE COURT:  It happens all the time.  Practically every lawyer underestimates time, I told my law clerk that today, it just comes with the territory.  And I'd feel more comfortable if we did come back tomorrow.

MR. JOHNSON:  That's perfectly fine.

THE COURT:  Y'all have obligations tomorrow that would keep you are from being here?

MR. DALEY:  No, your Honor.

MR. BURKE:  No, your Honor.

THE COURT:  Can you rearrange your flight schedule tomorrow?

MR. BURKE:  I e-mailed my assistant while we have been going so I think we should hopefully be able to --

THE COURT:  I'm pretty tired, as well.  So let's go ahead and break for right now.

Let me, before we break, I just want to -- one question that's kind of been haunting me a little bit going back to claim one, allowing the client to be unfettered, get away from the umbilical cord.  You know, in any death penalty cases we all know you have some major forks in the road as you go along and you've got to take one fork or another and then if you get a bad result it's easy to look back and say you should have gone the other direction.  And that's what I have to struggle with.

And I want to be sure I understand your testimony.  Are you faulting defense counsel for allowing Mr. Basham to go out in the woods on Thanksgiving day to try to help find the body?  In other words, you could have had a situation where defense counsel said we're not doing anything, we're not going to give a statement, we're not going in the woods, it's Thanksgiving day, bring us our Thanksgiving meal here in prison, we'd like to assert the Fifth Amendment, see you at trial.  And if they had done that then the argument would have been any good defense lawyer should have realized the amount

of evidence against these defendants, they should have tried to make an effort to find a body in an effort to preserve their life, the life of the defendant. The defense strategy was a bad strategy, the only thing they had going was to find the body.

So are you saying they should not have even made an effort or that they should have made the effort but be more careful about what they said while out there?

THE WITNESS: Well, I am very close to saying that given these circumstances had they known anything about this client I think going forward at all was a bad idea. But if they wanted to go forward there are certainly other ways that they could have tried to approach this so that they wouldn't have the client making uncounseled statements in the field.

THE COURT: Well, the reason I ask that point is I might be mistaken, but I think that Mr. Basham made some other damaging statements while he was at the elbow of his lawyer about dragging the body into the woods. I might be wrong about that, but I think he did.

THE WITNESS: I know that there was a statement about the deer crossing the road.

THE COURT: Right, the deer statement was clearly made with the lawyer sitting right beside him.

THE WITNESS: But I don't know about when or under what circumstances the dragging of the body statement --

929

MS. STONE:  Your Honor, I believe that was in the Littlejohn hypothetical.

THE COURT:  The dragging of the body?

MS. STONE:  Correct.  And as Mr. Monckton testified, a lot of that information came from Miss Parham, she didn't agree with that, but the dragging distance comment I believe was the Littlejohn hypothetical.

THE COURT:  What I'm struggling with, I'm just trying to envision how the defendant would go to the woods, try to help find the body but not say anything.  He's got to say, look here, I remember a cemetery, I remember the animal farm or something, and he's either going to say it himself or through counsel or counsel has to make a hypothetical statement.

MR. JOHNSON:  And in addition to the hypothetical, I think that, as we discussed, there was a moment in the van when Mr. Basham leaned over to Mr. Littlejohn and whispered something in his ear and Mr. Littlejohn said go -- or Mr. Littlejohn either said go ahead or Mr. Littlejohn provided information himself that the officers needed to be looking for a purse strap.

So in addition to the hypothetical there was information provided through counsel that a purse strap needed to be found, because obviously there was some connection to where the purse strap was going to be and where the body was.

930

THE COURT: I'm just I guess pointing out that Mr. Monckton and Mr. Littlejohn were really walking a tightrope out there in the woods trying to do the best thing to do. It was difficult.

THE WITNESS: And that's what I was trying to point out when I said that this idea that there was some difference between interrogating him and having him give directions. And, again, maybe with the benefit of hindsight this does seem different. I accept that there's foresight and hindsight, but, my goodness, if you were to sit down and think what's going to unfold here, if I draw the line between interrogating and seeking directions, what pitfall am I falling into. And I think, I think it would have become obvious to them that they would have to have a very tight constraint on what was going to happen from that moment forward.

THE COURT: With that, let's adjourn for the day. And I have a plea at 9:00 o'clock tomorrow. My guilty pleas normally take a half hour, with this defendant we'd better allow 45 minutes. We have been already been through two aborted guilty plea colloquies and I'm not sure this one is going to succeed either.

MS. MIMMS: Your Honor, if I may address the court?

THE COURT: Certainly.

MS. MIMMS: I have an obligation in Charlotte tomorrow, and as local counsel I'm not actively participating.

931

May I be excused tomorrow?

THE COURT:  No problem at all.  Thank you very much. We will be in recess.

(Recess, 5:55 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  date                          s/  Daniel E. Mayo


DEFENSE WITNESSES

JACK SWERLING

        CROSS                704

        REDIRECT             799

LARRY HAMMOND

        DIRECT               824

        CROSS                873