IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 4:02-CR-00992-JFA |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| BRANDON L. BASHAM, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO BASHAM'S SUCCESSIVE
§ 2255 MOTION AND IN SUPPORT OF MOTION TO DISMISS OR, IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT**

Respectfully submitted,

SHERRI A. LYDON
UNITED STATES ATTORNEY

*/s/Robert F. Daley, Jr.*
Robert F. Daley, Jr. (ID # 6460)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
Tel.:    (803) 929-3054
Fax:    (803) 929-3135
Email:  Bob.Daley@usdoj.gov

## TABLE OF CONTENTS

**PAGE(S)**

TABLE OF AUTHORITIES .......................................................................................... iv

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................2

II.    PROCEDURAL BACKGROUND ...................................................................................4

       A.    Indictment .....................................................................................................4
       B.    Guilty Phase ..................................................................................................5
             1. Initial Jury Instructions .............................................................................5
             2. Government's Opening Statement ..............................................................6
             3. Defense Opening Statement........................................................................7
             4. Government's Case ....................................................................................7
             5. Closing Arguments...................................................................................16
             6. Jury Charge ............................................................................................17
             7. Verdict ....................................................................................................17
       C.    Penalty Phase ..............................................................................................18
             1. Preliminary Jury Instructions...................................................................18
             2. Government's Case ..................................................................................18
             3. Defense Case............................................................................................18
             4. Final Jury Instructions.............................................................................20
             5. Closing Arguments...................................................................................21
             6. Jury Verdicts............................................................................................23
             7. Sentence ..................................................................................................24
       D.    Subsequent Proceedings...............................................................................24

III.   LEGAL BACKGROUND ..........................................................................................25

       A.    Section 924(c)'s residual and force clauses....................................................25
       B.    Section 2255 Proceedings .............................................................................26

IV.    ARGUMENTS .........................................................................................................27

       1.    Basham's §§ 924(c) conviction remain valid even after *Davis*
             because both predicates - carjacking resulting in death and
             kidnapping resulting in death - are crimes of violence under the force
             clause of § 924(c)(3)(A)................................................................................27

       2.    Even if kidnapping resulting in death is no longer a crime of
             violence, carjacking is a crime of violence which alone supports
             Basham's § 924(c) conviction even after *Davis*................................................33

3.      Even if the court were to vacate Basham's § 924(c) conviction, vacating Basham's death sentences on Counts 1 and 2 would not be warranted..................................................................................................38

CONCLUSION................................................................................................................44

CERTIFICATE OF SERVICE ........................................................................................47

## TABLE OF AUTHORITIES

**CASES**                                                                                  **PAGE(S)**

*Basham v. United States*,
109 F. Supp. 3d 753 (D.S.C. 2013) ............................................................................ 24

*Basham v. United States*,
136 S. Ct. 1449 (2016) ................................................................................................ 24

*Basham v. United States*,
560 U.S. 938 (2010) .................................................................................................... 24

*Beeman v. United States*,
871 F.3d 1215 (11th Cir. 2017) ............................................................................ 26, 37

*Bennett v. United States*,
119 F.3d 468 (7th Cir. 1997) ...................................................................................... 26

*Bousley v. United States*,
523 U.S. 614 (1998) .................................................................................................... 45

*Burrage v. United States*,
571 U.S. 204 (2014) ............................................................................................... 28, 29

*Connally v. Gen. Constr. Co.*,
269 U.S. 385 (1926) .................................................................................................... 45

*Dugger v. Adams*,
489 U.S. 401 (1989) .................................................................................................... 45

*Engle v. Isaac*,
456 U.S. 107 (1982) .................................................................................................... 45

*Estell v. United States*,
924 F.3d 1291 (8th Cir. 2019) .................................................................................... 34

*Fulks v. United States*,
875 F.Supp.2d 535 (D.S.C. 2010) .............................................................................. 16

*Gonzales v. Duenas-Alvarez*,
549 U.S. 183 (2007) .................................................................................................... 32

*Hedgpeth v. Pulido*,
555 U.S. 57 (2008) ...................................................................................................... 35

*In re Hubbard*,
825 F.3d 225 (4th Cir. 2016) ...................................................................................... 26

*In re Irby*,
858 F.3d 231 (4th Cir. 2017) .................................................................... 29, 30, 31, 33

*In re Moore*,
830 F.3d 1268 (11th Cir. 2016) ............................................................................ 26, 37

*In re Williams*,
330 F.3d 277 (4th Cir. 2003) ...................................................................................... 31

*Jacobs v. United States*,
350 F.2d 571 (4th Cir. 1965) ................................................................................. 26, 37

*Johnson v. Mississippi*,
486 U.S. 578 (1988) .................................................................................................... 43

iv

*Johnson v. United States*,
    135 S. Ct. 2551 (2015) ......................................................................... 1, 24, 45
*Johnson v. United States*,
    559 U.S. 133 (2010) ..................................................................................... 28
*Johnson v. United States*,
    2019 WL 1790218 (C.D.Cal. 2019) ............................................................ 36
*Massaro v. United States,*
    538 U.S. 500 (2003) ....................................................................................... 1
*Mathis v. United States*,
    136 S. Ct. 2243 (2016) .................................................................................. 27
*Miller v. United States*,
    261 F.2d 546 (4th Cir.1958) ................................................................... 26, 37
*Moncrieffe v. Holder*,
    569 U.S. 184 (2013) ..................................................................................... 31
*Murray v. Carrier*,
    477 U.S. 478 (1986) ..................................................................................... 45
*Neder v. United States*,
    527 U.S. 1 (1999) ......................................................................................... 35
*Penry v. Johnson*,
    532 U.S. 782 (2001) ..................................................................................... 41
*Schlup v Delo*,
    513 U.S. 298 (1995) ..................................................................................... 45
*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ................................................................................... 1
*Skilling v. United States*,
    561 U.S. 358 (2010) ..................................................................................... 35
*Stokeling v. United States*,
    139 S. Ct. 544 (2019) ................................................................................... 28
*Taylor v. United States*,
    495 U.S. 575 (1990) ..................................................................................... 27
*United States v. Basham*,
    561 F.3d 302 (4th Cir. 2009) ................................................................ 2, 5, 24
*United States v. Basham*,
    789 F.3d 358 (4th Cir. 2015) ........................................................................ 24
*United States v. Battle*,
    927 F.3d 160 (4th Cir. 2019) ............................................................... 1, 29, 32
*United States v. Bell*,
    704 F. App'x 297 (4th Cir. 2017) ................................................................. 31
*United States v. Brown*,
    161 F.3d 256 (5th Cir. 1998) ........................................................................ 44
*United States v. Cammorto*,
    859 F.3d 311 (4th Cir. 2017) .................................................................... 1, 32
*United States v. Castleman*,
    572 U.S. 157 (2014) ................................................................................. 1, 29

*United States v. Causey*,
    185 F.3d 407 (5th Cir. 1999) ................................................................................... 42
*United States v. Covington*,
    880 F.3d 129 (4th Cir. 2018) ................................................................................... 27
*United States v. Cruz-Rivera*,
    904 F.3d 63 (1st Cir. 2018) ..................................................................................... 34
*United States v. Davis*,
    139 S. Ct. 2319 (2019) ...................................................................................... passim
*United States v. Doctor*,
    842 F.3d 306 (4th Cir. 2016) ............................................................................ 32, 33
*United States v. Ellyson*,
    326 F.3d 522 (4th Cir. 2003) ................................................................................... 35
*United States v. Evans*,
    848 F.3d 242 (4th Cir. 2017) ....................................................................... 34, 37, 45
*United States v. Fike*,
    82 F.3d 1315 (5th Cir. 1996) ................................................................................... 44
*United States v. Gillon*,
    704 F.3d 284 (4th Cir. 2012) ................................................................................... 42
*United States v. Gutierrez*,
    876 F.3d 1254 (9th Cir. 2017) ................................................................................. 34
*United States v. Hadden*,
    475 F.3d 652 (4th Cir. 2007) ............................................................................ 38, 39
*United States v. Hastings*,
    134 F.3d 235 (4th Cir.1998) .................................................................................... 35
*United States v. Hayes*,
    589 F.2d 811 (5th Cir. 1979) ................................................................................... 29
*United States v. Hill*,
    890 F.3d 51 (2d Cir. 2018) ...................................................................................... 32
*United States v. Hillary*,
    106 F.3d 1170 (4th Cir. 1997) ................................................................................. 38
*United States v. Hornsby*,
    666 F.3d 296 (4th Cir. 2012) ................................................................................... 44
*United States v. Jackson*,
    918 F.3d 467 (6th Cir. 2019) ................................................................................... 34
*United States v. Jefferson*,
    674 F.3d 332 (4th Cir. 2012) ................................................................................... 35
*United States v. John*,
    2017 WL 318804 n.1 (E.D.N.Y. 2017) ................................................................... 36
*United States v. Jones*,
    854 F.3d 737 (5th Cir. 2017) ................................................................................... 34
*United States v. Lee*,
    697 F. App'x 175 (4th Cir. 2017) ............................................................................ 31
*United States v. Lentz*,
    524 F.3d 501 (4th Cir. 2008) ................................................................................... 28

*United States v. Livingston*,
63 F. App'x 106 (4th Cir. 2003) ................................................................................. 44

*United States v. Louthain*,
771 F. App'x 208 (4th Cir. 2019) ............................................................................... 38

*United States v. Maxwell*,
823 F.3d 1057 (7th Cir. 2016) .................................................................................... 31

*United States v. McNeal*,
818 F.3d 141 (4th Cir. 2016) ...................................................................................... 32

*United States v. Nguyen*,
829 F.3d 907 (8th Cir. 2016) ...................................................................................... 44

*United States v. Parrish*,
767 F. App'x 440 (4th Cir. 2019) ............................................................................... 31

*United States v. Reyes-Contreras*,
910 F.3d 169 (5th Cir. 2018) ...................................................................................... 30

*United States v. Ruiz-Hernandez*,
890 F.3d 202 (5th Cir. 2018) ...................................................................................... 28

*United States v. Simms*,
914 F.3d 229 (4th Cir. 2019) ................................................................................. 1, 25

*United States v. Torres-Miguel*,
701 F.3d 165 (4th Cir. 2012) ......................................................................... 29, 33, 34

*United States v. Vasquez*,
672 F. App'x 56 (2d Cir. 2016) .................................................................................. 36

*United States v. Ventura*,
864 F.3d 301 (4th Cir. 2017) ...................................................................................... 39

*United States v. Walker*,
934 F.3d 375  (4th Cir. 2019) ..................................................................................... 28

*United States v. Wills*,
346 F.3d 476 (4th Cir. 2003) ...................................................................................... 29

*Williams v. United States*,
2018 WL 806659 (D.S.C. 2018) ................................................................................ 31

*Yates v. United States,*
354 U.S. 298 (1957) .................................................................................................... 35

## **STATUTES**

18 U.S.C. § 242 ..................................................................................................... 29, 34
18 U.S.C. § 371 ............................................................................................................... 4
18 U.S.C. § 922(g) .......................................................................................................... 4
18 U.S.C. § 922(j) ........................................................................................................... 4
18 U.S.C. § 922(o) .......................................................................................................... 4
18 U.S.C. § 924(c) ................................................................................................. passim
18 U.S.C. § 924(c)(1)(A) ........................................................................................ 25, 33
18 U.S.C. § 924(c)(3)(A) ....................................................................................... passim
18 U.S.C. § 924(c)(3)(B) ...................................................................... 1, 2, 25, 34, 45
18 U.S.C. § 1201 ................................................................................... 2, 4, 27, 44
18 U.S.C. § 1201(a) ...................................................................................................... 27

18 U.S.C. § 2119 .......................................................................................................... 44

18 U.S.C. § 2119(3) ............................................................................................... 2, 4, 27

18 U.S.C. § 2312 ............................................................................................................ 4

18 U.S.C. § 3591(a)(2) ................................................................................................. 30

18 U.S.C. § 3592(a) ..................................................................................................... 19

21 U.S.C. § 841(b) ....................................................................................................... 28

28 U.S.C. § 2244(b) ..................................................................................................... 26

28 U.S.C. § 2255 .................................................................................................... passim

## **RULES**

United States Sentencing Guidelines, § 4B1.2(a) ........................................................ 31

In June 2016, Basham was granted permission by the Fourth Circuit to file a successive § 2255 motion attacking his § 924(c) conviction in light of *Johnson v. United States*, 135 S. Ct. 2551 (2015). Dkt. # 1615. Basham filed his § 2255 motion on June 17, 2016. Dkt. # 1616. The United States moved to dismiss the motion based on the statute of limitations, reserving the right to raise additional procedural defenses and merits arguments if the motion to dismiss were denied. Dkt. # 1627. The proceedings were then held in abeyance pending decisions in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018); *United States v. Simms*, 914 F.3d 229 (4th Cir. 2019); and *United States v. Davis*, 139 S. Ct. 2319 (2019). Dkt. #s 1640, 1650, 1653. The Supreme Court in *Davis* and the Fourth Circuit in *Simms* concluded that the residual clause of § 924(c)(3)(B) is unconstitutionally vague and therefore void. The Court has now ordered the parties to file supplemental briefing in light of *Davis* and *Simms*. Dkt. # 1655.

In light of *Davis* and *Simms*, the United States no longer asserts that Basham's § 2255 motion is untimely. Instead, the United States provides this supplemental memorandum explaining why the court should deny Basham's § 2255 motion and enter judgment in favor of the United States.[1] First, both carjacking and kidnapping resulting in death remain crimes of violence under the force clause of § 924(c)(3)(A) even after *Davis*. Second, even if kidnapping resulting in death were to no longer qualify as a crime of violence predicate for § 924(c), carjacking alone still supports Basham's § 924(c) conviction. Finally, even if this court were to find that Basham's § 924(c) conviction was invalid in light of *Davis*, the appropriate result would be to vacate only the sentence for that count and leave the rest of the sentences, including the death sentences, in place. For these reasons, Basham's § 2255 motion is without merit.

---

[1]The United States is filing simultaneously with this memorandum a new motion to dismiss or, in the alternative, for summary judgment based on the reasons set forth in this memorandum.

1

I.     **INTRODUCTION AND SUMMARY OF ARGUMENT**

This case involves the killing of Alice Donovan.  On November 14, 2002, in a Wal-Mart parking lot in Conway, South Carolina, Basham jumped out of a moving truck driven by Chad Fulks.  Basham carjacked and kidnapped Alice Donovan at gunpoint and made her drive her BMW to the back of the parking lot, where Fulks met them.  Fulks got in the driver's seat of the BMW and Basham got in the back seat with Donovan.  During the kidnapping and carjacking of Donovan, she was raped and eventually killed.  *United States v. Basham*, 561 F.3d 302, 311-15 (4th Cir. 2009).

Basham was sentenced by a jury to two death sentences for carjacking resulting in death, in violation of 18 U.S.C. § 2119(3), and kidnapping resulting in death, in violation of 18 U.S.C. § 1201.  Dkt. #s 805 and 806 (special verdict forms).  Basham was also sentenced to an additional 744 consecutive months' imprisonment for various other crimes.  Dkt. # 886 (judgment).  One of the additional crimes was using and carrying a firearm during and in relation to, and possessed in furtherance of, a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 6).  Basham was sentenced to 84 months imprisonment for Count 6.

Basham now claims that his § 924(c) conviction is invalid.  He claims that the residual clause of § 924(c)(3)(B) is unconstitutionally vague, and the charged predicate "crimes of violence" for his § 924(c) count—carjacking resulting in death and kidnapping resulting in death— categorically fail to qualify as "crimes of violence" under the force clause of § 924(c)(3)(A). Dkt. # 1616, pp. 15-30.  Basham further claims that the alleged invalidity of his § 924(c) conviction requires the reversal of his death sentences.  *Id.* at pp. 36-40.

Basham's arguments fail for several reasons.  First, both carjacking resulting in death and kidnapping resulting in death remain crimes of violence under the force clause of § 924(c)(3)(A)

2

even after *Davis*: they have as an element the use, attempted use, or threatened use of physical force against the person or property of another. Therefore, Basham's § 924(c) conviction is still valid.

Second, even if kidnapping resulting in death were to no longer qualify as a crime of violence predicate for § 924(c), carjacking alone still supports Basham's § 924(c) conviction. Fourth Circuit law is clear that carjacking is a crime of violence under the force clause of § 924(c)(3)(A). Therefore, because carjacking is a valid crime of violence predicate under the force clause of § 924(c)(3)(A), Basham's § 924(c) conviction is still valid.

Finally, even if the court were to vacate Basham's § 924(c) conviction, this court must leave in place Basham's death sentences under Counts 1 and 2. The jury returned independent verdicts of death on Counts 1 (carjacking resulting in death) and 2 (kidnapping resulting in death), and the district court imposed concurrent death sentences on those counts, independent of the sentences on the other non-capital offenses, including Count 6. Additionally, the court instructed the jury that only Counts 1 and 2 were the basis for a possible death sentence. The jury was not instructed to, nor did it, rely on Basham's § 924(c) conviction to impose the death penalty. Furthermore, the § 924(c) count did not result in the admission of any additional prejudicial evidence against Basham because the § 924(c) charge arose from the same set of facts as the carjacking resulting in death and kidnapping resulting in death charges. The exact same evidence would have been presented against Basham even if he had not been charged with a violation of § 924(c). For all these reasons, Basham's § 2255 must be denied and dismissed.

3

## II.     PROCEDURAL BACKGROUND

### A.     Indictment

In December 2002, Basham and Fulks were indicted in a three-count indictment charging them with carjacking resulting in death, in violation of 18 U.S.C. § 2119(3); kidnapping resulting in death, in violation 18 U.S.C. § 1201; and interstate transportation of a stolen motor vehicle, in violation of 18 U.S.C. § 2312.  Dkt. # 23.  Several months later, on April 23, 2003, they were charged in a superseding indictment with the following charges:

| | |
|---|---|
| Count 1: | Carjacking resulting in death, in violation of 18 U.S.C. § 2119(3); |
| Count 2: | Kidnapping resulting in death, in violation 18 U.S.C. § 1201; |
| Count 3: | Interstate transportation of a stolen motor vehicle, in violation of 18 U.S.C. § 2312 |
| Count 4: | Conspiracy to commit the offense charged in Counts 1-3 and 7-8, in violation of 18 U.S.C. § 371; |
| Count 5: | Conspiracy to use and carry firearms during and in relation to crimes of violence, in violation of 18 U.S.C. § 922(o); |
| Count 6: | Using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); |
| Count 7: | Possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g); |
| Count 8: | Possession of stolen firearms, in violation of 18 U.S.C. § 922(j). |

Superseding Indictment, filed on April 23, 2019 (copy attached).

Count 1 specifically charged:  "That on or about November 14, 2002… [Fulks and Basham] with intent to cause death and serious bodily harm, by force, violence,  and intimidation did take from the person and presence of another, to wit Alice Donovan, a motor vehicle that had been transported in interstate and foreign commerce, that is a 1994 BMW 318i, and Alice Donovan's death resulted."  Count 2 specifically charged:  "On or about November 14, 2002 . . . [Fulks and Basham] willfully and unlawfully did kidnap and carry away Alice Donovan, and did willfully

4

transport Alice Donovan in interstate from Conway, South Carolina to North Carolina, and did

hold her for ransom, reward and otherwise, and Alice Donovan's death resulted." The underlying

"crimes of violence" for the § 924(c) charge in Count 6 were the crimes charged in Counts 1 and

2 of the superseding indictment,  carjacking resulting in death and kidnapping resulting in death.

*Id.* at pp.1, 2, and 11.  The superseding indictment alleged aggravating factors and special findings

supporting the imposition of the death penalty for the offenses charged in Counts 1 and 2.

### B.     Guilt Phase

Basham's trial began on September 13, 2004.  *See* Vol. I of trial transcript. During the guilt

phase, the Government produced testimony from 89 witnesses, including several of Basham's

victims of related crimes.  Basham's post-arrest statements to the FBI were introduced, as were his

statements to a former middle school teacher and his letters to girlfriend Beth McGuffin. The Wal-

Mart surveillance videos capturing the carjacking and kidnapping of Donovan were introduced, as

were the ATM withdrawals made by Fulks with Donovan's ATM card.  *United States v. Basham*,

561 F.3d 302, 315-16 (4th Cir. 2009).

### 1.     Initial Jury Instructions

Prior to opening statements in the guilt phase, the court instructed the jury that any death

sentence that might be imposed later would be based on only convictions under Count 1 and Count

2:

> For each of the eight counts of the indictment, you will be
> required to decide whether the government has proved the defendant
> guilty beyond a reasonable doubt.  Of the eight counts, only the first
> two counts charge crimes for which the law provides that the death
> penalty may be a penalty.  For this reason, if you find the defendant
> guilty either of count 1, carjacking, resulting in death, or count two,
> kidnapping, resulting in death, we will then move into phase two of
> the trial where you will receive additional evidence that you may

5

consider in determining whether the defendant should receive a sentence of death or life in prison without the possibility of parole.

As to the remaining counts, that is counts three through eight, if you find the defendant guilty, the court, not the jury, will determine the appropriate punishment for those counts. The instructions I am giving you this morning relate only to phase one of this trial. If you find the defendant guilty as to count 1 or count 2, I will give you additional instructions about phase two later. Let me emphasize again that I do not mean to suggest that there will be a phase two. That is entirely for you to decide.

Vol. I of trial transcript at 11-12.

### 2.     **Government's opening statement**

In its opening statement, the government described the November 14, 2002 carjacking and

kidnapping of Alice Donovan which resulted in her death:

Barry Donovan is Alice Donovan's husband. He spoke to her on the morning of November 14, 2002, and she told him she was going shopping at Wal-Mart that day. Alice Donovan drives a blue 1994 BMW 318I. The surveillance video at the Wal-Mart store in Conway, South Carolina showed at 2:37 p.m., a blue sedan was followed very closely by a white pickup truck into the parking lot. When the blue sedan pulls into a parking space, the white truck slows down, a white male jumps out of the truck, approaches the blue sedan. The white truck then circles the parking lot, comes back in front of the blue sedan, and then backs up and then the blue car pulls out. Forty-eight seconds after Brandon Basham jumped out of the moving truck, Alice Donovan was driving her blue sedan out of that parking lot. It took 48 seconds for them to choose Alice.

The first thing on their minds at that point was money. As they headed North with Alice Donovan in her own car, Chad Fulks began using Alice Donovan's ATM card at various locations. While he was at stores, various locations using the ATM card, Brandon Basham kept a watch over Alice Donovan in her own car to keep her captive. After using ATM machines just before 4:00 o'clock, Fulks and Basham stopped at a gas station in Shallotte, North Carolina . . . and Fulks went inside to buy three Mountain Dews and some tape. While he was inside, Brandon Basham, in broad daylight, was sitting in the back of Alice Donovan's car, with Alice, keeping her there.

At 4:26 p.m. that afternoon, Angie Warner, who is Alice's daughter, got [a] phone call from Alice saying, "I have gone

6

shopping. I will be home late." Shortly after 4:30…, witnesses who were at the Bee Tre Farm Hunt Club, which is in Winnabow, North Carolina just North of the North Carolina, South Carolina border, saw a blue sedan come down towards the hunt club with three occupants, two white males and a female. One of those witnesses later saw that blue sedan parked at a turn into a cemetery on the Bee Tree Farm Road, a road that leads off a paved road down to a hunt club down to Bee Tree Farm. Alice Donovan has never been seen since.

Vol. I of trial transcript at 37-38.

### 3.     Defense Opening Statement

Basham's defense was that Fulks had killed Donovan. Basham conceded he and Fulks kidnapped and carjacked Donovan, but he denied that he killed or intended to kill her. Basham emphasized Fulks was intelligent whereas Basham had a low IQ, had learning disabilities, and had been placed in special education classes when he was young. Basham also maintained Fulks was familiar with the areas outside Kentucky where they committed their crimes, and Basham, who did not know how to drive a car, had not been outside of Kentucky before he and Fulks escaped from jail. *See* Vol. 1 of trial transcript at 64-69 (counsel's opening statement); *Basham*, 561 F.3d at 315.

### 4.     Government's case

In 2002, Basham was serving a sentence on forgery convictions at the Hopkins County, Kentucky, Detention facility. In October, Fulks became Basham's cellmate. In early November, each were charged with new crimes. On November 4, they escaped by scaling a wall at the recreation area. Vol. I of trial transcript at 75-96.

On November 5, Basham and Fulks went to James Hawkins's home in Hanson, Kentucky, falsely claiming their car was disabled in Robards, Kentucky. They asked Hawkins to drive them there. Hawkins agreed. En route, Fulks told Hawkins their car was in Indiana and directed him to

7

drive them there.  Later, Fulks told Hawkins to change direction again.  Basham pulled a knife to force Hawkins to keep driving.  Fulks took over driving and drove the truck to a field.  Fulks and Basham forced Hawkins out of the truck, tied him to a tree, and then drove away.  Several hours later, Hawkins freed himself, stopped a passing motorist, and reported the crimes to the police.  *Id.* at 189-234; Vol. II of trial transcript at 11-25.

On November 6, Fulks and Basham drove to Portage, Indiana, where Tina Severance–a former girlfriend of Fulks–lived in a trailer with her daughter and her friend Andrea Roddy. Basham began a sexual relationship with Roddy.  Fulks, Basham, Severance and Roddy went to a motel in Northern Indiana for two nights.  On the second night, Fulks asked Severance if she knew where he could get some firearms.  Severance said her friend Robert Talsma had firearms at his house.  Fulks and Basham decided to steal Talsma's guns, and they persuaded the two women to help them.  On November 8, Severance and Roddy lured Talsma out of his house with an offer to buy him breakfast. Roddy unlocked a door and opened a window in Talsma's house. Basham and Fulks then entered Talsma's residence and stole four firearms, Talsma's checkbook, and a ring. Later, Basham and Fulks rejoined the two women and drove to a motel in Sturgis, Michigan. Basham and Roddy stayed at the motel while Fulks and Severance visited Fulks's father and his brother Dewayne.  Fulks and Severance then drove to the house of Ronnie Fulks, Fulks's brother, in Goshen, Indiana. Fulks and Severance smoked marijuana and methamphetamine. Vol. II of trial transcript at 93-180; Vol. III of trial transcript at 57-85.

That evening, Basham heard a noise outside his motel room. He opened the door and saw a policeman outside.  Basham closed the door and cocked a .22 revolver, one of Talsma's pistols, telling Roddy that he would shoot a police officer to avoid being caught.  The next day, November 9, Basham, armed with a pistol, and Roddy went to a K-Mart.  Basham stopped to talk to three or

8

four teenagers. Basham told Roddy one of the teens had a lot of cash and he would have liked to kill him for the money. Basham purchased several items with Talsma's checks. After leaving the store, Basham invited the teenagers to his motel room, intending to sell them "fake" drugs. Severance and Dewayne Fulks arrived at the motel shortly afterwards. Basham was "freaking out" because police officers were knocking on some doors in the motel. The room smelled of marijuana. Basham, who was armed, told Severance he would have killed any police officer who tried to enter the room. Severance was angry with Basham for inviting the teenagers. The teenagers left. Basham, Dewayne Fulks, and the two women then drove to Ronnie Fulks's house. Vol. II of trial transcript at 179-83; Vol. III of trial transcript at 73-90.

On November 10, Fulks, Basham, and the women drove to a motel in Piketon, Ohio, in Severance's van. Basham purchased supplies with Talsma's checks. Basham and Fulks bought two sets of camouflage clothing. On November 11, Fulks, Basham and the women drove to Huntington, West Virginia and checked into a motel. Wearing camouflage, Basham and Fulks left the motel by themselves and did not return until November 12. Vol. II of trial transcript at 175-205; Vol. III of trial transcript at 90-98.

Meanwhile, Samantha Burns—a 19-year-old college student who worked at a J.C. Penney store at the Huntington Mall–went missing. On November 11, Burns and her aunt had gone to Penney's to buy clothes. They parked their cars at different locations in the parking lot. In her car, Burns kept some candy boxes that she was selling for a school function. At 9:46 p.m., Burns called her mother and said she was at a friend's house and would return shortly. Burns was never seen alive again. Later that night, Fulks used Burns's ATM card at two local banks. Vol. III of trial transcript at 163-190, 290-91; Vol. 8 of trial transcript at 63-90. During the early morning hours of November 12, a local West Virginia Fire Department responded to a call that there had

9

been an explosion followed by a fire at a rural area three miles from Huntington. The Fire Department found Burns's burned car near a cemetery. Vol. III of trial transcript at 219-230.

Meanwhile, on November 12, Basham and Fulks returned to the motel carrying muddy clothes. Fulks told Severance they had stolen money from a car. Basham, Fulks, and the two women checked out and drove to South Carolina. In Severance's van, the women saw mud and one of the candy boxes Burns had kept in her car. On a chain around his neck, Basham was wearing a heart-shaped ring that Burns was wearing the day she disappeared. Basham said he got the candy from a girl who was selling it and he had stolen the ring from a car. That evening, Basham, Fulks, and the two women checked into a motel in Little River, South Carolina. Vol. II of trial transcript at 206-20; Vol. III of trial transcript at 97-107.

On November 13, Basham and Fulks left the motel to steal purses and wallets from unattended vehicles. Afterwards, Basham, Fulks, and the women went shopping, purchased alcohol, and returned to the motel where they drank, smoked marijuana, and played cards. Severance found Burns's ID card in one of Fulks's bags. Fulks took it and threw it in the trash. Vol. II of trial transcript at 222-30; Vol. III of trial transcript at 108-10.

On November 14, Basham, Fulks, and the two women left the motel and drove to Myrtle Beach, South Carolina. After checking into a motel and leaving the women there, Fulks and Basham drove to Conway, South Carolina, where they broke into the home of Sam Jordan and stole firearms. Carl Jordan, Sam's father, drove up just as Fulks and Basham were about to leave. Fulks tried to ram Jordan's car with his van but then stopped short. Basham came out of the house and fired at least one shot in the direction of a greenhouse. Fulks fired a shot above Jordan's head that shattered the back window of Jordan's car. Jordan drove away, and Fulks and Basham

10

followed him for a short distance, still shooting. Vol. II of trial transcript at 237-38; Vol. IV of trial transcript at 29-55.

Basham and Fulks abandoned Severance's van. They stole a truck and drove to a Wal-Mart in Conway, where they approached a blue BMW driven by 44-year old Alice Donovan. Basham got into the car and forced Donovan to drive to the back of the parking lot where Fulks was waiting. Fulks got into the car and drove it away. The abduction of Alice Donovan in the Wal-Mart parking lot was captured on Wal-Mart surveillance video. Vol. IV of trial transcript at 103-114; Trial Exhibits 128, 129A & B. The video shows the white truck driven by Fulks follow behind Donovan's BMW. The video further shows Basham get out of the moving truck and get into the BMW, and then the BMW pull out of the parking space and head to the back of the parking lot. At approximately 4:03 p.m., Fulks used Donovan's ATM card to buy gas at a gas station in Shallote, North Carolina, near the South Carolina border. At approximately 4:30 p.m., Donovan called her daughter and said she was shopping and she would be late returning home. Later that day, several men at a hunt lodge at the Bee Tree Farms Hunt Club in Winnabow, North Carolina, saw two men and a woman in a blue BMW drive to the end of a road by the lodge, turn around and leave. Fulks and Basham temporarily parked the car at a nearby cemetery. Donovan was never seen alive again. Vol. IV of trial transcript at 220-45; Vol. IX of trial transcript at 20-48, 148-150.

Basham and Fulks returned to their motel and told Severance and Roddy they had to leave town because Basham had shot at some police officers and Severance's van had been seized. Basham and Fulks drove Donovan's car to West Virginia, using Donovan's ATM card in Little River, Myrtle Beach, and in Raleigh, North Carolina. Later, Severance falsely reported to the

11

police that her van had been stolen. Vol. II of trial transcript at 238-246; Vol. III of trial transcript at 110-115; Vol. IX of trial transcript at 43-44; Vol. X of trial transcript at 169-70.

On November 15, Fulks and Basham drove to Beth McGuffin's house, who let them stay at her house. Basham carried a firearm in his coat pocket. Fulks asked McGuffin to help him buy drugs. McGuffin called her brother, a drug dealer, and drove Basham and Fulks to his house. While Fulks was inside, Basham told McGuffin that he did not want to "fuck around, or he [Basham] will shoot him [McGuffin's brother]." McGuffin's brother had no drugs for sale. Later that day, Fulks purchased an "8-ball" of crack cocaine and shared it with Basham and McGuffin at her house. Fulks wanted to purchase methamphetamine, but he was unsuccessful. The next morning, November 16, Basham had sex with McGuffin and then gave her Burns's ring. Basham and McGuffin had sex three times that weekend. Basham, Fulks, and McGuffin spent the day smoking crack. That night, they saw a news story about Burns on television. McGuffin remarked Burns was probably dead. Fulks replied, "She is dead." Vol. V of trial transcript at 57-97.

Meanwhile, FBI agents investigating the Hawkins kidnapping learned Basham and Fulks might be in Myrtle Beach and Severance had reported her van stolen. On November 16, FBI and local agents interviewed Severance and learned Basham and Fulks had left the area. They also heard reports of the crime-spree in Conway and that Donovan was missing. The agents suspected Basham and Fulks might be responsible for those crimes. Vol. X of trial transcript at 144-154.

On Sunday, November 17, Basham, Fulks, and McGuffin smoked marijuana. Basham and Fulks left McGuffin's house, telling her that they were going to Arizona. Fulks and Basham drove to the Ashland Mall in Ashland, Kentucky, a 20-minute drive from Huntington. That evening, in the mall parking lot, Basham approached Andrea Francis and her mother as they were in their car, pointed a gun at Andrea, and asked for directions to Greenville. He tried to get into the car but

12

changed his mind when he noticed Andrea was talking on her cell phone. Basham said, "My bad," and walked away. Andrea's mother called the police. Vol. V of trial transcript at 97-101; Vol. X of trial transcript at 250-270.

Ashland Police Officer Matt Davis was on patrol four blocks from the mall when he heard a police dispatch about Basham's attempted carjacking. Davis saw Basham, who fled when he saw Davis. Basham drew his pistol and fired one shot in the air and another at Davis, missing him. Basham fled and hid on the banks of the Ohio River behind some rail cars. Davis called for police reinforcements. One and one-half hours later, Basham surrendered to the police, falsely identifying himself as "Josh Rittman." The police seized from Basham a knife that belonged to Donovan and a crack cocaine pipe. Local police officers found Basham's pistol inside a railroad car several days later. Vol. VI of trial transcript at 143-170, 218-270; Vol. IX of trial transcript at 34-35.[2]

Meanwhile, federal and state agents learned "Rittman" was Basham and he was a recent escapee. On November 19 early in the morning, FBI Special Agent Scott Vito interviewed Basham at the Boyd County Detention Center. Initially, Basham admitted he and Fulks had committed several crimes after their escape but did not mention the Burns or Donovan killings. After further questioning, Basham admitted he and Fulks had kidnapped a woman in the Conway Wal-Mart parking lot, but he insisted the woman was still alive and she was with Fulks. Vol. IX of trial transcript at 137-148.

---

[2] Fulks got away from the Huntington Mall. Eventually, on November 20, Goshen, Indiana police staked out Ronnie Fulks's house because they had received a tip that Fulks might go there. Later that morning, Fulks left Ronnie's house, followed by Ronnie and his girlfriend, and hid the BMW at a barn. Afterwards, the Goshen police officers arrested Fulks and seized the BMW. Investigators subsequently discovered Fulks's semen in the BMW. Vol. VII of trial transcript at 45-100; Vol. IX of trial transcript at 99-101.

Agents reinterviewed Basham at about 9:45 a.m. the same day. Basham said he and Fulks were carrying firearms when they kidnapped Donovan; they had used her credit cards to obtain cash; they had driven her to Ashland, where they decided to steal purses for money; and Basham had been waiting for Fulks shortly before Basham fired at Officer Davis at the mall. Basham also indicated he thought Donovan was dead, and she had not been in the car when Basham and Fulks were at the Ashland Mall. Vol. IX of trial transcript at 157-185.

On November 20, FBI agents interviewed Basham for about eight hours. Basham provided additional details about his crime spree with Fulks. Basham said after he and Fulks had kidnapped Donovan, Fulks drove to a motel where he let Basham out of the car, then he drove Donovan to a remote rural location where he had sex with her, tied her up, and then left her. Basham assisted FBI Agent Pat Maley in drawing a map of the places where Basham, Fulks, and Donovan had been. The map corresponded to the Savannah Bluff area in Horry County, South Carolina. Vol. IX of trial transcript at 189-210. From November 20-22, FBI and local agents searched the Savannah Bluff area and an area in Brunswick County, North Carolina, to try to locate Donovan's body, but they were unsuccessful. Vol. X of trial transcript at 155-160.

On November 25, Basham, who was then represented by attorney Richard Hughes, agreed to help the FBI locate Donovan's body. He drew a map to show the likely location of her body, but he said he could not remember any specific landmarks. Basham referred to a cemetery where "they did their thing." Basham also said Donovan's body had been left covered but unburied in the woods, and referred to the "dragging distance" from the road. Vol. VIII of trial transcript at 218-230; Vol. X of trial transcript at p. 80.

14

On November 26, through his lawyer, Basham informed the FBI Burns was dead and her body had been rolled down an embankment into the Guyandotte River in Huntington.  Vol. VIII of trial transcript at 232-240.

On November 28, a search team of federal and state agents, including FBI Agent Long, Brunswick County Sheriff Ronald Hewett–joined by Basham and his two recently appointed defense counsel, Cameron Littlejohn, Jr. and William Monckton—drove to Brunswick County, North Carolina, to try to find Donovan's body.  En route, Basham saw a deer, then said, "I never could kill a deer and here I have--" but Littlejohn stopped him from completing that sentence. Basham told the search team he and Fulks had driven the BMW past a park, taken Donovan's body out of the car, dragged it to the woods, and covered it.  Twice, Basham became emotional as he pointed out the places where he and Fulks had been.  Basham told the agents he had thrown out a Liz Claiborne purse strap at the Bee Tree Farms Cemetery.  At one point, an agent asked Basham, "Is this where it happened?" Basham replied, "It is.  This is it."   The agents searched the cemetery but they did not find Donovan's body or the strap.  The agents ended the search.  Vol. X of trial transcript at 6-40.

Beginning in November 2002, Basham wrote a series of letters to McGuffin.  Basham said he loved McGuffin.  He denied having "hurt that girl from South Carolina," and he blamed Fulks for their crime spree.  Vol. V of trial transcript at 115-125.  He did, however, admit he "did a lot of bad s—t with [Fulks]."  Vol. V of trial transcript at 129.

On December 24, 2002, Basham called Clifford Jay, a former middle-school teacher in Kentucky.  Jay asked Basham whether he had killed Donovan.  Basham replied, "Yes, Sir.  We killed them."  Jay was surprised by Basham's use of the term "them" because he had heard only of the Donovan killing.  Jay advised Basham to cooperate with the police to locate Donovan's

15

body.  Basham said he did not remember where Donovan's body was but she had been tied to a tree. Jay reported Basham's admissions to police.  Vol. X of trial transcript at 225-235.

Federal, state, and private organizations conducted intensive searches to find the bodies of Donovan and Burns. Their bodies were not found.  Vol. VII of trial transcript at 177-241; Vol. VIII of trial transcript at 33-50.[3]

### 5.     Closing arguments

In the defense closing argument, counsel again admitted Basham and Fulks "possessed the weapons" the "government said they possessed."  Vol. XII of trial transcript at 91.  Additionally, he admitted "there was no question about the abduction of Alice Donovan."  He conceded Basham "participated in her abduction" and "participated in taking her car."  *Id.* at 92.  Counsel again contended the singular issue as to the kidnapping resulting in death and carjacking resulting in death was whether "Basham had the intent to hurt or kill Alice Donovan when she was abducted."  *Id.* at 92.  Counsel admitted Basham abducted Alice Donovan as he jumped into her BMW at the Wal-Mart parking lot:

> At the Wal-Mart in South Carolina, there is no question that Brandon Basham left the vehicle and got in the vehicle with Alice Donovan. There is no question about that, that he left the vehicle, the truck there at the Wal-Mart, Chad Fulks got in the BMW.  Mr. Gasser is exactly correct.  There were several occasions when they were driving along the road and Chad Fulks was stopping to use the ATMs that Brandon Basham was alone with Alice Donovan.  There is no question about that.  I don't dispute that with the government in any way whatsoever.  That he had the opportunity, if he wanted, to let Alice Donovan go.

---

[3]"On January 18, 2009, six years after the death of Alice Donovan, a search team located seven pieces of bone that appeared to be part of a human skull in a rural area of northeast Horry County, South Carolina. The search team subsequently found several additional bone fragments, including one that appeared to be a forearm bone. DNA testing confirmed that these partial remains were Alice Donovan's." *Fulks v. United States*, 875 F.Supp.2d 535, 623 (D.S.C. 2010).

*Id.* at 135-36.

With regard to Count 6 (the § 924(c) count), defense counsel tied Counts 1 and 2 with Count 6. Counsel admitted if the jury found defendant guilty of <u>both</u> Counts 1 (carjacking resulting in death) and 2 (kidnapping resulting in death), he was guilty of the § 924(c) charge:

> Count 6 is using a firearm during and in relation to a crime of violence. Now, if you find Mr. Basham guilty of counts 1 and 2, that, basically, satisfies that particular count, that is, using a firearm during and in relation to a crime of violence. But as we, again, submit carjacking really was not one of the crimes that was committed in this case because of that lack of intent on the part of Mr. Basham. Kidnapping still would be.

*Id.* at 100-01. Counsel reiterated this point later: "As to Count 6, use of a firearm during and in relation to a crime of violence. Again, that is going to be something that you, depending upon what your findings are <u>as to Count 1 and Count 2</u>, then your decision on Count 6 will be relatively easy." *Id.* at 101-02 (emphasis added).

### 6. Jury Charge

The district court charged the jury on the elements of Count 6. In particular, the court charged that carjacking resulting in death and kidnapping resulting in death are crimes of violence for § 924(c) purposes. *Id.* at 208. Additionally, the court instructed the jury, "if you find the defendant guilty on either Count 1 or Count 2, the third element [crime of violence] of Count 6 will be met." *Id.*

### 7. Verdict

After the 13-day trial, the jury convicted Basham of all eight counts in the superseding indictment. Dkt. # 766.

### C.     Penalty Phase

#### 1.     Preliminary jury instructions

Basham's sentencing trial began on October 12, 2004. Vol. XV of trial transcript. Prior to opening statements, the court instructed the jury that any death sentence would be based on convictions under Count 1 and Count 2 alone:

> You have unanimously found the defendant guilty of all eight counts in the indictment. **For purposes of your participation in this proceeding, however, we need to focus only on the first two counts.** The first two counts charge Mr. Basham with offenses for which the penalty is either life imprisonment without the possibility of release or death. These two offenses are: Count one, carjacking, resulting in death; and Count two, kidnapping, resulting in death.

*Id.* at p. 15 (emphasis added); *see also id.* at 16 ("After the opening statements, the government will go first and introduce evidence that it feels authorizes or justifies the imposition of the death penalty for each of the two charges as to which Mr. Basham was found guilty."); *id.* at 33 ("The law requires you to weigh these factors and to decide whether you are unanimously persuaded that the aggravating factors sufficiently outweigh any mitigating factors to justify imposing a sentence of death. You should decide this with regard to each of the two counts of the indictment."); *id.* at 34 ("You must consider the weight and value of each factor and make your decision accordingly as to each count.").

#### 2.     Government's case

At the beginning of the penalty phase, the government introduced the testimony of the witnesses in the guilt phase, "all the evidence and exhibits that were introduced during the guilt phase" and "all of the stipulations" in the guilt phase. *Id.* at 86. The government also introduced testimony from correctional officers and a female nurse regarding Basham's misconduct, drug use,

18

and sexual misconduct towards female employees in prison. Additionally, the government introduced testimony from Donovan's husband, daughter, and sister regarding the impact her death had on their family. Finally, the government entered a videotape showing a courtroom scuffle between Basham and the U.S. Marshals which occurred during the guilt phase of the trial. *Basham*, 561 F.3d at 315.

### 3.     Defense case

In mitigation, Basham offered six statutory and thirty non-statutory factors. The six statutory factors were: (1) impaired capacity; (2) duress; (3) minor participation; (4) no prior violent criminal conduct; (5) emotional disturbance; and (6) other factors. See 18 U.S.C. § 3592(a). Most of the non-statutory mitigating factors related to Basham's troubled youth and home life. In particular, Basham put forth evidence that his parents encouraged his bad behavior, forced him to steal to support their drug habits, and even introduced him to drugs. Basham was also sexually abused by one of his father's friends.

Basham also put forth mitigation evidence regarding his mental condition. Basham showed he was diagnosed with learning disabilities at a young age and eventually placed into youth homes following his expulsion from school. Basham also put forth evidence suggesting he had a deteriorating mental condition—to wit, Basham's IQ had declined from 100 as a youth to approximately 68 due to illegal drug abuse and other factors. Experts testifying on Basham's behalf diagnosed him as suffering from a brain impairment, multiple-cause dementia, drug-inhalant psychosis and anxiety. His psychiatrist admitted under oath, however, that these problems did not contribute to his offenses or keep him from distinguishing between right and wrong. Finally, Basham put forth evidence of his ability to adapt to prison life through the testimony of prison officials. *Basham*, 561 F.3d at 315.

19

4.     **Final jury instructions**

In the court's final jury instructions, it reminded the jurors their verdict as to life imprisonment or death was as to Counts 1 and 2:

> As you know, the defendant has been found guilty of two offenses for which the death penalty is available: carjacking, resulting in death, and kidnapping, resulting in death. You will have to decide the appropriate punishment and return individual verdicts for each of the two counts. The instructions I give you today apply, equally, to both counts.

Vol. XXIX of trial transcript at p. 193; *id.* at 201 ("You must decide, in regard to both offense, whether the aggravating factors, which you have found to exist, sufficiently outweighs the mitigating factors found to exist for that offense."). The court additionally explained to the jury that it had prepared "two verdict forms that detail special findings that you are asked to make, and the possible decisions you can render as to each of the offenses to which the defendant has been found guilty." *Id.* at p. 194.

The court also instructed the jury: "You may only consider evidence, including testimony, documents, and stipulations between the parties received in this courtroom, in making your determination." *Id*. at 195. Later, the court emphasized: "Your verdict must be based solely on the evidence presented in this courtroom and in accordance with my instructions." *Id.* at 233.

The court provided a detailed explanation of the process the jury needed to follow to reach a verdict. The court explained all the steps required by the special verdict forms. *Id.* at 202-33. At the end of the instructions, the court emphasized to the jury it would reach separate decisions on the appropriate sentences for Counts 1 and 2: "In addition, I advise you that you may recommend one sentence for Count 1, and a different sentence for Count 2. In other words, you are not obligated to impose the same sentence for both counts." *Id.* at 233. The court explained

20

that was the reason for separate special verdict forms for Count 1 and Count 2. *Id.* at 233 ("As noted earlier, there are two verdict forms because you must return a verdict or punishment for each of the two counts.").

Importantly, the court never mentioned Basham's § 924(c) conviction during the jury instructions in the sentencing phase.

### 5.     Closing Arguments

In the government's closing argument, the prosecutor said the following regarding the evidence supporting the threshold intent factor:

> Now the statutory threshold factor. . . . You must find the presence of one of these threshold intent factors. The defendant, himself, intentionally killed the victim. The defendant, himself, intentionally inflicted serious bodily injury that resulted in the death of the victim.  Now, those are actual—Mr. Basham actually, physically, either killing Alice Donovan or doing something to her to where she ultimately died.

> Threshold factors three and four are factors you can consider if you don't think Brandon Basham's hand had a role in actually killing Alice Donovan.  That is what three and four, the defendant intentionally participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act, or the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and the victim, Alice Donovan, died as a direct result of the act.

> I submit—let me take these backwards.  I submit on the testimony and evidence you have here, and based on the verdicts you have found, three and four are no-brainers. No-brainers. Look at number four.  The defendant intentionally and specifically engaged in an act of violence. Ladies and gentlemen, you have convicted Brandon Basham and, he has admitted in statements that he knowingly engaged in the act of kidnapping and act of carjacking

21

armed with a deadly weapon, knowing that the act created a grave risk of death to a person, being Alice Donovan.

Ladies and gentlemen, anytime you rob someone, or kidnap somebody at gun point, particularly after you did it 72 hours before to a 19-year-old girl, that is creating grave risk. By definition, armed carjacking, armed kidnapping is a risk of death to any citizen in this state. By his admissions, by your verdict, by your conviction of Brandon Basham, you have found intent level four, that is if you believe Mr. Basham's hand had nothing to do with killing Alice Donovan.

Reckless disregard for human life. Armed with a gun. Brandon Basham is in the back seat of that car. In the very least, in the light most favorable to Brandon Basham, he is the one that approached Alice Donovan with a gun while Chad Fulks was in the truck. He is the one that sat in that back seat. He is the one that held the gun at her side that kept her from walking out of that car when Chad Fulks went multiple times to use the ATM machine. Two to three minutes Chad Fulks was in the convenience store in Shallotte, North Carolina. The only thing keeping Alice Donovan from walking to her freedom from keeping her alive today all the times Chad Fulks walked away from that car on November 14th, only one person, only one person, that was Brandon Basham.

So by your convictions, by his admissions, and by your common sense number four is present, and that is if you don't find his hand actually had a role in killing Alice Donovan.

Same thing with number three. Number three, the defendant intentionally participated in an act contemplating that the life of a person would be taken. Ladies and gentlemen, this is the motivational factor. He had already carjacked, and kidnapped, and killed one woman. What do you think his motivation was? What do you think Brandon Basham's motivation was? He is approaching the car with Alice Donovan with the gun in her side. Do you think either Chad Fulks or Brandon Basham, after carjacking, kidnapping, robbing Alice Donovan, after spending all of that time with Alice Donovan, do you think for one minute they would drop her off at the corner and say, go call the police. Identify me in a South Carolina courtroom. Send me away to prison for the rest of my life. Contemplating that a life of a person would be taken, using lethal force.

22

> The gun provides the lethal force. And, again, ladies and gentlemen, for you jurors to have convicted Mr. Basham of carjacking, you had to find that intent factor. You had to have found, at the time of the crime, that Brandon Basham intended to cause death or serious bodily harm. And, ladies and gentlemen, you have convicted Brandon Basham. He is guilty of kidnapping, resulting in death; he is guilty of carjacking, resulting in death. Not only as a matter of fact, but as a matter of law. You have convicted him of those two charges. So, either one of those two are clearly present by your previous verdicts, and by the testimony of the witnesses and the admission of the defendant.

Vol. XXIX of trial transcript at 52-56.

### 6.     **Jury Verdicts**

After approximately seven hours of deliberation, *id.* at 250-52; Vol. XXX of trial transcript at 2-4, the jury unanimously returned separate verdicts of death against Basham on Counts 1 and 2. Dkt. #s 805 & 806 (special verdict forms). *See also* Vol. XXX of trial transcript at 4-16. The jury unanimously found the government proved beyond a reasonable doubt that Basham intentionally and specifically engaged in an act of violence, knowing the act created a grave risk of death to Alice Donovan, such that participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act. Dkt. #s 805 & 806, at p. 2.

The jury also unanimously found the government proved beyond a reasonable doubt the statutory aggravating factor that Alice Donovan's death, and the injury resulting in her death, occurred during Basham's commission or attempted commission of, or during the immediate flight from, his commission of a kidnapping. Dkt. #s 805 & 806, at p. 3. It also found the following non-statutory aggravating factors beyond a reasonable doubt: (1) Basham committed the offense after he escaped from the Hopkins County, Kentucky, detention facility on November 4, 2002, while awaiting trial on serious charges; (2) Basham, subsequent to his escape, participated in a carjacking and kidnapping that resulted in the death of 19-year-old Samantha Burns in Huntington, West

23

Virginia; (3) Basham, subsequent to his escape, participated in a first-degree burglary and other criminal conduct that resulted in the assault with intent to kill Carl Jordan in Conway, South Carolina; (4) Basham, subsequent to his escape, participated in a carjacking and kidnapping of James Hawkins; and (5) Basham, subsequent to his escape, participated in the attempted murder of a police officer in Ashland, Kentucky; and (6) the effect of the death of Alice Donovan on her family, including the extent and scope of the injuries and losses suffered by Alice Donovan and her family.  Dkt. #s 805 & 806, at 4-5.

### 7.     Sentence

The district court imposed concurrent sentences of death as to Counts 1 and 2.  The court also sentenced Basham to a consecutive 744 months imprisonment for his various other crimes. Dkt. # 886 (judgment).  Basham was sentenced to 84 months imprisonment for Count 6 (§ 924(c)). *Id.*

### D.     Subsequent proceedings

Basham appealed his convictions and death sentences.  The Fourth Circuit affirmed the death sentences.  *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009).  The Supreme Court denied Basham's certiorari petition.  *Basham v. United States*, 560 U.S. 938 (2010).  Basham next filed an exhaustive § 2255 motion, which this court denied after holding an evidentiary hearing. *Basham v. United States*, 109 F. Supp. 3d 753 (D.S.C. 2013).  Basham appealed this order.  The Fourth Circuit affirmed the denial of the § 2255 motion.  *United States v. Basham*, 789 F.3d 358 (4th Cir. 2015).  The Supreme Court denied Basham's certiorari petition.  *Basham v. United States*, 136 S. Ct. 1449 (2016).

Basham was granted permission by the Fourth Circuit to file a successive § 2255 motion attacking his § 924(c) conviction in light of *Johnson v. United States*.  Dtk. # 1615.  Basham filed

24

his § 2255 motion on June 17, 2016.  Dkt. # 1616.  The United States moved to dismiss based on the statute of limitations, reserving the right to raise additional procedural defenses and merits arguments if the motion to dismiss were denied.  Dkt. # 1627.  The proceedings were then held in abeyance pending decisions in *Dimaya*, *Simms*, and *Davis*. The court has now ordered the parties to file supplemental briefing in light of *Davis* and *Simms*.

## III.    LEGAL BACKGROUND

### A.    Section 924(c)'s residual and force clauses

Section 924(c) provides in relevant part that "any person who, during and in relation to any crime of violence . . ., uses or carries a firearm" shall be sentenced "in addition to the punishment provided for such crime of violence." 18 U.S.C. § 924(c)(1)(A). Section 924(c) defines "crime of violence" through two alternative provisions. The first provision states a "crime of violence" is a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A).  This provision is referred to as the "force clause." The second provision states a "crime of violence" is a felony "that[,] by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B).  This provision is referred to as the "residual clause."

In *United States v. Davis*, 139 S. Ct. 2319 (2019), the Supreme Court struck as unconstitutionally vague § 924(c)(3)(B)'s residual clause definition of "crime of violence." *Id.* at 2336.  The Fourth Circuit came to the same conclusion a few months earlier in *United States v. Simms*, 914 F.3d 229 (4th Cir. 2019) (en banc). *Davis* and *Simms*, however, do not affect § 924(c)(3)(A)'s force clause definition of "crime of violence."

**B.     Section 2255 Proceedings**

To obtain authorization to file a successive motion to vacate, a prisoner need only make a prima facie showing that his motion satisfies the requirements of 28 U.S.C. § 2244(b)—that is, "'a sufficient showing of possible merit to warrant a fuller exploration by the district court.'" *In re Williams*, 330 F.3d 277, 281 (4th Cir. 2003) (quoting *Bennett v. United States*, 119 F.3d 468, 469-70 (7th Cir. 1997)). The successive authorization inquiry, however, does not ask whether the movant "will ultimately prevail on his claim." *In re Hubbard*, 825 F.3d 225, 229 (4th Cir. 2016). And if there were any doubt, the *Hubbard* court explicitly concluded that "it is for the district court to determine whether the new rule [in *Johnson*] extends to the movant's case, not for [the Fourth Circuit] in this [authorization] proceeding." *Id.* at 231. Accordingly, the Fourth Circuit's preliminary decision authorizing a successive petition does not relieve the district court of the duty to independently review a § 2255 motion and rule on any applicable procedural and merits arguments.

Additionally, Basham, as movant, has the burden of demonstrating by a preponderance that he is entitled to relief. *See Jacobs v. United States*, 350 F.2d 571, 574 (4th Cir. 1965); *Miller v. United States*, 261 F.2d 546, 547 (4th Cir.1958) (per curiam) ("Because the proceeding under 28 U.S.C. § 2255 is a civil collateral attack upon the judgment of conviction, the burden of proof is upon petitioner to establish [his claim] by a preponderance of evidence."); *see also Beeman v. United States*, 871 F.3d 1215, 1222 (11th Cir. 2017) (*Johnson* § 2255 movant "bears the burden to prove the claims in his § 2255 motion"); *In re Moore*, 830 F.3d 1268, 1272 (11th Cir. 2016) ("a movant has the burden of showing he is entitled to relief in a § 2255 motion—not just a prima facie showing that he meets the requirements of § 2255(h)(2), but a showing of actual entitlement to relief on his *Johnson* claim").

26

## IV.    ARGUMENTS

> **Argument 1:** **Basham's § 924(c) conviction remains valid even after *Davis* because both predicates—carjacking resulting in death and kidnapping resulting in death—are crimes of violence under the force clause of § 924(c)(3)(A).**

Basham's § 924(c) conviction remains valid even after *Davis* because the charged predicate crimes of violence of carjacking resulting in death and kidnapping resulting in death qualify as "crimes of violence" under § 924(c)(3)(A)'s force clause: they have as an element the use, attempted use, or threatened use of physical force against the person or property of another.

To determine whether an offense falls within § 924(c)(3)(A), courts generally apply a "categorical approach." *See, e.g., Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016) (describing categorical approach in context of Armed Career Criminal Act); *Taylor v. United States*, 495 U.S. 575, 602 (1990) (same). Under that approach, a court "focus[es] solely" on "the elements of the crime of conviction," not "the particular facts of the case." *Mathis*, 136 S. Ct. at 2248. If the statute of conviction lists multiple alternative elements, as opposed to alternative means of committing a single element, it is "divisible" into different offenses. *Id.* at 2249. To classify a conviction under a divisible statute, a court may "look[ ] to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, [the] defendant was convicted of." *Id.*; *see United States v. Covington*, 880 F.3d 129, 132 (4th Cir. 2018).

Carjacking resulting in death and kidnapping resulting in death are crimes of violence under the force clause. The death-results provisions of the carjacking and kidnapping statutes trigger an enhanced penalty, 18 U.S.C. § 2119(3) (increasing sentencing range "if death results"); 18 U.S.C. § 1201(a) (increasing sentencing range if "the death of any person results"), and

27

therefore are elements of the aggravated offenses of carjacking resulting in death and   kidnapping resulting in death.[4] *See Burrage v. United States*, 571 U.S. 204, 210 (2014) ("Because the 'death results' [penalty] enhancement [in 21 U.S.C. § 841(b)] increased the minimum and maximum sentences to which Burrage was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt."); *United States v. Lentz*, 524 F.3d 501, 512 (4th Cir. 2008) ("death resulted" is an essential element of the offense of kidnapping resulting in death); *United States v. Ruiz-Hernandez*, 890 F.3d 202, 210 (5th Cir. 2018) ("resulting-in-death element" in 8 U.S.C. § 1324(a)(1)(B)(iv) "increases the applicable statutory maximum sentence and thus must be submitted to the jury and found beyond a reasonable doubt"). The carjacking and kidnapping statutes are therefore divisible into different offenses—carjacking that does not result in death and carjacking that does result in death, and kidnapping that does not result in death and kidnapping that does result in death—and Basham was unquestionably charged with and convicted of the offenses of carjacking resulting in death and kidnapping resulting in death.   Dkt. # 766 (Verdict form).

Carjacking resulting in death and kidnapping resulting in death have as an element the use, attempted use, or threatened use of physical force against the person or property of another. "Physical force" in this context means "force capable of causing physical pain or injury to another person," *Johnson v. United States*, 559 U.S. 133, 140 (2010) (interpreting analogous provision of the Armed Career Criminal Act), including any "amount of force necessary to overcome a victim's resistance," *Stokeling v. United States*, 139 S. Ct. 544, 555 (2019). The force may be indirect. *See*

---

[4] The government concedes that federal kidnapping not resulting in death does not qualify as a crime violence under the force clause of § 924(c). *See United States v. Walker*, 934 F.3d 375 (4th Cir. 2019).   However, because the predicate at issue in this case is "kidnapping resulting in death," *Walker* is not controlling.

28

*United States v. Battle*, 927 F.3d 160, 166-67 (4th Cir. 2019) ("As this Court noted in *In re Irby*, . . . the "distinction we drew in *Torres-Miguel* between indirect and direct applications of force and our conclusion that poison involves no use or threatened use of force, no longer remains valid in light of *Castleman*'s explicit rejection of such a distinction.' *In re Irby*, 858 F.3d 231, 238 (4th Cir. 2017).").

To prove the offenses of carjacking resulting in death and kidnapping resulting in death, the government will have to prove the victim was subjected to "physical force" within the meaning of § 924(c)(3)(A). The requirement that "death results" from the carjacking or kidnapping requires a causal connection between the offense and the death; it would not be sufficient, for example, to show the victim happened to die of natural causes during the course of a carjacking or kidnapping. *See Burrage*, 571 U.S. at 214 ("a phrase such as 'results from' imposes a requirement of but-for causation"); *United States v. Hayes*, 589 F.2d 811, 821 (5th Cir. 1979) (holding that the "death results" provision of 18 U.S.C. § 242 incorporates general principles of causation and noting that death would not "result" from a § 242 violation if the victim is struck by lightning while being detained pursuant to an illegal arrest); *United States v. Wills*, 346 F.3d 476, 500 (4th Cir. 2003) (upholding jury instruction for kidnapping resulting in death charge in which jury was instructed it must determine "whether [victim's] death resulted from the willful and intentional conduct of the defendant"). Establishing that connection will, as in this case, require proof that force capable of causing physical pain or injury or of overcoming a victim's resistance was used during the course of the commission of the offense—whether or not the force was direct or intentional. *See Irby*, 858 F.3d at 236 ("unlawfully killing another human being requires the use of force capable

29

of causing physical pain or injury to another person")[5]; *United States v. Reyes-Contreras*, 910 F.3d 169, 180-84 (5th Cir. 2018) (en banc).

Indeed, where, as here, carjacking resulting in death and kidnapping resulting in death are charged as capital offenses, to return a verdict of death the jury necessarily must find the defendant intentionally killed his victim; intentionally inflicted serious bodily injury that resulted in his victim's death; intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person and the victim died as a result of the act; or intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act. *See* 18 U.S.C. § 3591(a)(2); Superseding Indictment, filed April 23, 2003, at 14-15 (indictment importing into Counts 1 and 2 the statutory aggravating factors in § 3591(a)); Dkt. #s 805 & 806 (special verdict forms).

All statutory aggravating factors of § 3591(a)(2) entail intentional conduct that caused a victim's death. Capital carjacking resulting in death and kidnapping resulting in death, therefore, categorically have as an element—imported from 18 U.S.C. § 3591(a)(2)—the use, attempted use, or threatened use of physical force against the person or property of another because no defendant can be found guilty of those offenses without a finding that he used force capable of causing physical pain or injury against another person.

---

[5] In *In re Irby*, the Fourth Circuit was faced with a request to file a successive habeas petition. The petitioner argued that second-degree retaliatory murder was not categorically a crime of violence. To deny the petition in *In re Irby*, the Fourth Circuit necessarily had to conclude that the petitioner's argument lacked merit. To reach this conclusion, the court found that even though no means were specified, the ends specified—the unlawful killing of another—required the use of physical force.

It is clear that carjacking resulting in death and kidnapping resulting in death are the unlawful killing of a person.  Therefore, they qualify as crimes of violence under the force clause. *See Irby*, 858 F.3d at 238  ("one cannot unlawfully kill another human being without a use of physical force capable of causing physical pain or injury to another"); *United States v. Parrish*, 767 Fed.Appx. 440, 443 (4th Cir. 2019) ("Because North Carolina second-degree murder requires the unlawful killing of a human being, we conclude that it qualifies as a crime of violence under USSG § 4B1.2(a)."); *United States v. Lee*, 697 Fed.Appx. 175 (4th Cir. 2017) (same); *United States v. Bell*, 704 Fed.Appx. 297, 298 (4th Cir. 2017) (same); *Williams v. United States*, 2018 WL 806659, at *3 (D.S.C. 2018) (Seymour, J.) (holding that South Carolina voluntary manslaughter requires the intentional killing of another and, therefore, necessarily has, as an element, the intentional use of physical force against another).

The existence of a fanciful hypothetical scenario in which death might result from a kidnapping or carjacking without the use of "physical force" does not change the categorical analysis under § 924(c)(3)(A). *See United States v. Maxwell*, 823 F.3d 1057, 1062 (7th Cir. 2016) (defendant cannot "rely on fanciful hypotheticals not applicable in real world contexts (apart from law school exams)" to show categorical orverbreadth).  The Supreme Court and Fourth Circuit have repeatedly cautioned against using "legal imagination" to treat an offense as categorically overbroad. *See Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013) ("there must be 'a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls

outside the generic definition of a crime'") (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007));[6] *see also Battle*, 927 F.3d at 164 (quoting *Moncrieffe).*

Basham must point to at least one case in which a court found the death-results element of carjacking resulting in death or kidnapping resulting in death where there was no application of "physical force*."* The court must look to the "minimum conduct" required to obtain a conviction for the crime, but also must ensure that there is "a realistic probability, not a theoretical possibility, that a state would actually punish that conduct." *United States v. Doctor*, 842 F.3d 306, 308, 317 (4th Cir. 2016); *United States v. Hill*, 890 F.3d 51, 56 (2d Cir. 2018) (noting that "to show that a particular reading of the statute is realistic, a defendant must at least point to his own case or other cases in which the courts in fact did apply the statute in the manner for which he argues"). Basham has cited to no such case, and the government is not aware of one. This fact is fatal. *See Battle*, 927 F.3d at 167 (noting that "Battle cannot point to any Maryland [assault with intent to murder] case to support the notion that AWIM may be committed by an act of mere omission"); *Doctor*, 842 F.3d at 310 ("Doctor has not 'identified a single [ ] robbery prosecution where the victim feared bodily harm'—that is, was intimidated—by 'something other than violent physical force.'") (quoting *United States v. United States v. McNeal*, 818 F.3d 141, 156 (4th Cir. 2016)); *Cammorto*, 859 F.3d at 317-18 ("Like the defendant in *Duenas–Alvarez*, Cammorto provides us with no Georgia case, including his own, suggesting 'a realistic probability' that Georgia would treat a defendant as a principal where that defendant would not be principal under federal law."). And as explained above, no such case could exist in the capital context, where kidnapping resulting in

---

[6] The Fourth Circuit has noted that the Supreme Court "declined to explore fanciful hypotheticals that could support a conviction" in *Duenas-Alvarez*. *United States v. Cammorto*, 859 F.3d 311, 317 (4th Cir. 2017).

death must always include the additional element of intentional violence. *See Doctor*, 823 F.3d at 317.

For these reasons, Basham's § 924(c) conviction remains valid even after *Davis* because carjacking resulting in death and kidnapping resulting in death still qualify as "crimes of violence" under § 924(c)(3)(A)'s force clause: they have as an element the use, attempted use, or threatened use of physical force against the person or property of another.[7]

|  |  |
|---|---|
| **Argument 2:** | **Even if kidnapping resulting in death is no longer a crime of violence, carjacking is a crime of violence which alone supports Basham's § 924(c) conviction even after *Davis*.** |

Even if this court were to determine that kidnapping resulting in death were no longer a valid predicate crime of violence for § 924(c) purposes after *Davis*, federal carjacking (even if death does <u>not</u> result) is a crime of violence under § 924(c)(1)(A)'s force clause which continues to support Basham's § 924(c) conviction. Basham was convicted of carjacking resulting in death and kidnapping resulting in death. Dkt. # 766. Likewise, he was convicted of the § 924(c) count charging the crime of violence predicates of carjacking resulting in death and kidnapping resulting in death set forth in Counts 1 and 2. It would seem impossible to imagine a scenario where the jury could have concluded that Basham was guilty of using a firearm in furtherance the kidnapping resulting in the death of Alice Donovan without also concluding he did so in furtherance of the carjacking resulting in the death of Alice Donovan when the same jury found Basham guilty of both carjacking resulting in death and kidnapping resulting in death. In short, the carjacking

---

[7] Basham's extended reliance on *United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012), for the proposition that death can result without physical force, Dkt. 1616, at pp. 18-22, is misplaced. *Torres-Miguel* has been abrogated by the United States Supreme Court decision in *United States v. Castleman*, 572 U.S. 157 (2014). *See United States v. Battle*, 927 F.3d 160, 165-67 (4th Cir. 2019). *See also In re Irby*, 858 F.3d at 838.

resulting in death and kidnapping resulting in death of Alice Donovan involved the same conduct. Therefore, Basham's § 924 (c) conviction remains valid even if kidnapping resulting in death is no longer a valid predicate crime of violence for § 924(c) purposes after *Davis*.

As noted above, in *Davis*, the Court struck as unconstitutionally vague the § 924(c)(3)(B) definition of "crime of violence." 139 S. Ct. at 2336. The *Davis* decision does not affect § 924(c)(3)(A)'s force clause definition of "crime of violence." The law is well settled that carjacking (even when it does not result in death) is a crime of violence under § 924(c)(3)(A)'s still valid force clause. *United States v. Evans*, 848 F.3d 242, 247-48 (4th Cir. 2017)[8]; *Estell v. United States*, 924 F.3d 1291 (8th Cir. 2019); *United States v. Jackson*, 918 F.3d 467, 486 (6th Cir. 2019); *United States v. Cruz-Rivera*, 904 F.3d 63 (1st Cir. 2018); *United States v. Gutierrez*, 876 F.3d 1254 (9th Cir. 2017) (per curiam); *United States v. Jones*, 854 F.3d 737, 740–41 (5th Cir. 2017). Because Basham's § 924(c) conviction rests on the clearly qualifying carjacking resulting in death predicate, it does not matter whether kidnapping resulting in death qualifies as a crime of violence predicate after *Davis*.

Count 6 of the superseding indictment in this case charged Basham with using and carrying a firearm during and in relation to two predicate crimes of violence: carjacking resulting in death, as charged in Count 1 of the indictment; and kidnapping resulting in death, as charged in Count 2 of the indictment. *See* Superseding Indictment, at pp. 1, 2 and 11. The court instructed the jury in the guilt phase that "if you find the defendant guilty on either Count 1 or Count 2, the third element

---

[8]To the extent, Basham argues *Torres-Miguel* renders carjacking outside the force clause, he is mistaken. *Evans* was decided five years after *Torres-Miguel* and the court explicitly noted that its conclusion that carjacking falls within the force clause was "not altered by our decision in *Torres–Miguel*." *See Evans*, at 848 F.3d at 247.

[crime of violence] of Count 6 will be met." Vol. XII of trial transcript at. 208. The jury found Basham guilty of all eight counts in the superseding indictment. Dkt. 766.

Pursuant to *Yates v. United States*, on direct appeal, when a general verdict on a criminal charge rests on alternative theories, one valid and the other invalid, the verdict must be set aside only if it is "impossible to tell which ground the jury selected." 354 U.S. 298, 312 (1957); *see also United States v. Ellyson*, 326 F.3d 522, 531 (4th Cir. 2003). A *Yates* alternative-theory error is subject to ordinary harmlessness review, and the relevant appellate inquiry is whether the error was harmless beyond a reasonable doubt. *See Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008); *see also Skilling v. United States*, 561 U.S. 358, 414 & n. 46 (2010) (recognizing that harmless error analysis applies to alternative-theory error cases on direct appeal); *United States v. Jefferson*, 674 F.3d 332, 361 (4th Cir. 2012). Accordingly, a court is not entitled to reverse a conviction that could rest on either a valid or invalid legal theory if the court can conclude "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999). Put another way, the *Yates* error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 15 (internal quotation marks omitted). By way of example, if the evidence the jury "necessarily credited in order to convict the defendant under the instructions given ... is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed." *United States v. Hastings*, 134 F.3d 235, 242 (4th Cir.1998).

As set forth above, the § 924(c) carjacking resulting in death and kidnapping resulting in death predicate crimes were inextricably intertwined—they both involved the same core set of facts involving the initial abduction of Alice Donovan at gun point by Basham in the Wal-Mart

parking lot followed by the continued carjacking and kidnapping (and rape) of Donovan which eventually lead to her death at the hands of Basham and Fulks. As a result, it strains credulity to believe Basham's jury could have concluded that Basham was guilty of using a firearm during and furtherance of the kidnapping resulting in death of Alice Donovan on November 14, 2002, without at the same time also concluding that he did so during and in furtherance of the carjacking resulting in death of Alice Donovan on November 14, 2002. *See Johnson v. United States*, 2019 WL 1790218, at *6 (C.D.Cal. 2019) (rejecting § 2255 attack on § 924(c) based on *Davis* because predicates—conspiracy to commit Hobbs Act robbery and substantive Hobbs Act robbery—were inextricably intertwined). This is further evidenced by the jury finding Basham guilty of both the carjacking resulting in death and kidnapping resulting in death counts. *See United States v. John*, 2017 WL 318804, at *1 n.1 (E.D.N.Y. 2017) (rejecting attack on § 924(c) conviction based on district court's failure to instruct jury to unanimously agree on which of four predicate crimes supported verdict: "Since, however, the jury validly reached a unanimously guilty verdict on every predicate crime alleged, the erroneous jury instruction was necessarily harmless."). Therefore, even if this court were to find kidnapping resulting in death no longer constitutes a § 924(c) predicate crime of violence, Basham cannot meet his burden of proving the likelihood that the jury based its § 924(c) verdict solely on that predicate and not also on the other clearly valid predicate offense identified in the § 924(c) count—carjacking resulting in death.

Where a § 924(c) verdict firmly rests on a clearly qualifying predicate offense, there is no concern about a possible defect in an alternative crime of violence predicate when the predicates are inextricably intertwined. *See United States v. Vasquez*, 672 Fed.Appx. 56, 61 (2d Cir. 2016) (affirming § 924(c) convictions based on valid drug trafficking crime predicates even if alternative Hobbs Act robbery conspiracy predicate was invalid because there was no possibility that § 924(c)

verdicts rested only on robbery conspiracy predicate given that agreement to rob was inextricably intertwined with and in furtherance of drug trafficking crimes). Here, Basham's § 924(c) conviction was supported by the carjacking resulting in death predicate, which presents no legal problem. *See Evans*, 848 F.3d at 247-48 ("Evans' crime of conviction, carjacking resulting in bodily injury in violation of Section 2119(2), is categorically a crime of violence under the force clause of Section 924(c)(3)"). This case does not present an instance where there is uncertainty about whether the jury based its § 924(c) conviction on only one of the predicates. Under the circumstances, there is no reasonable construction of the evidence that would lead to the conclusion that the use of the firearm related only to the kidnapping of Alice Donovan and not also to the carjacking of Alice Donovan. Therefore, it is inescapable the jury based it § 924(c) verdict on both the carjacking and kidnapping resulting in death predicates.

Equally important, in the context of a successive § 2255 motion, Basham cannot meet his burden to prove the likelihood that the jury based its § 924(c) conviction solely on the supposedly invalid kidnapping resulting in death predicate. *Jacobs*, 350 F.2d at 574; *Miller*, 261 F.2d at 547. No reasonable review of the record supports such a conclusion. Regardless of whether Basham's kidnapping resulting in death categorically qualifies as a crime of violence under § 924(c)(3)(A)'s elements clause, his other charged predicate—carjacking resulting in death—remains a valid § 924(c) predicate after *Davis*. Basham, as the movant, bears the burden of proving by a preponderance that he was found guilty of § 924(c) solely on the kidnapping resulting in death predicate, and not also on the other valid predicate offense identified in the § 924(c) count (carjacking resulting in death). *See Beeman*, 871 F.3d at 1222; *In re Moore*, 830 F.3d at 1272. Basham cannot meet this burden and his § 2255 must be denied.

**Argument 3:**        **Even if the court were to vacate Basham's § 924(c) conviction, vacating Basham's death sentences on Counts 1 and 2 would not be warranted.**

Finally, even if this court were to find Basham's § 924(c) conviction were invalid in light of *Davis*, the appropriate result would be to vacate only the conviction and sentence for the § 924(c) count and leave the rest of the sentences, including the death sentences, in place. *See United States v. Hadden*, 475 F.3d 652, 661 (4th Cir. 2007) ("[T]he goal of § 2255 review is to place the defendant 'in exactly the same position he would have been' had there been no error in the first instance").

The Fourth Circuit has made clear a district court, in granting relief and vacating a § 924(c) conviction and sentence in a § 2255 proceeding, may strike the § 924(c) sentence and leave the remaining sentence intact. *Id.* at 669 ("the district court itself—by striking the § 924(c) sentence and reentering the remaining sentence—indicated that it was satisfied with the resulting sentence"). That is what this court should do if it were to find Basham's § 924(c) conviction invalid. The court has broad and flexible power under § 2255 to determine the nature and scope of the remedial proceedings in the first instance, and nothing forbids it from doing what the text of § 2255 clearly permits: "'correct[ing]' a prisoner's unlawful sentence without conducting a formal "resentenc[ing].'" *Id.* (internal citation omitted) (quoting *United States v. Hillary*, 106 F.3d 1170, 1171 (4th Cir. 1997)); *see also United States v. Louthain*, 771 Fed.Appx. 208, 209 (4th Cir. 2019) (finding no abuse of discretion in § 2255 proceeding when district court left unchanged the sentences on the remaining counts "not impacted by the armed career criminal designation").

Basham claims the "sentencing package doctrine" requires he receive a full resentencing if his § 924(c) conviction is vacated. *See* Dkt. # 1616, at pp. 36-37. Basham is incorrect for at least two reasons. First, even if this court were to vacate the § 924(c) conviction, there is no basis

38

for such a ruling to warrant amendment of Basham's death sentences or his other sentences. Pursuant to § 2255, the appropriate approach would be a correction of Basham's sentence by vacating the § 924(c) portion of the sentence consecutive to the death sentences and leaving the remainder of the sentences (including the death sentences) intact. *Hadden*, 475 F.3d at 669. This is not an instance where there is a strong likelihood that the district court crafted a disposition in which the sentences on the various counts formed part of an overall plan that would come unraveled with the vacating of the § 924 conviction. *See United States v. Ventura*, 864 F.3d 301, 309 (4th Cir. 2017). In this case, the district court simply imposed the maximum sentences it could under the law and ran them all consecutive. Thus, the sentencing package doctrine has no application in the present case.

Second, the sentencing package doctrine typically applies when a court of appeals vacates a sentence and remands to the district court for resentencing. *Id.* at 309. Where, as here, the district court itself would be exercising its discretion to correct a sentence pursuant to § 2255, rather than being mandated to do so by an appellate court on review, it does not apply. In *Hadden*, the Fourth Circuit noted this distinction:

> We do not deny that the sentence-package theory has support in our case law. The sentence-package theory, however, does not help Hadden. Here, we -- the appellate court -- did not conclude that Hadden's original sentence was unlawful, vacate that sentence, and remand to the district court; instead, the district court itself -- by striking the § 924(c) sentence and reentering the remaining sentence -- indicated that it was satisfied with the resulting sentence.

475 F.3d at 669. In short, the sentencing package doctrine is of no help to Basham.

Even if this court were to determine the § 924(c) conviction was invalid, the court should vacate only the § 924(c) conviction and sentence and leave the remainder of Basham's sentence undisturbed because the § 924(c) <u>conviction</u> had no impact on the imposition of the death

sentences. In Basham's sentencing phase the jury returned independent verdicts of death against

Basham on both Counts 1 (carjacking resulting in death) and 2 (kidnapping resulting in death),

and the district court imposed independent, concurrent death sentences on those counts. Dkt. #s

805 and 806 (special verdict forms); Dkt. # 886 (judgment).

Basham's death sentences on his carjacking resulting in death and kidnapping resulting in

death counts were rendered by the sentencing jury without reference to Basham's other counts of

conviction. At no point was the jury instructed to consider the § 924(c) conviction in deciding

whether to impose the death penalty.

Basham, however, argues the jury did consider his § 924(c) conviction and that

consideration undermined the validity of the penalty phase of his capital trial. *See* Dkt. # 1616, at

pp. 36-40. Basham is mistaken when he makes this assertion that the jury considered his § 924(c)

conviction in deciding to impose the death penalty. As noted above, the district court instructed

the jury at the beginning of the penalty phase that any death sentence would be based on the

convictions under Count 1 and Count 2 alone:

> You have unanimously found the defendant guilty of all eight counts in the indictment. **For purposes of your participation in this proceeding, however, we need to focus only on the first two counts.** The first two counts charge Mr. Basham with offenses for which the penalty is either life imprisonment without the possibility of release or death. These two offenses are: Count one, carjacking, resulting in death; and Count two, kidnapping, resulting in death.

Vol. XV of trial transcript at p. 15 (emphasis added); *see also id.* at 16 ("After the opening

statements, the government will go first and introduce evidence that it feels authorizes or justifies

the imposition of the death penalty for each of the two charges as to which Mr. Basham was found

guilty."); *id*. at 33 ("The law requires you to weigh these factors and to decide whether you are

40

unanimously persuaded that the aggravating factors sufficiently outweigh any mitigating factors to justify imposing a sentence of death. You should decide this with regard to each of the two counts of the indictment."); *id.* at 34 ("You must consider the weight and value of each factor and make your decision accordingly as to each count.").

Similarly, in its final instruction, the court instructed the jurors that their verdict as to life imprisonment or death was as to Counts 1 and 2:

> As you know, the defendant has been found guilty of two offenses for which the death penalty is available: carjacking, resulting in death, and kidnapping, resulting in death. You will have to decide the appropriate punishment and return individual verdicts for each of the two counts. The instructions I give you today apply, equally, to both counts.

Vol. XXIX of trial transcript at p. 193. *Id.* at 201 ("You must decide, in regard to both offense, whether the aggravating factors, which you have found to exist, sufficiently outweighs the mitigating factors found to exist for that offense."). The court additionally explained to the jury that it had prepared "two verdict forms that detail special findings that you are asked to make, and the possible decisions you can render as to each of the offenses to which the defendant has been found guilty." *Id.* at p. 194.

The court made clear the jury could "only consider evidence, including testimony, documents, and stipulations between the parties received in this courtroom, in making your determination." Id. at 195. Later, the court emphasized: "Your verdict must be based solely on the evidence presented in this courtroom and in accordance with my instructions." Id. at 233. There is a strong presumption jurors follow their instructions. *See Penry v. Johnson*, 532 U.S. 782,

41

799 (2001); *United States v. Gillon*, 704 F.3d 284, 297 (4th Cir. 2012). There is no reason to stray from the presumption here.[9]

Basham specifically claims the government supposedly relied upon his § 924(c) conviction in its closing argument in the penalty phase. *See* Dkt. 1616, at p. 38 ("In closing argument the prosecutor urged jurors to find the statutory aggravating factors existed, and thereafter sentence Mr. Basham to death, based only on the evidence and convictions from the guilt phase."). Basham is incorrect. Basham takes a far too myopic view of the government's remarks. A full review of the relevant passage, *see* Vol. XXIX of trial transcript at 52-56, reveals nothing argued in that passage relied upon Basham's § 924(c) conviction. First, all the facts recounted in the argument were supported separately from Basham's § 924(c) conviction. More importantly, a fair reading of the argument makes clear the "convictions" referenced in the argument were the convictions for carjacking resulting in death and kidnapping resulting in death. Vol. XXIX of trial transcript at 53 ("you have convicted Brandon Basham and, he has admitted in statements that he knowingly engaged in the act of kidnapping and act of carjacking"); *id.* at 55-56 ("And, ladies and gentlemen, you have convicted Brandon Basham. He is guilty of kidnapping, resulting in death; he is guilty of carjacking, resulting in death. Not only as a matter of fact, but as a matter of law. You have

---

[9] The special verdict forms, moreover, required the jury to weigh the aggravating and mitigating factors separately for Counts 1 and 2 and to impose separate sentences on each death-eligible count. The jury, therefore, necessarily determined that a death sentence was warranted on Count 1 without regard for the Count 2 conviction and certainly without regard to the § 924(c) conviction. *Cf. United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999) (remand for resentencing required because "[t]he jury did not make separate recommendations concerning the appropriate penalties for each count of conviction" and therefore it was "impossible to say that the jury's penalty phase recommendations of the death penalty were not influenced by the fact that [defendants] had received three death eligible convictions, rather than two").

convicted him of those two charges.  So, either one of those two are clearly present by your previous verdicts, and by the testimony of the witnesses and the admission of the defendant.").[10]

Likewise, the facts supporting the § 924 convictions did not taint the jury's death sentences. The jury was instructed to consider evidence, including testimony, documents, and stipulations between the parties received in the courtroom in the penalty phase, in making its determination about the death penalty and that their verdict had to be based on the evidence presented in the courtroom in accordance with the court's instructions.

This is not a case where a supposedly invalid conviction resulted in the admission of additional prejudicial evidence against the defendant.  There is no question that evidence supporting the § 924(c) conviction had no spillover effect on the jury's determination to impose the death penalty on Counts 1 and 2.  The evidence introduced by the government supporting the imposition of the death sentence in the penalty phase would not have changed if the § 924(c) count had not existed.  Basham has not pointed to any specific evidence admitted in the penalty phase that would have been inadmissible if the § 924(c) count had not been charged.  *See United States*

_____

[10] Basham's reliance on *Johnson v. Mississippi*, 486 U.S. 578 (1988), is also misplaced. In *Johnson*, the Supreme Court invalidated a death sentence where the "sole evidence" supporting one of the aggravated circumstances that led to the imposition of the death sentence was a prior felony conviction that was later reversed. *Id.* at 581.  In *Johnson*, no facts regarding the underlying conviction were introduced.  Only a certified copy of a state court conviction was introduced. Additionally, in *Johnson*, at the sentencing hearing the prosecutor repeatedly referred to the certified conviction document that had officially committed the defendant to prison in New York. *Johnson* is not applicable to Basham's case for at least the following reasons: (1) Basham's § 924 conviction were not presented to the jury for consideration as evidence or otherwise; (2) the § 924 conviction was not a basis to support any of the statutory or non-statutory aggravating factors found by the jury; (3) the prosecution did not repeatedly refer to Basham's § 924 conviction during the penalty phase; and (4) the government presented  overwhelming evidence regarding the carjacking and kidnapping resulting in Alice Donovan's death—which was admitted to by Basham's counsel in his opening statements and closing arguments—and that evidence would have been introduced even if Basham had never been charged with or convicted of his § 924(c) charge.

43

*v. Hornsby*, 666 F.3d 296, 311 (4th Cir. 2012) (on direct appeal, court found no spillover prejudicial effect caused by reversed counts because defendant "has not pointed this Court to any specific evidence admitted at his trial that would be inadmissible at a trial only for the [valid] counts"); *United States v. Livingston*, 63 Fed.Appx. 106, 107 (4th Cir. 2003) (finding that the defendant's remaining convictions should not be vacated because there was no prejudicial spillover from evidence supporting the dismissed counts: "The evidence in support of the reversed counts and the remaining counts was identical.")

Additionally, the carjacking statute, 18 U.S.C. § 2119, and the kidnapping statute, 18 U.S.C. § 1201, do not use the phrase "crime of violence," and *Davis* has no bearing on convictions under those statutes. Accordingly, regardless of the post-*Davis* validity of Basham's § 924(c) conviction, the court should leave intact his death sentences on Counts 1 and 2. *See United States v. Nguyen*, 829 F.3d 907, 922 (8th Cir. 2016) (remand for resentencing unnecessary where district court imposed concurrent sentences on other properly obtained counts of conviction); *United States v. Fike*, 82 F.3d 1315, 1328 (5th Cir. 1996) (remand for resentencing unnecessary after vacatur of one count where defendant received separate life sentence on another count), overruled on other grounds by *United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) (en banc).

Basham cannot meet his burden to show his § 924(c) conviction had any impact on his death sentences. Therefore, even if this court were to vacate Basham's § 924(c) conviction in light of *Davis*, no resentencing is warranted and the court should leave in place the death sentences on Counts 1 and 2.

V.    **CONCLUSION**

The court should deny Basham's § 2255 motion and enter judgment in favor of the United States   First, both carjacking resulting in death and kidnapping resulting in death remain crimes

of violence under the force clause of § 924(c)(3)(A) even after *Davis*. Second, even if kidnapping resulting in death were to no longer qualify as a crime of violence predicate for § 924(c), carjacking alone still supports Basham's § 924(c) conviction. Finally, even if this court were to find that Basham's § 924(c) conviction was invalid in light of *Davis*, the appropriate result would be to vacate only the sentence for that count and leave the rest of the sentences, including the death sentences, in place.[11] For these reasons, Basham's § 2255 motion is without merit.

**[SIGNATURE FOLLOWING]**

---

[11]Alternatively, the court should also dismiss the § 2255 motion because Basham procedurally defaulted his *Davis* claim by failing to raise a vagueness objection to his § 924(c) conviction at sentencing and on direct appeal. *See Massaro v. United States,* 538 U.S. 500, 504 (2003); *Murray v. Carrier,* 477 U.S. 478, 490-92 (1986). If a prisoner cannot show both cause for his procedural default and actual prejudice, a court should not consider his challenge unless he can demonstrate "actual innocence." *Bousley v. United States,* 523 U.S. 614, 620-24 (1998).

Basham has no cause to excuse his default. A vagueness challenge to § 924(c)(3)(B), while perhaps unexpected before *Johnson v. United States*, 135 S. Ct. 2551 (2015), was not "novel." *See, e.g.*, *Dugger v. Adams*, 489 U.S. 401, 409-410 (1989) (finding that a claim was not novel where "the legal basis for a challenge was plainly available"). The foundational principle undergirding *Davis*—vague criminal laws violate due process—existed for nearly a century before that case was decided. *See, e.g.*, *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Fulks/Basham clearly had all of "the tools to construct" a constitutional vagueness challenge to § 924(c)(3)(B) before *Davis*. *See Engle v. Isaac*, 456 U.S. 107, 133 (1982). Furthermore, even if a claim is futile based upon prior binding precedent, that does not constitute cause. *See Bousley,* 523 U.S. at 623.

Finally, Basham cannot establish actual prejudice or actual innocence. In the context of the procedural bar, "[t]o establish actual innocence, petitioner must demonstrate that, 'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have convicted him.'" *Bousley*, 523 U.S. at 623 (quoting *Schlup v Delo*, 513 U.S. 298, 327-28 (1995)). Basham's § 924 conviction was predicated on carjacking resulting in death and kidnapping resulting in death. Carjacking clearly qualifies as a crime of violence under the still valid force clause of § 924(c)(3)(A). *See United States v. Evans*, 848 F.3d 242 (4th Cir. 2017). Because the carjacking resulting in death offense was inextricably intertwined with the kidnapping resulting in death, Basham cannot establish actual prejudice or actual innocence.

45

Respectfully submitted,

SHERRI A. LYDON
UNITED STATES ATTORNEY

*/s/Robert F. Daley, Jr.*
Robert F. Daley, Jr. (ID # 6460)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
Tel.:    (803) 929-3054
Fax:    (803) 929-3135
Email:  Bob.Daley@usdoj.gov

October 1, 2019

IN THE UNITED STATES DISTRICT COURT
FOR THEDISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 4:02-CR-00992-JFA |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| BRANDON L. BASHAM, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The undersigned assistant united states attorney hereby certifies that he has caused service of the **SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO BASHAM'S SUCCESSIVE § 2255 MOTION AND IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** by a paralegal specialist employed in the office of the United States Attorney for the District of South Carolina who is a person of such age and discretion as to be competent to serve papers**.**

That on October 1, 2019, my Paralegal served a copy of the foregoing documents by ECF on the following:

Leticia Marquez, Esquire
Lindsey Layer, Esquire
Federal Public Defenders Office (AZ)
407 W. Congress Street, Suite 501
Tucson, AZ 85701
Email:  leticia_marquez@fd.org
Email:  Lindsey_Layer@fd.org

Respectfully submitted,

SHERRI A. LYDON
UNITED STATES ATTORNEY

*/s/Robert F. Daley, Jr.*
Robert F. Daley, Jr. (ID # 6460)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, SC 29201
Tel.:    (803) 929-3054
Fax:    (803) 929-3135
Email:  Bob.Daley@usdoj.gov

47